# Exhibit A

# Exhibit A

SHEILA GIANELLI
1604 N. Stockton Street
Stockton, CA 95203
(209) 684-2290

Plaintiff in Pro Per

Electronically Filed
Superior Court of California
County of San Joaquin
2021-01-29 09:05:40
Clerk: Kristy Kobus

Case Management Conference
07/28/2021 08:45 AM in 10D

STK-CV-UMR-2021-0000849

# SUPERIOR COURT OF CALIFORNIA

## SAN JOAQUIN COUNTY

| | |
|---|---|
| SHEILA GIANELLI,<br><br>        Plaintiff,<br><br><br><br>    vs<br><br><br><br>RONALD STEVEN SCHOENFELD, DEBRA LEE SILVER, LANCE SCHULTZ, NICK DUJMOVICH, PACIFIC GAS & ELECTRIC COMPANY, a California corporation, and Does 1 through 10,<br><br>        Defendants. | CASE NO:<br><br>**COMPLAINT**<br><br><br><br><br>Trial Date:  None Set |

- 1 -

COMPLAINT
GIANELLI V. SCHOENFELD, ET AL.

# **Table of Contents**

NATURE OF ACTION ................................................................................................3

PARTIES ...................................................................................................................4

VENUE AND JURISDICTION ..................................................................................5

BACKGROUND AND FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION ........5

EXHAUSTION OF ADMINSTRATIVE REMEDIES ..............................................14

FIRST CAUSE OF ACTION VIOLATION OF CALIFORNIA ...............................14

LABOR CODE SECTION 1102.5 ............................................................................14

SECOND CAUSE OF ACTION FOR ADVERSE EMPLOYMENT ACTION IN VIOLATION OF PUBLIC POLICY (*TAMENY* CLAIM) ..............................................16

THIRD CAUSE OF ACTION DISCRIMINATION BASED ON SEX IN VIOLATION OF FEHA [Govt. Code Section 12940 et seq.] ...............................................17

FOURTH CAUSE OF ACTION UNLAWFUL RETAILIATION IN VIOLATION OF FEHA [Govt. Code Section 129409(h)] ....................................................20

FIFTH CAUSE OF ACTION FOR VIOLATION OF RICO, 18 U.S.C. § 1962(c) ..................21

SIXTH CAUSE OF ACTION FOR VIOLATION OF RICO, 18 U.S.C. § 1962(d) ...............23

SEVENTH CAUSE OF ACTION FOR VIOLATION OF THE CALIFORNIA EQUAL PAY ACT, AS AMENDED CAL. LABOR CODE § 11975.5 AND THE FEDERAL EQUAL PAY ACT, 29 U.S.C. § 206(d) ..................................................24

EIGHTH CAUSE OF ACTION FOR CIVIL CONSPIRACY ..................................25

PRAYER FOR RELIEF ...........................................................................................26

COMPLAINT
GIANELLI V. SCHOENFELD, ET AL.

Plaintiff, Sheila Gianelli, alleges as follows:

**NATURE OF ACTION**

1. Ms. Gianelli was hired by PG&E in December of 2013.  In the summer of 2014 her third level supervisor, Defendant Lance Schultz, ("SCHULTZ") asked her to review her first level supervisor's transportation budget, as it was one million dollars over budget at the end of May 2014.  Immediately after reviewing the budget and supporting information, Ms. Gianelli discovered and thereafter reported a criminal conspiracy which was defrauding PG&E of millions of dollars annually to the company's Compliance and Ethics helpline in August of 2014.  Ms. Gianelli was then interviewed by the Federal Bureau of Investigations. Federal felony charges were filed against one of the perpetrators of the fraud, Defendant Ronald Schoenfeld ("SCHOENFELD").  He plead guilty to one count of Conspiracy to Commit Wire Fraud, a felony under 18 U.S.C. § 371 in case number 2:20-cr-00150-KJM in the United States District Court for the Eastern District of California.  SCHOENFELD admitted he formed a conspiracy with his cousin, Defendant Debra Silver ("SILVER") to establish an entity, All American Logistics, LLC, ("AAL") for the purpose, and in furtherance, of defrauding Defendant PG&E.  In January of 2021, SCHOENFELD was sentenced to twenty-two months in federal prison and ordered to pay $1.4 million in restitution.  The criminal conspiracy had been effective from 2006 to 2014, costing PG&E an estimated $8.7 million.

2. Shortly after Ms. Gianelli reported the criminal activity in 2014, she was retaliated against by her second and third level supervisors.  Her second level supervisor, Defendant Nick Dujmovich, ("DUJMOVICH"), met with Ms. Gianelli and her first level supervisor.  Both reported to DUJMOVICH the circumstances and evidence of the criminal enterprise. DUJMOVICH, who was a close personal friend of SCHOENFELD's, refused to report it

further.  Ms. Gianelli, after waiting ten (10) days, was forced to report the criminal enterprise to the Compliance and Ethics Hot Line.  DUJMOVICH thereafter told Ms. Gianelli directly that she had "made the mess, so she had to clean it up."  He blamed her, and directed her to rebuild the entire transportation sourcing and management process, a task with responsibilities and qualifications three grade levels above her then current position. When Ms. Gianelli responded to him that the criminal conspiracy was not her fault, and that she was doing work above her pay level, he told her that her concerns were, in his words, just a "Bitch Session."

3.   Her third level supervisor, SCHULTZ, upon hearing Ms. Gianelli's concerns about the potential fraud, criminal activity, and that she was being retaliated against by DUJMOVICH, simply and directly stated to her, "[she] should not have reported it."  SCHULTZ refused to do anything to help Ms. Gianelli, approving and joining in DUJMOVICH's retaliation, including, but not limited to approving the lowest performance reviews, bonus payouts, and performance raises possible.

4.   Ms. Gianelli endured this retaliation from her direct supervisors, being defamed by them to the entire organization, being ostracized by her colleagues, and the emotional distress of bearing the burden of opposing criminal conduct alone.  Ms. Gianelli finally escaped the corrupt, unethical, and sexist supply chain organization at PG&E on August 7, 2017.

## **PARTIES**

5.   Plaintiff, Sheila Gianelli, is an individual residing in San Joaquin County.

6.   Ms. Gianelli is informed and believes, and thereon alleges SCHOENFELD was, at all times relevant herein, a resident of the State of California.

7.   Ms. Gianelli is informed and believes, and thereon alleges SILVER was, at all times relevant herein, a resident of the State of California.

- 4 -

8.  Ms. Gianelli is informed and believes, and thereon alleges SCHULTZ was, at all times relevant herein, a resident of the State of California.

9.  Ms. Gianelli is informed and believes, and thereon alleges DUJMOVICH was, at all times relevant herein, a resident of the State of California.

10. Ms. Gianelli is informed and believes, and thereon alleges, that PG&E is a corporation organized and existing under the laws of the State of California with its principal place of business in San Francisco, California.

## VENUE AND JURISDICTION

11. Venue is appropriate in Superior Court for the County of San Joaquin as it is the principal place of business for the Defendant AAL, the place of residence for Ms. Gianelli, and SILVER, as well as a place of business for PG&E, and the individual defendants were/are employees or independent contractors of PG&E during all relevant times employed and/or doing business in San Joaquin County.

12. This Complaint has common issues of fact and law such that this court should exercise concurrent jurisdiction over the federal causes of action.

## BACKGROUND AND FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

13. In November of 2006, SCHOENFELD and SILVER, who are cousins, formed a criminal enterprise.  The terms of the criminal enterprise are identified and admitted to by a co-conspirator, SCHOENFELD more particularly described in his Plea Agreement in his criminal case listed above and attached at Exhibit A to this Complaint.

14. As admitted by SCHOENFELD, he was hired by PG&E in August of 2006, and his co-conspirator cousin SILVER established the entity AAL in November, 2006.  SILVER

- 5 -

offered to pay SCHOENFELD 2.5% of the value of all contracts he procured for her from PG&E.  SCHOENFELD accepted.  On May 23, 2007, SCHOENFELD created a corporation, Diversity Transportation, Inc. to facilitate kickback payments from AAL.  From May 2007 to September 2014, SCHOENFELD received at least $1,476,295.15 in kickback payments from AAL for the aid he provided SILVER.  SCHOENFELD caused payroll checks to be issued to his various financial accounts, and then wired money from those accounts to pay for his personal expenses, notably on March 16, 2015 and April 14, 2015 to his American Express card.  These funds were proceeds of the conspiracy with SILVER. SCHOENFELD was aware his kickback arrangement was not allowed by PG&E, and he took active steps to conceal his relationship with SILVER and AAL from PG&E.  He avoided having social meetings at locations where other PG&E employees might be present. SCHOENFELD used personal electronic mail to communicate with SILVER regarding payments to be made pursuant to the scheme to conceal their actions from PG&E.  Money from this conspiracy received by AAL and SILVER originated in Louisiana, passed through Virginia or Texas, and were ultimately deposited in accounts in California controlled by AAL and SILVER.  The criminal conspiracy as described above is referred to as the "Criminal Enterprise."

15.  Three (3) individuals at PG&E moved from a private employer in the State of Michigan to take jobs in the Supply Chain organization at PG&E.  This group was referred to by employees in the Fleet Chain organization as the "Michigan Mafia."  SCHOENFELD joined this group, and met with them frequently outside of PG&E facilities, usually weekly. DUJMOVICH was a member of the "Michigan Mafia."  After Ms. Gianelli reported the Criminal Enterprise and SCHOENFELD was fired, the remaining three (3) members (or original members) left PG&E and work for the same employer in Texas, including

- 6 -

DUJMOVICH.

16. In 2013, Ms. Gianelli interviewed for a two different Manager positions at PG&E in the Supply Chain/Materials organization.

17. Ms. Gianelli has a B.S. in Industrial Engineering from Purdue University and an M.B.A from University of the Pacific.  She has 27+ years' experience in Supply Chain Management including 6 years at the Director level.

18. During the interview process for the Distribution Manager Position, Vice President Gun Shim posed the question, "That is a male dominated department, how would you handle yourself over there?"  VP Shim was referencing that the Director, SCHULTZ does not now, nor to Ms. Gianelli's knowledge, has ever had a female direct report under him.  Ms. Gianelli was not offered the Distribution Manager position, which was offered to, and accepted by, a male.  She was, however, offered interview for a Transportation Manager position.

19. Ms. Gianelli proceeded with the interview process for the Transportation Manager position. She was interviewed by SCHOENFELD and DUJMOVICH, who stated they were the decision makers for the hire.  The explained she was in the running for the position with one other person.  Ms. Gianelli was not offered the Transportation Manager position, which was offered to, and accepted by, a male, Jim Henderson.

20. DUJMOVICH thereafter contacted Ms. Gianelli and pursued her for another position, albeit the lowest position he could offer.  He stated the organization needed her expertise and experience, and repeatedly enticed her to join the organization.  After several discussions with DUJMOVICH she did accept PG&E's offer for the position of Analyst in the Supply Chain organization.

21. Ms. Gianelli's immediate supervisor was the person she had interviewed against for the

Transportation Manager position, Jim Henderson.  DUJMOVICH became her second level supervisor, and SCHULTZ her third.

22.  At the inception of this position, two items became immediately clear to Ms. Gianelli.  One, Mr. Henderson had no experience or knowledge for the position in which he was hired, and two, DUJMOVICH repeatedly told Ms. Gianelli not to look at anything associated with Transportation and SCHOENFELD.  At the time of this statement, 2013-14, SCHOENFELD had procured almost $80 million to AAL and was responsible for sending AAL and SILVER tens of millions annually.

23.  Mr. Henderson, as Manager, had oversight of a multi-million dollar transportation budget.  A large portion of which was being serviced under the Criminal Enterprise.  Immediately after hiring Mr. Henderson, knowing his actions would go unquestioned, SCHOENFELD ratcheted up the profit for the Criminal Enterprise.  In January 2014, SCHOENFELD increased the amount PG&E paid AAL for moving transformers from one vehicle to another from $125 per unit to $275 per unit.  SCHOENFELD unilaterally did this, and Mr. Henderson did not question it.  In March of 2014, SCHOENFELD increased the rates PG&E paid to AAL from $1.30 per mile to $1.60 per mile, again, without any approvals from Mr. Henderson, and again, without any questioning from Mr. Henderson.

24.  At this point, Mr. Henderson's transportation budget was on pace to be over by $2 million at year's end.  This red flag alerted PG&E, who in turn raised the issue with the Director of the Supply Chain/Materials organization, SCHULTZ.  After being unable to determine the cause of the over-budget issue with anyone else in his organization, SCHULTZ directed Ms. Gianelli to examine it.

25.  In the summer of 2014, Ms. Gianelli, at the direction of SCHULTZ, Ms. Gianelli for the first time had oversight of the transportation budge subject to Criminal Enterprise.  Within days

- 8 -

Ms. Gianelli had acquired evidence of unethical and irregular procurement. Ms. Gianelli conveyed her findings to her colleague, Mario Carrasco, who agreed to accompany her to a meeting with SCHOENFELD to inquire directly with him about the irregularities. SCHOENFELD admitted to authorizing the irregularities, stating he had to do it alone as Mr. Henderson, who should have been involved in the approval, "had no idea what he was doing." SCHOENFELD had just hired Mr. Henderson months earlier. After SCHOENFELD and Mr. Carrasco had left the room and I was alone, SCHOENFELD returned and cornered me in the room. He asked a couple of times to Ms. Gianelli, "if he and I were ok?" meaning if Ms. Gianelli was willing to "look the other way." Ms. Gianelli, fearing for her safety, replied, "sure, we are ok," and exited the office and facility as fast as she could.

26. Ms. Gianelli then raised her concerns to her first level manager, Mr. Henderson. He agreed to assist Ms. Gianelli with bringing her concerns forward to PG&E. They both met with DUJMOVICH, a personal friend and member of the "Michigan Mafia" with SCHOENFELD. At this meeting, it was immediately apparent DUJMOVICH was covering for SCHOENFELD. Ms. Gianelli and Mr. Henderson left it with DUJMOVICH, as their supervisor, to report the issues to PG&E. DUJMOVICH did not report it. Ever. Instead, he covered for his friend, SCHOENFELD and the Criminal Enterprise.

27. After ten (10) days, Ms. Gianelli's character mandated she act. She unilaterally reported the Criminal Enterprise to the PG&E Ethics and Compliance hot line. Immediately, the Internal Audit division opened a case and started an investigation. The Internal Audit department requested Ms. Gianelli's assistance, without the knowledge of DUJMOVICH, and their investigation resulted in SCHOENFELD's termination from PG&E.

28. In his departure, SCHOENFELD and the "Michigan Mafia" group let it be known Ms.

- 9 -

Gianelli had lied, was wrong, and SCHOENFELD would be filing a wrongful termination lawsuit.

29. Her colleagues ostracized and shunned Ms. Gianelli.  SCHOENFELD had groomed relationships with people in the organization for years.  One particularly telling example relates to Mr. Henderson's predecessor, Jeff Thomas.  SCHOENFELD also had authority over procurement of PG&E's fleet vehicles, a spend of hundreds of millions.  Mr. Thomas, during a meeting with Ms. Gianelli and Mr. Henderson, directly offered, "Ya, Ron got me a great deal on my car with [a PG&E fleet vendor]."  The Criminal Enterprise had infiltrated the entire Supply Chain organization, and Ms. Gianelli was seen as the pariah and treated as such.

30. The diversity newsletter for PG&E, "Powered by Diversity", identified SILVER and AAL numerous times for awards.  It pronounced AAL the "Vendor of the Year" in 2009.  SILVER, in accepting these awards, thanked who she identified as her mentor, SCHULTZ.

31. After SCHOENFELD was fired and AAL contracts were terminated as a result of their Criminal Enterprise, Ms. Gianelli was directly retaliated against by SCHULTZ and DUJMOVICH.  DUJMOVICH thereafter told Ms. Gianelli directly that she had "made the mess, so she had to clean it up" - as if the Criminal Enterprise was her idea.  Nevertheless, he blamed her, and directed as a condition of her future employment, Ms. Gianelli to rebuild the entire transportation sourcing process, a task with responsibilities and qualifications multiple grade levels above her then current position.  When Ms. Gianelli responded to him that the criminal conspiracy was not her fault, and that she was doing work above her pay level, he told her that her concerns were, in his words, just a "Bitch Session."

32. Her third level supervisor, SCHULTZ, after Ms. Gianelli told him directly of the retaliation against her by DUJMOVICH, simply ignored her concerns and seemed to Ms. Gianelli not

to care at all about the retaliation.  SCHULTZ refused to do anything to help Ms. Gianelli, thereafter ratifying and approving DUJMOVICH's retaliation, including, but not limited to approving for her the lowest performance reviews, bonus payouts, and performance raises possible.  These reviews were just short of identifying Ms. Gianelli as an employee that failed to meet expectations of the role and thereby set her upon a path for termination for cause.  SHULTZ agreed that after Ms. Gianelli had saved company millions, alone helped effectuate the removal of the Criminal Enterprise, and rebuilt the system to prevent a reoccurrence of future fraudulent activities, she was deserving only of the bare minimum performance reviews and pay.

33.  Ms. Gianelli then took her requests to prohibit DUJMOVICH from retaliating to her to PG&E's human resources departments.  After several discussions with them, SCHULTZ moved Ms. Gianelli to a warehouse position in Fremont, California, a demotion in visibility to other company leadership and opportunity for professional growth.  This placement by SCHULTZ was intended to limit Ms. Gianelli's job responsibilities and professional growth, stifle the use of her 20+ years' experience in supply chain management, suppressing her visibility and convey the clear message to the entire organization of what happens to employees who identify criminal activities, and diminish to outright exterminate her ability to be promoted.

34.  Instead of stopping the retaliation of DUJMOVICH and censoring his illegal conduct, SCHULTZ approved the promotion of DUJMOVICH to Director under another member of the "Michigan Mafia", Dave Meisel.

35.  To avoid the continual retaliation, Ms. Gianelli was forced to seek roles outside of her area of expertise, supply chain management.  As further and continuous retaliation, SCHULTZ tried to stop her exit from his organization, refusing to agree to her taking a role outside his

organization.  However, human resources overrode his request and approved her new role, which was outside his control, on August 7, 2017.

36. Since escape from the sexist and corrupt Supply Chain/Materials organization, Ms. Gianelli's career with PG&E has flourished.  She has received "exceeds expectations" performance reviews and been promoted twice, all verifying the despicable treatment she was subjected to for three years as a direct result of exposing the Criminal Enterprise.

37. As a direct and proximate result of the Criminal Enterprise and retaliation, Ms. Gianelli suffered the following adverse employment actions, ("Adverse Employment Actions"):

   a. Ms. Gianelli was not hired into a role she was qualified for because the interviewers and decision makers were actively involved with, and subsequently plead guilty to, federal felonies for their ongoing criminal conspiracy to defraud PG&E of millions of dollars over a period of eight (8) or more years, only stopped by the actions of Ms. Gianelli to uncover and report the criminal activity.

   b. Suppression of any ideas, thoughts, plans, recommendations, such that her position with colleagues was undermined and her value to the company, and in the industry diminished.

   c. Ms. Gianelli was ostracized by her colleagues.

   d. Despite doing what no male could do or had done, despite having the opportunity to do; namely, uncover the evidence of fraud and criminal conspiracy which saved the Defendant company millions of dollars and resulted in a criminal conviction of federal felony charges, Ms. Gianelli received a "meets expectation" from the very supervisor, DUJMOVICH, that refused to report the criminal activity when Ms. Gianelli provided him clear, uncontroverted, and overwhelming evidence of criminal activity.  It is a grossly amoral and cowardly act to not only

fail to act in the face of clear criminal activity, but also to then retaliate against Ms. Gianelli by documenting in her personnel file by way of her annual review she "meets expectations"; her courageous actions were barely enough for her to remain employed with Defendant.  This review was written by DUJMOVICH and confirmed by SCHULTZ.

e.  In response to Ms. Gianelli placing her own person and family's safety at risk, the attendant emotional distress for standing up to the Criminal Enterprise and the "Michigan mafia", Ms. Gianelli was awarded the bare minimum cost of living increase.  This minimum cost of living raise was written by DUJMOVICH and approved by SCHULTZ.

f.  Ms. Gianelli informed SCHULTZ directly of the retaliation.  SCHULTZ refused to acknowledge or investigate Ms. Gianelli's well founded allegations of retaliation.  Ms. Gianelli was abandoned by SCHULTZ, her claims ignored, and she was forced to remain employed under DUJMOVICH, despite being directed, as a condition of employment, the task of rebuilding the system the SCHOENFELD had erected to embezzle millions.  Ms. Gianelli was forced to choose between staying in her current position and endure the ongoing retaliation or quit her employment.

g.  The following year Ms. Gianelli continued to complain of retaliation to human resources, SCHULTZ answered their request by physically moving her position to a warehouse in Fremont, California, a more difficult commute from the professional offices in San Ramon, California, and a demotion in terms of visibility and opportunity for professional growth.

h.  As a means to escape the retaliation short of quitting her job, Ms. Gianelli sought

- 13 -

1    out other positions in the company and secured a temporary assignment with

2    Mario Carassco.  SCHULTZ tried to stop Ms. Gianelli form taking a temporary

3    assignment opportunity at the onset and throughout the one year term of the

4    temporary assignment.  After an initial period of temporary assignment, Ms.

5    Gianelli requested release from SCHULTZ so she could accept the permanent

6    position with Mario.  As a means of further retaliation, SCHULTZ refused to

7    release Ms. Gianelli, demanding she return to her old position at the warehouse,

8    and reporting up the chain of command to SCHULTZ again.  Ms. Gianelli was

9    forced to fight and plead, begging to be released.  With the assistance and support

10    of Mr. Carassco, human resources intervened and allowed Ms. Gianelli's release

11    from SCHULTZ's organization and control.

## EXHAUSTION OF ADMINSTRATIVE REMEDIES

13  38.  Ms. Gianelli exhausted her administrative remedies or will exhaust her administrative

14    remedies by filing a complaint against Defendant company named herein with the California

15    Department of Fair Employment and Housing within three years from the date of Defendant

16    company's last adverse employment action, and thereafter receiving her "Right-to-Sue"

17    letter on January 23, 2021.

## FIRST CAUSE OF ACTION VIOLATION OF CALIFORNIA
## LABOR CODE SECTION 1102.5

21  39.  Ms. Gianelli repeats and repleads and incorporates by this reference, paragraphs 1 through

22    38 inclusive, above, as though fully set forth herein.

23  40.  California Labor Code Section 1102.5 prohibits retaliation by an employer against an

24    employee for disclosing, or because the employer believes the employee may disclose,

information to a government or law enforcement agency, to a person with authority over the employee, or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, if the employee has reason to believe that the information discloses a violation of state of federal stature, or a violation of a or noncompliance with a local, state, or federal rule or regulation.

41. Defendants took Adverse Employment Actions against Ms. Gianelli in substantial part because they believed she would disclose, and actually did disclose and provide the evidence of the Criminal Enterprise.

42. As a direct and proximate result of the acts of Defendants, as alleged above, Ms. Gianelli has suffered and will continue to suffer economic damages, including lost wages and other compensatory damage in an amount to ascertain at the time of trial.

43. As a further direct and proximate result of the acts of Defendants, as alleged above, Ms. Gianelli has suffered and will continue to suffer mental and emotional distress, including but not limited to humiliation, anxiety, nervousness, and depression and has been generally damaged in an amount to ascertained at the time of trial.

44. As a direct and proximate result of the acts of Defendants, as alleged above, Ms. Gianelli has and will incur attorneys' fees and costs in an amount to be proven at the time of trial. Pursuant to the provisions of Code of Civil Procedure Section 1021.5, or any other provision allowed by law, Ms. Gianelli is entitled to the reasonable value of such attorneys' fees and costs.

45. As a direct and proximate result of the conduct of Defendants, Ms. Gianelli was forced to incur or will incur substantial costs and attorneys' fees.  Under Labor Code § 1102.5 as amended, Ms. Gianelli is entitled to recover reasonable attorney's fees according to proof at the time of trial.

46. The above-described acts of Defendants, which were carried out by managing agents were willful, intentional, and carried out in conscious disregard of the rights and safety of Ms. Gianelli as well as members of the public.  As such, in committing the above-described acts, Defendants acted with malice and with the intent to vex, injure and annoy Ms. Gianelli, thereby warranting the imposition of exemplary and punitive damages in an amount sufficient to punish said Defendants and to deter other from engaging in similar conduct.

## SECOND CAUSE OF ACTION FOR ADVERSE EMPLOYMENT ACTION IN VIOLATION OF PUBLIC POLICY (*TAMENY* CLAIM)

47. Ms. Gianelli repeats and repleads and incorporates by this reference, paragraphs 1 through 46 inclusive, above, as though fully set forth herein.

48. Ms. Gianelli was, at all relevant times plead herein, and currently is, an employee of PG&E.

49. Defendants took adverse employment actions against Ms. Gianelli in substantial part because they feared she would disclose, and eventually did disclose, information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has the authority to investigate, discover, or correct the violation or noncompliance, based on her reasonable belief that the information disclosed a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.  Specifically, Defendants took these adverse employment actions against Ms. Gianelli because they feared she would disclose, and eventually did disclose the Criminal Enterprise, and the discriminatory treatment of employees based upon gender.

50. Defendants' adverse employment actions against Ms. Gianelli were and are contrary to the public policy embodied in Labor Code Section 1102.5, subdivision (b), which prohibits employer retaliation against any employee who reports a reasonably suspected violation of

- 16 -

the law to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance.  Section1102.5 reflects the broad public policy interest in encouraging workplace "whistleblowers," who may without fear of retaliation report concerns regarding an employer's illegal conduct.

51.  Defendants' adverse employment actions taken against Ms. Gianelli violated fundamental principles of public policy of protecting whistleblowers as described above and as codified in Labor Code Section 1102.5.

52.  Defendants' conduct, as described hereinabove, also violated the policy of the State of California, as evidenced by the enactment of the FEHA (Govt. Code Section 12940, *et seq*.) Specifically, Defendants took adverse employment actions against Ms. Gianelli on the basis of her gender and subjected her to discriminatory treatment and comments.

53.  As a direct and proximate result of Defendants, Ms. Gianelli has suffered harm, including lost earnings, lost future earnings, and other employment benefits, and humiliation, embarrassment, and mental anguish.  Ms. Gianelli is therefore entitled to general and compensatory damages in an amount according to proof at trial.

54.  Defendants' action described herein were done with a conscious disregard for the rights of Ms. Gianelli and with the intent to vex, injure, an annoy Ms. Gianelli such as to constitute oppression, fraud or malice under California Civil Code Section 3294 and to entitle Ms. Gianelli to punitive damages in an amount appropriate to punish or set an example of Defendants.

**THIRD CAUSE OF ACTION DISCRIMINATION BASED ON SEX IN VIOLATION OF**

**FEHA [Govt. Code Section 12940 et seq.]**

55. Ms. Gianelli repeats and repleads and incorporates by this reference, paragraphs 1 through 54 inclusive, above, as though fully set forth herein.

56. Defendant, and Does 1-10, inclusive, and each of them are employers subject to California Government Code Section 12940.

57. The California Fair Employment and Housing Act ("FEHA") prohibits an employer from taking adverse employment actions against a protected individual based on her sex.  Adverse employment action include, without limitation, discharging from employment, refusing to transfer/promote, refusing to hire, and discriminating in compensation, terms and conditions or privileges of employment.  "Sex" includes, but is not limited to, a person's gender.  Govt. Code Section 12926(r).

58. Ms. Gianelli began working for PG&E in December, 2013.

59. Defendants' discriminatory practices against Ms. Gianelli are evidenced by its hiring practices and promotion opportunities.  During Ms. Gianelli's first interview, she met with Vice President Gun Shim, who expressed animosity and skepticism toward Ms. Gianelli based on her gender; asking specifically, "This department is male dominated, how do you plan to deal with that?"  Besides being an admission his department had a disparate impact against females, Ms. Gianelli was left in the awkward situation of having to either stand up for her civil rights or admit she would defer to the male dominated department to avoid any disruption of a "boys' club" atmosphere.  In another interview, SCHOENFELD attempted to dominate the interview with a discussion of wine, as Ms. Gianelli had previously been employed at Gallo Wineries.  It was clear neither of these men were interested in Ms. Gianelli's 20+ year employment history in supply chain management or hiring her for the Transportation Manager role.

60. Ms. Gianelli believes and therefore alleges, SCHULTZ's department did not, at the time of

- 18 -

Ms. Gianelli's first interview, have female managers, and has not had one to the date of this filing.

61. Despite Ms. Gianelli having many accomplishments, including, but not limited to the exposure of the Criminal Enterprise and rebuilding of that system, she was subjected to adverse employment actions.  During one meeting, SCHULTZ expressly gave credit to Mr. Carassco for Ms. Gianelli's work.  Several times Mr. Carassco stated to SCHULTZ he did not do the work, Ms. Gianelli did, and deserves the accolades.  Each time, SCHULTZ refused to acknowledge Ms. Gianelli, who was in the room.

62. Ms. Gianelli was required to complete work several pay grades above her position, but was paid far less than the male counterparts who complete the same or similar work.

63. Ms. Gianelli is informed and believes and thereon alleges that Defendants took adverse employment action on the basis of her gender, and that any reason stated otherwise is mere pretext.

64. The discriminatory actions of Defendant against Ms. Gianelli constitute unlawful discrimination on the basis of sex in violation of FEHA, codified in Government Code Section 12945(a).

65. The above-mentioned sex-based discriminatory actions and impact further reveal Defendants' discriminatory attitude about women and their value in the workplace.  Upon information and belief, had Ms. Gianelli been a man, Defendant would have treated her with far more respect and promoted her, and certainly would have paid her more for the quality of work she produced.

66. As a proximate result of the acts of Defendants, as described above, Ms. Gianelli has suffered and will continue to suffer economic damages, including lost wages, lost benefits, loss of promotional opportunity, and other compensatory damages in an amount to be

ascertained at trial.

67. As a proximate result of the acts of Defendants, Ms. Gianelli suffered and continues to suffer humiliation, emotional and mental distress, anxiety and stress and has been generally damaged in an amount to be ascertained at the time of trial.

68. As a direct and proximate result of the conduct of Defendants, Ms. Gianelli was forced to incur substantial costs and attorneys' fees.  Under Government Code Section 129659(b), Ms. Gianelli is entitled to recover reasonable attorney's fees according to proof at the time of trial.

69. The acts of Defendant were intentional, willful and malicious, carried out by the managing agents, and done in conscious disregard of Ms. Gianelli's rights, safety and wellbeing and with the intent to vex, injure and annoy her.  As such, Ms. Gianelli request that exemplary and punitive damaged be assessed against each of these Defendants in an amount to sufficient to punish Said Defendant and to deter other from engaging in similar conduct.

**FOURTH CAUSE OF ACTION UNLAWFUL RETAILIATION IN VIOLATION OF FEHA [Govt. Code Section 129409(h)]**

70. Ms. Gianelli repeats and repleads and incorporates by this reference, paragraphs 1 through 69 inclusive, above, as though fully set forth herein.

71. California Government Code Section 12940(h) prevents an employer from retaliating against an employee who complains and/or opposes any discrimination or harassment under FEHA or for exercising her rights under FEHA.

72. Ms. Gianelli opposed and protested what she reasonably believed to be unlawful discrimination and retaliation against her by Defendant.  Ms. Gianelli opposed the discrimination by repeatedly requesting equal pay and by raising complaints for a pay

1    differential as compared to the work she was doing and her male colleagues.

2
3    **FIFTH CAUSE OF ACTION FOR VIOLATION OF RICO, 18 U.S.C. § 1962(c)**

4    73.   Ms. Gianelli repeats and repleads and incorporates by this reference, paragraphs 1 through

5          72 inclusive, above, as though fully set forth herein.

6    74.   This Cause of Action is against Defendants SCHOENFELD, SILVER, DUJMOVICH, and

7          SCHULTZ.

8    75.   AAL is an enterprise engaged in and whose activities affect interstate commerce.

9          SCHOENFELD and SILVER are employed by or associated with the enterprise.

10   76.   SCHOENFELD and SILVER conducted the Criminal Enterprise as previously stated in

11         paragraphs 14 and 15.  SCHOENFELD and SILVER agreed to and did conduct and

12         participate in the conduct of the enterprise's affairs through a pattern of racketeering activity

13         for the unlawful purpose of intentionally defrauding PG&E.  More specifically described in

14         the admitted facts of SCHOENFELD in his Plea Agreement at Exhibit A:  SCHOENFELD

15         and SILVER conspired to and did defraud PG&E of millions of dollars through a scheme of

16         artificially inflating the transportation charges of AAL, creating processes to charge

17         unnecessary fees to PG&E, and used confidential information to bid and secure contracts

18         between PG&E and AAL valued at over $80 million dollars from 2006 to 2014.

19         SCHOENFELD passed along confidential pricing information from PG&E to SILVER,

20         allowing SILVER and SCHOENFELD to inflate the charges to PG&E and profit to AAL.

21         SILVER and SCHOENFELD agreed SILVER would pay him 2.5% of the value of all

22         contracts she received through AAL from PG&E.

23   77.   Pursuant to and in furtherance of their fraudulent scheme, the SCHOENFELD and SILVER

24         committed multiple related acts of wire fraud in violation of 18 U.S.C. § 1343.

- 21 -

78. Defendants DUJMOVICH and SCHULTZ committed acts of racketeering activity by retaliating against Ms. Gianelli in violation of 18 U.S.C. § 1513(e).  Ms. Gianelli reported the offenses of federal crimes of SHOENFELD and SILVER during an in person interview and phone conversations with the Federal Bureau of Investigations in late 2014 and/or early 2015.  The Federal Bureau of Investigations is a "law enforcement" agency as defined by 18 U.S.C. § 1515.

79.  DUJMOVICH and SCHULTZ's retaliation was an intentional interference with her employment and livelihood as defined by 18 U.S.C. § 1513(e) specifically intended to punish Ms. Gianelli for uncovering the Criminal Enterprise of SCHOENFELD, who was DUJMOVICH's personal friend, and SILVER, for which SHULTZ was her mentor.  The specific acts of retaliation and interference are listed above as the Adverse Employment Actions.

80. The acts of the Criminal Enterprise set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

81. The Defendants listed in this cause of action have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

82. As a direct and proximate result of these Defendant's racketeering activities and violations of 18 U.S.C. § 1962(c), Ms. Gianelli has been injured in her business and property in that: Ms. Gianelli was not hired for the Manager position by SCHOENFELD, so that SCHOENFELD could instead hire Mr. Henderson, thereby protecting the Criminal Enterprise and racketeering activity, and that she was retaliated against for exposing the Criminal Enterprise and racketeering activity and the Adverse Employment Actions were taken against her.

- 22 -

**SIXTH CAUSE OF ACTION FOR VIOLATION OF RICO, 18 U.S.C. § 1962(d)**

83. Ms. Gianelli repeats and repleads and incorporates by this reference, paragraphs 1 through 82 inclusive, above, as though fully set forth herein.

84. This Cause of Action is against Defendants SCHOENFELD and SILVER.  As set forth above, SCHOENFELD and SILVER agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c).  Specifically: SCHOENFELD and SILVER conspired to and did conduct the Criminal Enterprise as stated above.  SCHOENFELD and SILVER conspired to conduct and participate in the affairs of the enterprise through a pattern of racketeering activity (§ 1962(c)).  SCHOENFELD admitted each element of this federal offense in his Plea Agreement and was sentenced for Conspiracy to Commit Wire Fraud 18 U.S.C. § 371.  SCHOENFELD admitted his conspiracy was with his co-conspirator, SILVER.

85. SCHOENFELD and SILVER have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

86. SCHOENFELD and SILVER knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

87. As a direct and proximate result of these Defendant's racketeering activities and violations of 18 U.S.C. § 1962(d), Ms. Gianelli has been injured in her business and property in that: Ms. Gianelli was not hired for the Manager position by SCHOENFELD, so that

COMPLAINT
GIANELLI V. SCHOENFELD, ET AL.

1    SCHOENFELD could instead hire Mr. Henderson, thereby protecting the Criminal

2    Enterprise and racketeering activity, and that she was retaliated against for exposing the

3    Criminal Enterprise and racketeering activity and the Adverse Employment Actions were

4    taken against her.

5

6    **SEVENTH CAUSE OF ACTION FOR VIOLATION OF THE CALIFORNIA EQUAL**

7    **PAY ACT, AS AMENDED CAL. LABOR CODE § 11975.5 AND THE FEDERAL**

8    **EQUAL PAY ACT, 29 U.S.C. § 206(d)**

9    88. Ms. Gianelli repeats and repleads and incorporates by this reference, paragraphs 1 through

10   87 inclusive, above, as though fully set forth herein.

11   89. SHULTZ, DUJMOVICH, and PG&E have discriminated against Ms. Gianelli in violation of

12   California Labor Code § 1197.5 and the Federal Equal Pay Act, 29 U.S.C. § 206(d) by

13   paying her at wage rates less than the wage rates paid to male employees for substantially

14   equal or similar work, when viewed as a composite of skill, effort, and responsibility, and

15   performed under similar working conditions, from her date of hire to August 7, 2017.

16   90. SHULTZ, DUJMOVICH, and PG&E willfully violated California Labor Code § 1197.5 and

17   the federal Equal Pay Act, 29 U.S.C. § 206(d) by intentionally, knowingly, and deliberately

18   paying Ms. Gianelli less than men for substantially equal or similar work from her date of

19   hire to August 7, 2017.

20   91. As a result of SHULTZ, DUJMOVICH, and PG&E's conduct, violation of California Labor

21   Code § 1197.5 and the Federal Equal Pay Act, 29 U.S.C. § 206(d), and/or their willful,

22   knowing and intentional discrimination, Ms. Gianelli has suffered and will continue to suffer

23   harm, including but not limited to lost earnings, lost benefits, and other financial loss, as

24   well as non-economic damages.  Ms. Gianelli is therefore entitled to all legal and equitable

- 24 -

remedies available under law, including wages, interest, and liquidated damages.

## EIGHTH CAUSE OF ACTION FOR CIVIL CONSPIRACY

92. Ms. Gianelli repeats and repleads and incorporates by this reference, paragraphs 1 through 91 inclusive, above, as though fully set forth herein.

93. Defendants SCHOENFELD, SILVER, DUJMOVICH, AND SCHULTZ ("Civil Conspiracy Defendants") conspired to create AAL, award transportation contracts to AAL, and to protect AAL.

94. In furtherance of this conspiracy, the Civil Conspiracy Defendants artificially inflated the capabilities of AAL, chose AAL to supply services to PG&E over other competitors, and influenced other employees at PG&E to do the same.  Each of these acts in furtherance of the conspiracy were done with the actual knowledge, or should have been know through the exercise of reasonable diligence, that the conspiracy promoted a criminal enterprise to defraud PG&E as stated elsewhere and above.  Civil Conspiracy Defendants, and each of them, were required to protect the criminal enterprise by actively deceiving others at PG&E, holding meetings outside the facilities of PG&E, restrain from using written communications, and retaliate against any PG&E employee or agent who threatened the criminal enterprise.  Such despicable conduct of these wrongful acts makes each Civil Conspiracy Defendants responsible as joint tortfeasors for all damages ensuing from the wrongs stated herein.

95. As stated elsewhere and in the above Causes of Action, the conduct of the Civil Conspiracy Defendants caused harm, and continues to cause harm, to Ms. Gianelli in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Gianelli requests that this Court enter judgment as follows:

Compensatory damages according to proof at trial;

Treble damages against RICO Defendants;

Attorney's fees as provided by statute;

For all wages due pursuant to California Labor Code § 1157.5 and the Federal Equal Pay Act, 29 U.S.C. § 206(d) in an amount to be ascertained at trial;

For liquidated damages pursuant to California Labor Code § 1157.5 and the Federal Equal Pay Act, 29 U.S.C. § 206(d);

For prejudgment interest on unpaid wages at a rate of 10% per annum pursuant to California Labor Code § 1157.5 and California Civil Code §§3287-8, and/or any other applicable provision providing for prejudgment interest;

Trial by Jury; and

For such further relief that the Court may deem just and proper.


Dated: January 27, 2021                    By _Sheila Gianelle_____
                                                Sheila Gianelli

- 26 -

EXHIBIT A

McGREGOR W. SCOTT
United States Attorney
ANDRÉ M. ESPINOSA
AMY S. HITCHCOCK
TANYA B. SYED
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:20-CR-150-KJM |
| Plaintiff, | PLEA AGREEMENT |
| v. | DATE: August 31, 2020 |
| RONALD STEVEN SCHOENFELD, | TIME: 9:00 AM |
| Defendant. | COURT: Hon. Kimberly J. Mueller |

I. **INTRODUCTION**

A. **Scope of Agreement.**

The Information in this case charges the defendant with violating 18 U.S.C. § 371 – Conspiracy to Commit Honest Services Fraud ("Count One") and 18 U.S.C. § 1956 –Monetary Laundering ("Counts Two through Three"). This document contains the complete Plea Agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case. This Plea Agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

B. **Court Not a Party.**

The Court is not a party to this Plea Agreement. Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of defendant, including activities which may not have been charged in

the Information. The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this Plea Agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this Plea Agreement. The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.    DEFENDANT'S OBLIGATIONS

### A.    Guilty Plea.

The defendant will plead guilty to Count One – 18 U.S.C. § 371 (Conspiracy to Commit Honest Services Fraud). The defendant agrees that he is in fact guilty of these charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this Plea Agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

### B.    Waiver of Indictment.

The defendant acknowledges that under the United States Constitution he is entitled to be indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed. R. Crim. P. 7(b), he agrees to waive any and all rights he has to being prosecuted by way of indictment to the charges set forth in the Information. The defendant agrees that at a time set by the Court, he will sign a written waiver of prosecution by Indictment and consent to proceed by Information

PLEA AGREEMENT                                    2

1    rather than by Indictment.

2        **C.    Waiver of Statue of Limitation.**

3        The defendant understands that he has a right under 18 U.S.C. § 3282 to have the criminal

4    charges resolved by this Agreement brought within 5 years of the commission of the offenses.  The

5    defendant acknowledges that, through counsel, he previously requested the opportunity to confer with

6    the United States and conduct investigation and legal research prior to any charges being filed in this

7    matter and in furtherance of a potential pre-indictment resolution of possible criminal charges.  The

8    defendant further acknowledges that, through counsel, he previously executed written agreements tolling

9    the otherwise applicable statute of limitations in this matter.  The defendant expressly waives the statute

10   of limitations as a defense to the criminal charges being resolved by this Plea Agreement.

11       **D.    Restitution.**

12       The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of

13   certain offenses.  The defendant agrees that his conduct is governed by the Mandatory Restitution Act

14   pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims

15   affected by this offense, including, but not limited to, the victims covered in the factual basis and other

16   victims as a result of the defendant's conduct for the offenses charged from the periods through in or

17   about August 2006 through in or about February 2015.  The amount of restitution has not yet been

18   determined, but may be up to $1,476,295.15.  The government's position is that the amount of

19   restitution to be paid to the victim is $1,476,295.15.  The defendant may argue to the Court that that he

20   believes the restitution amount is otherwise, pursuant to the relevant legal authorities.

21       Restitution payments shall be made by cashier's or certified check made payable to the Clerk of

22   the Court.

23       The defendant further agrees that he will not seek to discharge any restitution obligation or any

24   part of such obligation in any bankruptcy proceeding.

25       **E.    Fine.**

26       The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a

27   fine, and that no fine should be imposed.  The defendant understands that it is his burden to affirmatively

28   prove that he is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury

PLEA AGREEMENT                                    3

1  to the Probation Officer and the government in advance of the issuance of the draft Presentence

2  Investigation Report, along with supporting documentation.  The government retains the right to oppose

3  the waiver of a fine.  If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered

4  by the Court, up to the statutory maximum fine for the defendant's offense.

5  **F.    Special Assessment.**

6  The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering

7  a check or money order payable to the United States District Court to the United States Probation Office

8  immediately before the sentencing hearing.  The defendant understands that this Plea Agreement is

9  voidable at the option of the government if he fails to pay the assessment prior to that hearing.

10  **G.    Violation of Plea Agreement by Defendant/Withdrawal of Plea.**

11  If the defendant violates this Plea Agreement in any way, withdraws his plea, or tries to

12  withdraw his plea, this Plea Agreement is voidable at the option of the government.  If the government

13  elects to void the Agreement based on the defendant's violation, the government will no longer be

14  bound by its representations to the defendant concerning the limits on criminal prosecution and

15  sentencing as set forth herein.  A defendant violates the Plea Agreement by committing any crime or

16  providing or procuring any statement or testimony which is knowingly false, misleading, or materially

17  incomplete in any litigation or sentencing process in this case, or engages in any post-plea conduct

18  constituting obstruction of justice.  Varying from stipulated Guidelines application or agreements

19  regarding arguments as to 18 United States Code Section 3553, as set forth in this Agreement,

20  personally or through counsel, also constitutes a violation of the Plea Agreement.  The government also

21  shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to

22  reinstate any counts that may be dismissed pursuant to this Plea Agreement; and (3) to file any new

23  charges that would otherwise be barred by this Plea Agreement.  The defendant shall thereafter be

24  subject to prosecution for any federal criminal violation of which the government has knowledge.  The

25  decision to pursue any or all of these options is solely in the discretion of the United States Attorney's

26  Office.

27  By signing this Plea Agreement, the defendant agrees to waive any objections, motions, and

28  defenses that the defendant might have to the government's decision.  Any prosecutions that are not

time-barred by the applicable statute of limitations as of the date of this Plea Agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Plea Agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this Plea Agreement. The determination of whether the defendant has violated the Plea Agreement will be under a probable cause standard.

In addition, (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this Plea Agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this Plea Agreement, or any leads derived therefrom, should be suppressed. By signing this Plea Agreement, the defendant waives any and all rights in the foregoing respects.

**H.** **Asset Disclosure.**

The defendant agrees to make a full and complete disclosure of his assets and financial condition, and will complete the United States Attorney's Office's "Authorization to Release Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change of plea, including supporting documentation. The defendant also agrees to have the Court enter an order to that effect. The defendant understands that if he fails to complete truthfully and provide the described documentation to the United States Attorney's office within the allotted time, he will be considered in violation of the Agreement, and the government shall be entitled to the remedies set forth above in paragraph II.G.

**I.** **Agreement to Cooperate.**

The defendant agrees to cooperate fully with the government and any other federal, state, or local law enforcement agency, as directed by the government. As used in this Plea Agreement, "cooperation"

1    requires the defendant:  (1) to respond truthfully and completely to all questions, whether in interviews,

2    in correspondence, telephone conversations, before a grand jury, or at any trial or other court

3    proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the

4    defendant's presence is requested by the government or compelled by subpoena or court order; (3) to

5    produce voluntarily any and all documents, records, or other tangible evidence requested by the

6    government; (4) not to participate in any criminal activity while cooperating with the government; and

7    (5) to disclose to the government the existence and status of all money, property, or assets, of any kind,

8    derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal

9    activities or the illegal activities of any conspirators.

10                    **III.      THE GOVERNMENT'S OBLIGATIONS**

11            **A.      Dismissals/Other Charges.**

12           The government agrees to move, at the time of sentencing, to dismiss without prejudice the

13    remaining counts in the pending Information.  The government also agrees not to reinstate any dismissed

14    count except if this Agreement is voided as set forth herein, or as provided in paragraphs II.G (Violation

15    of Plea Agreement by Defendant/Withdrawal of Plea), VI.B (Stipulated Guideline Calculation), and

16    VII.B (Waiver of Appeal and Collateral Attack).

17            **B.      Recommendations.**

18                    1.      Incarceration Range.

19           The government will recommend that the defendant be sentenced to the low end of the

20    guideline range as stipulated in paragraph VI.B below.

21                    2.      Acceptance of Responsibility.

22           The government will recommend a two-level reduction (if the offense level is less than

23    16) or a three-level reduction (if the offense level reaches 16) in the computation of his offense level if

24    the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. §

25    3E1.1.  This includes the defendant meeting with and assisting the probation officer in the preparation of

26    the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging

27    in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the

28    preparation of the pre-sentence report or during the sentencing proceeding.

PLEA AGREEMENT                          6

3.      Reduction of Sentence for Cooperation.

The government agrees to recommend at the time of sentencing that the defendant's sentence of imprisonment be reduced by up to 15% of the applicable guideline sentence if he provides substantial assistance to the government, pursuant to U.S.S.G. § 5K1.1. The defendant understands that he must comply with paragraphs II.I and not violate this Plea Agreement as set forth in paragraph II.G herein. The defendant understands that it is within the sole and exclusive discretion of the government to determine whether the defendant has provided substantial assistance.

The defendant understands that the government may recommend a reduction in his sentence of less than 15% or no reduction at all; depending upon the level of assistance the government determines that the defendant has provided.

The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a recommendation and is not binding on the Court, that this Plea Agreement confers no right upon the defendant to require that the government make a § 5K1.1 motion, and that this Plea Agreement confers no remedy upon the defendant in the event that the government declines to make a § 5K1.1 motion. In particular, the defendant agrees not to try to file a motion to withdraw his guilty plea based on the fact that the government decides not to recommend a sentence reduction or recommends a sentence reduction less than the defendant thinks is appropriate.

If the government determines that the defendant has provided further cooperation within one year following sentencing, the government may move for a further reduction of his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

**C.**      **Use of Information for Sentencing.**

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

**IV.**      **ELEMENTS OF THE OFFENSE**

At a trial, the government would have to prove beyond a reasonable doubt the following

PLEA AGREEMENT         7

elements of the offenses to which the defendant is pleading guilty, 18 U.S.C. § 371 (Conspiracy to Commit Wire Fraud).

Although *not* elements of Conspiracy to Commit an Offense Against the United States, in violation of 18 U.S.C. § 371, the elements of the underlying criminal offense (Wire Fraud, in violation of 18 U.S.C. § 1343) are:

    a.    The defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

    b.    The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

    c.    The defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

    d.    The defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

Pursuant to 18 U.S.C. § 1346, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

Thus, to convict the defendant at trial on the charge of Conspiracy to Commit an Offense Against the United States, in violation of 18 U.S.C. § 371 (Count One), the government would have to prove beyond a reasonable doubt that:

    a.    Beginning at least as early as November 2006, and ending in or about February 2015, there was an agreement between two or more people to commit honest services fraud as charged in the Information;

    b.    The defendant became a member of the conspiracy knowing at least one of its objects and intending to help accomplish it; and

    c.    One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

The defendant fully understands the nature and elements of the crimes charged in the Information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

PLEA AGREEMENT

1

### V.    MAXIMUM SENTENCE

2

**A.    Maximum Penalty.**

3    The maximum sentence that the Court can impose is five years of incarceration, a fine of

4  $250,000, a three year period of supervised release and a special assessment of $100.  By signing this

5  Plea Agreement, the defendant also agrees that the Court can order the payment of restitution for the full

6  loss caused by the defendant's wrongful conduct.  The defendant agrees that the restitution order is not

7  restricted to the amounts alleged in the specific count to which he is pleading guilty.  The defendant

8  further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy

9  proceeding any restitution imposed by the Court.

10

**B.    Violations of Supervised Release.**

11    The defendant understands that if he violates a condition of supervised release at any time during

12  the term of supervised release, the Court may revoke the term of supervised release and require the

13  defendant to serve up to two additional years imprisonment.

14

### VI.    SENTENCING DETERMINATION

15

**A.    Statutory Authority.**

16    The defendant understands that the Court must consult the Federal Sentencing Guidelines and

17  must take them into account when determining a final sentence.  The defendant understands that the

18  Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the

19  Sentencing Guidelines and must take them into account when determining a final sentence.  The

20  defendant further understands that the Court will consider whether there is a basis for departure from the

21  guideline sentencing range (either above or below the guideline sentencing range) because there exists

22  an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into

23  consideration by the Sentencing Commission in formulating the Guidelines.  The defendant further

24  understands that the Court, after consultation and consideration of the Sentencing Guidelines, must

25  impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

26

**B.    Stipulated Guideline Calculation.**

27    The government and the defendant agree that there is no material dispute as to the following

28  sentencing guidelines variables and therefore stipulate to the following:

PLEA AGREEMENT                                          9

1               1.    **Base Offense Level**: The base offense level for the charges to which the

2  defendant is pleading guilty is **6**. See U.S.S.G. §§ 2X1.1 and 2B1.1(a)(1).

3               2.    **Specific Offense Characteristics:**

4                    a.     The parties agree and stipulate that fourteen levels are added **(+14)** under U.S.S.G. § 2B1.1, because the defendant received kickback payments pursuant to

5  the scheme that exceeded $500,000 but not more than $1,500,000. See id. at (b)(1)(H). However, the parties rely on distinct applications of the relevant

6  Guidelines provisions to reach this undisputed conclusion.

7                          1)     The government's position is that all of the kickback money should have gone to PG&E and not to the defendant, and is therefore loss to

8  PG&E. Thus, fourteen levels are added because the loss attributable to the defendant during the time period of his knowing involvement in the

9  conspiracy and within the scope of his knowing involvement exceeded $500,000 but was not more than $1,500,000. Id. at (b)(1)(H).

10

11                          2)     The defendant's position is that PG&E suffered a loss but that loss reasonably cannot be calculated, and the court should therefore use the

12  gain to the defendant that resulted from the offense as an alternative measure of loss. See U.S.S.G. § 2B1.1, Application Note 3(B). Thus,

13  fourteen levels are added because the gain to the defendant during the time period of his knowing involvement in the conspiracy and within the scope of his knowing involvement exceeded $500,000 but was not more than

14  $1,500,000. Id. at (b)(1)(H); 2B1.1, Application Note 3(B).

15                          3)     The parties agree that resolution of this dispute will not affect the applicable sentencing range and may impact only the Court's

16  determination of a restitution order.

17             3.    **Preliminary Offense Level:** The parties anticipate that the preliminary offense

18  level will be **20**.

19             4.    **Adjustments**: Three levels are subtracted (**-3**) if the defendant pleads guilty,

20  accepts responsibility for his offense, and the Specific Offense Level is above 16. U.S.S.G. §3E1.1.

21             5.    **Adjusted Offense Level**: Given the stipulations above, the parties anticipate that

22  the adjusted offense level will be **17.**

23             6.    **Criminal History and Sentencing Range**: The parties agree and stipulate that

24  the applicable criminal history will be determined by the Court's probation officers. The parties

25  estimate, but do not stipulate, that the defendant's criminal history category will be **I**, and that the

26  Guidelines sentencing range will be no less than **24 to 30 months** in prison. The defendant understands

27  that if the criminal history category differs from the parties' estimate, his Guidelines sentencing range

28  may differ from that set forth here.

### C.   **Departures or Other Enhancements or Reductions:**

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), or cross-references, except that the government may move for a departure or an adjustment based on a post-plea obstruction of justice (U.S.S.G. §3C1.1).  Both parties agree not to move for, or argue in support of, any departure from the Sentencing Guidelines.  However, the defendant may seek a variance from the Sentencing Guidelines under United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005), and may argue for any sentence supported by the facts and law.  The government may oppose the defendant's request for any sentence below the low-end of the applicable Guideline range.

### VII.   **WAIVERS**

### A.   **Waiver of Constitutional Rights.**

The defendant understands that by pleading guilty he is waiving the following constitutional rights:  (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be compelled to incriminate himself.

### B.   **Waiver of Appeal and Collateral Attack.**

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence.  The defendant agrees as part of his plea, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not exceed the statutory maximum for the offense to which he is pleading guilty.  The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which defendant is pleading guilty are unconstitutional, arguments that the applicable statute of limitations period set forth in 18 U.S.C. § 3282 have expired, and any and all claims that the statement of facts attached to this agreement is insufficient to support the defendant's plea of guilty.  The defendant

PLEA AGREEMENT                                11

1   specifically gives up the right to appeal any order of restitution the Court may impose.

2        Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if

3   one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the

4   statutory maximum; and/or (2) the government appeals the sentence in the case.  The defendant

5   understands that these circumstances occur infrequently and that in almost all cases this Agreement

6   constitutes a complete waiver of all appellate rights.

7        In addition, regardless of the sentence the defendant receives, the defendant also gives up any

8   right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any

9   aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

10       Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever

11  attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of

12  the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.G

13  herein.

14      **C.**    **Waiver of Attorneys' Fees and Costs.**

15       The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

16  119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

17  investigation and prosecution of all charges in the above-captioned matter and of any related allegations

18  (including without limitation any charges to be dismissed pursuant to this Plea Agreement and any

19  charges previously dismissed).

20          **VIII.**    **ENTIRE PLEA AGREEMENT**

21       Other than this Plea Agreement, no agreement, understanding, promise, or condition between the

22  government and the defendant exists, nor will such agreement, understanding, promise, or condition

23  exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and

24  counsel for the United States.

25  ///

26  ///

27  ///

28  ///

## IX.    APPROVALS AND SIGNATURES

### A.    Defense Counsel.

I have read this Plea Agreement and have discussed it fully with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this Plea Agreement.

Dated:    8/7/20

_____
CHRIS CANNON
Attorney for Defendant

### B.    Defendant:

I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement. In addition, no one has threatened or forced me in any way to enter into this Plea Agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated:    8/7/20

_____
RONALD STEVEN SCHOENFELD
Defendant

### C.    Attorney for United States:

I accept and agree to this Plea Agreement on behalf of the government.

Dated:    August 10, 2020

McGREGOR W. SCOTT
United States Attorney

_____
TANYA B. SYED
Assistant United States Attorney

PLEA AGREEMENT                    13

EXHIBIT "A"

**Factual Basis for Plea**

If this matter proceeded to trial, the United States would establish the following facts beyond a reasonable doubt:

In August 2006, defendant Ronald SCHOENFELD was hired by Pacific Gas & Electric Company ("PG&E") to oversee PG&E's trucking contracts. As an employee, SCHOENFELD owed PG&E his honest services. Specifically, PG&E's employee code of conduct included numerous policies that SCHOENFELD agreed to comply with, including the following:

- "Disclose any potential conflict of interest to your supervisor, and ensure that the appropriate decision-maker concurs in writing if you're allowed to remain in a situation that could be perceived as a conflict of interest."

- "If, during non-business hours, you solicit vendors or customers with whom you interact for PG&E, you must ensure that your solicitation does not create an appearance of impropriety or in any way imply that the vendor's or customer's dealings with PG&E will be affected by the response to your solicitation."

- "Maintain the confidentiality of information entrusted to you by PG&E and our customers, except when disclosure is properly authorized or legally mandated."

In November 2006, SCHOENFELD's cousin ("Individual 1") formed a limited liability company ("Company 1"), which was based in Stockton, in the State and Eastern District of California. SCHOENFELD offered to help Individual 1 obtain contracts for Company 1 in exchange for financial consideration. Individual 1 offered to pay 2.5% of the value of the contracts between Company 1 and PG&E in exchange for SCHOENFELD's help. SCHOENFELD accepted this offer.

SCHOENFELD took several steps to further this conspiracy. SCHOENFELD facilitated introductions with decision makers at PG&E and Individual 1 to help Company 1 receive contracts from PG&E. From 2007 to 2014, SCHOENFELD provided Individual 1 with rate information of competitors of Company 1, in violation of SCHOENFELD's duty to maintain confidentiality regarding such information. SCHOENFELD was aware of his duty to maintain confidentiality regarding such information.

In October 2008, SCHOENFELD assisted Individual 1 obtain an annual contract by and between PG&E and Company 1 worth at least $12,000,000, in violation of PG&E's bidding policies.

PLEA AGREEMENT                    A-1

SCHOENFELD was aware that this contract was in violation of PG&E's bidding policies.

In January 2014, SCHOENFELD increased amount PG&E paid to Company 1 for moving transformers from one vehicle to another from $125 per unit to $275 per unit without the requisite PG&E internal approvals.  SCHOENFELD was aware that this increase was in violation of PG&E's internal approval policies.

In March 2014, SCHOENFELD increased the rates paid to Company 1 from $1.30 per mile for shipping to $1.60 per mile without the requisite PG&E internal approvals.  SCHOENFELD was aware that this rate increase was in violation of PG&E's internal approval policies.

Over the course of the conspiracy, Company 1 received at least $82,133,142 for services provided to PG&E for contracts obtained through the conspiracy.  Specifically, Company 1 received the following payments—which originated in Louisiana, passed through Virginia or Texas, and were ultimately deposited into accounts in California controlled by Company 1—on the following dates from one of PG&E's billing processers:

| Date of Deposit | Amount of Deposit |
|---|---|
| December 29, 2014 | $25,211.32 |
| December 29, 2014 | $25,211.32 |
| December 29, 2014 | $25,211.32 |
| December 29, 2014 | $25,211.32 |
| January 7, 2015 | $71,384.58 |
| January 7, 2015 | $71,384.58 |
| January 7, 2015 | $71,384.58 |

In May 2007, SCHOENFELD caused a shell company, Diversity Transportation Inc., to be created to receive "kickback" payments for his role in the conspiracy.  From May 2007 to September 2014, SCHOENFELD received at least $1,476,295.15 in kickback payments from Company 1 for the aid he provided to Company 1.  SCHOENFELD caused payroll checks to be paid to various bank accounts in order to transfer the payments solicited from Individual 1.  One of these bank accounts was a Bank of America Joint Savings Account.  As of April 14, 2015, the only proceeds in this Bank of America Joint Savings Account was kickback payments from the conspiracy.  On March 16, 2015 and April 14, 2015, SCHOENFELD wired $5,100 and $2,700 to his American Express card.  These funds

1  were proceeds of the conspiracy.

2        SCHOENFELD was aware his kickback arrangement was not allowed by PG&E, and he took

3  active steps to conceal his relationship with Individual 1 from PG&E. He avoided having social

4  meetings at locations where other PG&E employees might be present. He also failed to disclose his

5  familial relationship with Individual 1 in violation of his duties to PG&E. SCHOENFELD used

6  personal electronic mail to communicate with Individual 1 regarding the payments to be made pursuant

7  to this scheme to conceal their actions from PG&E.

8

9       *I have read and carefully reviewed the Factual Basis for Plea with my attorney. I agree that as it*

10  *concerns my conduct it is correct. I also agree that if this matter proceeded to trial, the United States could*

11  *establish each of the facts contained within the Factual Basis for Plea beyond a reasonable doubt, and that those*

    *facts satisfy the elements of the offense to which I am pleading guilty.*

12

13  Dated: August 10, 2020

14                            RONALD STEVEN SCHOENFELD

                          Defendant

15

16

17

18

19

20

21

22

23

24

25

26

27

28