UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHEILA GIANELLI,<br><br>Plaintiff,<br><br>v.<br><br>RONALD STEVEN SCHOENFELD, et al.,<br><br>Defendants. | No.  2:21-cv-00477-JAM-KJN PS<br><br><u>ORDER & FINDINGS AND RECOMMENDATIONS ON MOTIONS TO DISMISS</u><br><br>(ECF Nos. 6, 19) |

Before the court are two motions to dismiss brought by three of the five defendants named in this action:  one by defendant Debra Lee Silver; and one by defendants Lance Schultz and Nick Dujmovich.[1]  (ECF Nos. 6, 19.)  Both motions were taken under submission without oral argument, pursuant to Local Rule 230(g).  (ECF Nos. 21 at 2, 27 at 25.)  Plaintiff filed oppositions to each motion, to which the moving defendants replied.  (ECF Nos. 15, 22, 28, 29.)  For the following reasons, the undersigned recommends:  (1) granting defendant Silver's motion in full; (2) granting defendants Dujmovich and Schultz's motion in part; and (3) dismissing all claims against these defendants—in addition to all claims against similarly situated non-moving

---

[1]    Because plaintiff is self-represented, the case is referred to the undersigned for all pretrial proceedings pursuant to 28 U.S.C § 636 and Local Rule 302(c)(21).

defendant Ronald Schoenfeld—with leave to amend as to some claims.

## I.   **BACKGROUND**

### A. Factual Allegations

The complaint in this action relates to plaintiff's hiring and treatment at work over a period from 2013 to 2017 due to a criminal conspiracy that she discovered in the "Supply Chain/Materials" department of Pacific Gas and Electric Company ("PG&E").  (ECF No. 1.1 ("Complaint") at 4-5, 8-13.)

In 2013, plaintiff was hired as an Analyst in PG&E's Supply Chain department.  (Id. at 4, 8.)  It was later revealed through a federal investigation—in which plaintiff assisted—that from approximately 2006 until 2015, another PG&E employee, non-moving defendant Ronald Schoenfeld, was conspiring to fraudulently funnel PG&E's annual trucking contracts to a company owned by his cousin, in return for over $1.4 million in kickback payments.  (Id. at 6-7, 42-43.)  Schoenfeld violated PG&E bidding policies by helping his alleged co-conspirator and cousin, Debra Silver—one of the moving defendants—to obtain contracts at inflated pay rates for her LLC, All American Logistics ("AAL").  (Id. at 4, 6-7, 42-43.)  In exchange, Schoenfeld received 2.5% of the value of the contracts procured for AAL.  (Id. at 6-7, 42.)  In August 2020, as a result of the federal investigation, Schoenfeld was charged with and pled guilty to one count of conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 371.[2]  (United States v. Schoenfeld, No. 2:20-cr-0150-KJM (E.D. Cal.), ECF Nos. 1 at 2, 12 at 1-2.)[3]  In January 2021, shortly before plaintiff filed this action, Schoenfeld was sentenced to 22 months in prison

---

[2]  "Honest services fraud entails a scheme or artifice to 'deprive another,' by mail or wire, 'of the intangible right of honest services.'"  United States v. Christensen, 828 F.3d 763, 784 (9th Cir. 2015) (quoting 18 U.S.C. § 1346 and citing mail and wire fraud statutes 18 U.S.C. §§ 1341, 1343); see also Skilling v. United States, 561 U.S. 358, 400-09, 412 (2010) (discussing historical recognition of private-sector honest services fraud and holding that § 1346 criminalizes only fraud that includes acceptance of bribes or kickbacks).

[3]  The undersigned takes judicial notice of the docket and filings in Schoenfeld's criminal case before this court.  See United States v. Howard, 381 F.3d 873, 876 n.1 (9th Cir. 2004) (courts may take judicial notice of public records, including court records from another case). Accordingly, plaintiff's request for judicial notice (ECF No. 16) is granted.

2

and ordered to pay PG&E some $1.4 million in restitution.[4]  (Id., ECF Nos. 37, 38.)

Plaintiff discovered and reported Schoenfeld's conspiracy in August 2014 shortly after joining PG&E.  (Complaint at 4.)  Plaintiff asserts overall that she was hired into a lower-level role in 2013 due to efforts to conceal the conspiracy; and that in retaliation for exposing the conspiracy, she was denied pay increases, given onerous assignments, and relocated to a less desirable work site until she was able to secure a transfer to a different department in August 2017.  (Id. at 4, 11-15.)  She also alleges that general sex discrimination within the Supply Chain department contributed to these adverse employment actions.  (Id. at 5, 8, 13, 18-21.)

In addition to defendants Schoenfeld and Silver, plaintiff also brings this action against PG&E, itself,[5] and two of her former upper-level managers in the Supply Chain department: (1) her third-level supervisor and the department's director, Lance Schultz; and (2) her second-level supervisor, Nick Dujmovich.  (Id. at 6, 9.)  Plaintiff—who holds a B.S. in Industrial Engineering and an M.B.A., and who has decades of experience in supply chain management— alleges that in 2013 she interviewed for two management-level positions in PG&E's Supply Chain department but was passed over in favor of less-qualified male applicants.  (Id. at 8-9.) Defendants Schoenfeld and Dujmovich conducted her interview for the second managerial position, which they ultimately gave to a man; and Dujmovich ended up instead offering plaintiff

---

[4]  Plaintiff assisted PG&E with preparing its restitution request and also appeared at Schoenfeld's sentencing on her own behalf to request personal restitution.  (No. 2:20-cr-0150-KJM (E.D. Cal.), ECF Nos. 30.1 (restitution request), 48 at 3-5 (sentencing transcript).)  The court took plaintiff's personal restitution request under submission and on September 8, 2021 denied the request.  (Id., ECF No. 50.)

[5]  PG&E does not join in the motions to dismiss, nor has it entered an appearance in this case, except to specially inform the state court (pre-removal) that this action is enjoined as to PG&E by virtue of a bankruptcy discharge injunction that became effective on July 1, 2020.  (ECF No. 23.2 at 2-4 (Notification of Effective Date of Chapter 11 Plan and Imposition of Plan Injunction).)  PG&E filed for bankruptcy in January 2019 and received a discharge of its pre-petition debts on July 1, 2020.  See In re: PG&E Corp. and Pacific Gas and Electric Co., No. 19-30088 (Bankr. N.D. Cal.), ECF Nos. 1, 8053, 8252.  Because plaintiff filed this suit against PG&E in February 2021 asserting pre-petition claims from 2017 and earlier, the court held that at least for purposes of consent-to-removal, plaintiff's service on PG&E was a legal nullity.  (ECF No. 27 at 11-14 & n.15.)  PG&E's continuing status as a defendant in this suit will be addressed by a future order.

a job as an Analyst, which she accepted in December 2013.  (Id. at 8.)  Plaintiff alleges that she was not hired for the managerial roles because of defendants' participation in the then-ongoing criminal conspiracy.  (Id. at 13, ¶ 37(a).)  At various points in the complaint, plaintiff alleges that Dujmovich and Schoenfeld were part of a group of PG&E employees known as the "Michigan Mafia," who had previously worked together at another company in Michigan before joining PG&E's Supply Chain department.  (Id. at 7, 10-11, 14.)  The complaint contains few specifics about the nature of this group or how it might be connected to Schoenfeld's kickback scheme.

From the start of her employment, Dujmovich—a "close personal friend" of Schoenfeld—told plaintiff not to look at anything associated with "Transportation and Schoenfeld."  (Id. at 4, 9-10.)  In the summer of 2014, however, defendant Schultz directed plaintiff to examine the department's transportation budget which was causing concern because it was on pace to exceed projections by $2 million.  (Id. at 9.)  Within days, plaintiff found "evidence of unethical and irregular procurement."  (Id. at 9-10.)  When she and another coworker approached Schoenfeld about it, he "admitted to authorizing the irregularities" and then asked plaintiff several times during the encounter whether "he and [she] were ok?," which plaintiff interpreted as a request that she look the other way.  (Id. at 10.)  Plaintiff and her immediate supervisor then brought her concerns to defendant Dujmovich, who was "covering for Schoenfeld" and never reported the issue higher up the chain.  (Id.)

Accordingly, plaintiff took it upon herself to report Schoenfeld's activity to the PG&E Ethics and Compliance hotline.  (Id.)  The company launched an investigation with plaintiff's assistance, which resulted in Schoenfeld's termination from PG&E.  (Id.)  In late 2014 or early 2015, plaintiff also cooperated with the FBI's investigation into the conspiracy.  (Id. at 23.)  Plaintiff alleges that, despite Schoenfeld's ouster, the criminal conspiracy had "infiltrated the entire Supply Chain organization," causing her to be treated as a "pariah" for having exposed it.  (Id. at 11.)  Dujmovich retaliated against her by directing her to "rebuild the entire transportation sourcing process"—a task not appropriate for her current role—telling her that "she had 'made the mess, so she had to clean it up.'"  (Id.)  When plaintiff reported this perceived retaliation to Schultz, he refused to help her and thereafter approved Dujmovich giving her "the lowest

4

performance reviews, bonus payouts, and performance raises possible"—despite her having saved the company millions of dollars.  (Id. at 12-14.)  Schultz later reassigned plaintiff to a "warehouse position" far from the main offices, which was "a demotion in terms of visibility and opportunity for professional growth."  (Id. at 12, 14.)

With a great deal of effort, plaintiff transferred to a new role at PG&E outside of Schultz's control on August 7, 2017; and since leaving the Supply Chain department, her "career with PG&E has flourished."  (Id. at 13.)

**B.  Procedural History**

A few days after Schoenfeld was sentenced in the criminal proceedings in this court, on January 29, 2021, plaintiff (representing herself) filed this civil case in San Joaquin County Superior Court.  Gianelli v. Schoenfeld, et al., No. STK-CV-UMR-2021-0000849 (Cal. Sup. Ct., San Joaquin Cty.).  The complaint contains eight causes of action:  (1) Violation of California Labor Code § 1102.5; (2) Adverse Employment Action in Violation of Public Policy; (3) Sex Discrimination in Violation of the California Fair Employment and Housing Act ("FEHA"); (4) Unlawful Retaliation in Violation of the FEHA; (5) Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (6) Violation of RICO, 18 U.S.C. § 1962(d) (conspiracy); (7) Violation of the California Equal Pay Act and the Federal Equal Pay Act; and (8) Civil Conspiracy.  (Complaint at 15-26.)

After some initial proceedings in state court, defendants removed the action to this court. (ECF Nos. 1 (Notice of Removal), 32 (Amended Notice of Removal).)  Soon thereafter, defendant Silver filed her instant motion to dismiss, to which plaintiff responded by moving to remand the case back to state court.  (ECF Nos. 6, 17.)  The day after plaintiff moved to remand, defendants Dujmovich and Schultz jointly filed their instant motion to dismiss.  (ECF No. 19.) The court paused the briefing of the motions to dismiss in order to first resolve plaintiff's motion to remand.  (ECF No. 21.)  On May 25, 2021, the undersigned recommended denying remand, and invited the remainder of the briefing on the motions to dismiss.  (ECF No. 27.)  On June 29, 2021, the district judge adopted the undersigned's recommendation, denying remand.  (ECF No. 30.)  On August 26, 2021, the court held a general status conference with the parties.  (ECF

5

35.)

The motions to dismiss by defendants Dujmovich, Schultz, and Silver were fully briefed and taken under submission.  (ECF Nos. 6, 7, 15, 19, 19.1, 22, 28, 29.)  Defendant Silver moves to dismiss all claims against her for failure to state a claim under Rule 12(b)(6).  (ECF No. 7 at 6.)  In their joint motion, defendants Dujmovich and Schultz likewise move to dismiss under Rule 12(b)(6), but they also seek dismissal under Rule 12(b)(2) for lack of personal jurisdiction over defendant Dujmovich, who now resides in Texas.  (ECF Nos. 19.1 at 1, 19.2.)

## II.   LEGAL STANDARDS

### A. Rule 12(b)(2) Standard

Under Federal Rule of Civil Procedure 12(b)(2), a party may seek dismissal of an action for lack of personal jurisdiction.[6]  For a federal district court to exercise personal jurisdiction over a non-resident defendant consistent with due process, that defendant must have "at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'"[7]  Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1110-11 (9th Cir. 2002) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 326 (1945)).

In response to a Rule 12(b)(2) motion, the plaintiff bears the burden of establishing personal jurisdiction.  Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp., 905 F.3d 597, 602 (9th Cir. 2018).  "Uncontroverted allegations in the complaint must be taken as true, and factual disputes are construed in the plaintiff's favor."  Id.  Where the motion is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts."  Sher v. Johnson, 911 F.2d 1357, 1361 (9th Cir. 1990).  Accordingly, the

---

[6]  Personal jurisdiction, a concept based in the Due Process Clause, refers to a court's "power to subject the defendant to judgment" concerning the conduct in question.  J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 884 (2011).

[7]  When, as here, "no federal statute governs personal jurisdiction, the district court applies the law of the forum state."  Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp., 905 F.3d 597, 602 (9th Cir. 2018).  "California's long-arm statute, Cal. Civ. Proc. Code § 410.10, is coextensive with federal due process requirements, so the jurisdictional analyses under state law and federal due process are the same."  Mavrix Photo, Inc. v. Brand Techs., Inc., 647 F.3d 1218, 1223 (9th Cir. 2011).

court only inquires into whether the plaintiff's "pleadings and affidavits make a prima facie showing of personal jurisdiction." Caruth v. Int'l Psychoanalytical Ass'n, 59 F.3d 126, 128 (9th Cir. 1995).

**B.  Rule 12(b)(6) Standard**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the pleadings set forth in the complaint. Vega v. JPMorgan Chase Bank, N.A., 654 F. Supp. 2d 1104, 1109 (E.D. Cal. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." Id.

In considering a motion to dismiss for failure to state a claim, the court accepts all of the facts alleged in the complaint as true and construes them in the light most favorable to the plaintiff. Corrie v. Caterpillar, Inc., 503 F.3d 974, 977 (9th Cir. 2007). However, the court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." Paulsen v. CNF Inc., 559 F.3d 1061, 1071 (9th Cir. 2009).

The court must construe a pro se pleading liberally to determine if it states a claim and, prior to dismissal, tell a plaintiff of deficiencies in her complaint and give plaintiff an opportunity to cure them if it appears at all possible that the plaintiff can correct the defect. See Lopez v. Smith, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (en banc); see also Hebbe v. Pliler, 627 F.3d 338, 342 n.7 (9th Cir. 2010) (stating that courts continue to construe pro se filings liberally even when evaluating them under the standard announced in Iqbal).

In ruling on a Rule 12(b)(6) motion to dismiss, the court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899 (9th Cir. 2007) (citation and quotation marks omitted). Although the court may not consider a

memorandum in opposition to a defendant's motion to dismiss to determine the propriety of a Rule 12(b)(6) motion, see Schneider v. Cal. Dep't of Corrections, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998), it may consider allegations raised in opposition papers in deciding whether to grant leave to amend, see, e.g., Broam v. Bogan, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003).

If the expiration of the applicable statute of limitations is apparent from the face of the complaint, the defendant may raise a statute of limitations defense in a Rule 12(b)(6) motion to dismiss.  Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980).  This is true even though expiration of the limitations period is an affirmative defense, because Federal Rule of Civil Procedure 9(f) "makes averments of time and place material for the purposes of testing the sufficiency of a complaint."  Suckow Borax Mines Consol. v. Borax Consol., 185 F.2d 196, 204 (9th Cir. 1950).  When a motion to dismiss is based on the running of the statute of limitations, "it can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled."  Jablon, 614 F.2d at 682.  In contrast, where the statute of limitations question turns on factual issues that may be disputed, the question is more appropriately addressed at a later stage of the proceeding.  Id.

### III.   DISCUSSION

#### A.  Personal Jurisdiction Exists over Defendant Dujmovich

The court begins with defendant Dujmovich's argument that he is not subject to personal jurisdiction in California because he has been a resident of Texas since March 28, 2020, and has not worked for PG&E since April 1, 2020.  (ECF No. 19.1 at 19-20; see ECF No. 19.2 (Dujmovich Decl.) ¶¶ 3, 5.)  This argument is easily dispatched with as it is uncontroverted that at all times relevant to the causes of action against him, defendant Dujmovich was a resident of California and worked for PG&E in California while supervising plaintiff.  (Complaint ¶¶ 2, 9, 26 (describing in-person meeting with Dujmovich), 37(g) (referencing professional offices in San Ramon, California).)

Whether analyzed under the rubric of "general" or "specific" personal jurisdiction, at the time of the events in question (that is, from 2013 through 2017), defendant Dujmovich had more than enough contacts with the state of California to subject him to personal jurisdiction in this

court.  See Steel v. United States, 813 F.2d 1545, 1549 (9th Cir. 1987) (in specific jurisdiction analysis, holding that "courts must examine the defendant's contacts with the forum at the time of the events underlying the dispute when determining whether they have jurisdiction"); Delphix Corp. v. Embarcadero Techs., Inc., 749 F. App'x 502, 505 (9th Cir. 2018) (quoting and applying Steel in general jurisdiction analysis).  As plaintiff rightly points out in her opposition, "one cannot defeat personal jurisdiction by a move away from the state in which the underlying events took place."  Steel, 813 F.2d at 1549.  Dujmovich's reply brief gives no response to plaintiff's observation that Dujmovich "actually, physically, lived in [California], was employed in the state, interviewed, supervised, and further interacted with Plaintiff in the State of California."  (ECF No. 28 at 7.)  "[T]he fair warning given [Dujmovich] by his contacts with California does not expire simply because of his lack of later contacts with the state."  Steel, 813 F.2d at 1549-50.  Accordingly, Dujmovich's motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) should be denied.

**B. RICO Claims (COAs #5 & #6)**

The complaint asserts RICO claims against the four individual defendants:  Dujmovich, Schoenfeld, Schultz, and Silver.  (Complaint at 22-25.)  Plaintiff claims that as a result of Schoenfeld and Silver's kickback scheme, she was not hired at the managerial level in 2013 and later was unlawfully retaliated against by Dujmovich and Schultz for exposing the scheme.  (Complaint ¶¶ 82, 87.)

RICO creates a civil remedy for "[a]ny person injured in [their] business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  Section 1962, in turn, makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  It also makes it "unlawful for any person to conspire to violate any of the provisions of the subsections (a), (b), or (c) of this section."  Id. § 1962(d).

Plaintiff asserts two RICO causes of action in her complaint:  (1) a § 1962(c) claim

against all four individual defendants; and (2) a § 1962(d) claim against defendants Schoenfeld and Silver.  (Complaint ¶¶ 74, 84.)  The moving defendants argue that the RICO claims are both barred by the statute of limitations and inadequately pled.  (ECF Nos. 7 at 12-21, 19.1 at 15-18.) The court agrees that the RICO claims are at least partially time-barred and recommends that the RICO claims be dismissed for failure to state a claim, with leave to amend only as to the potentially timely claims.

> 1. All RICO Claims for Injuries Discovered on or before August 13, 2016, Are Time-Barred

The statute of limitations for civil RICO actions, imported from the Clayton Act, is four years.  Agency Holding Corp. v. Malley-Duff & Assoc., Inc., 483 U.S. 143, 156 (1987); Pincay v. Andrews, 238 F.3d 1106, 1108 (9th Cir. 2001).  When applying this statute of limitations, courts in the Ninth Circuit follow the "injury discovery" rule, which has two components.  Grimmett v. Brown, 75 F.3d 506, 510 (9th Cir. 1996).  "First, the civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies [the] cause of action."  Id. (internal quotation omitted); Pincay, 238 F.3d at 1109 (noting that either "actual or constructive notice" begins statute of limitations).  The second component is the "separate accrual rule," "which provides that a new cause of action accrues for each new and independent injury, even if the RICO violation causing the injury happened more than four years before."  Grimmett, 75 F.3d at 510.

In keeping with the Supreme Court's interpretation that Congress intended RICO to incentivize "prompt litigation to combat racketeering," Rotella v. Wood, 528 U.S. 549, 557 & n.3 (2000), "the 'injury discovery' rule encourages diligence in RICO prosecutions and insures that evidence remains fresh," Grimmett, 75 F.3d at 512.  Nevertheless, general equitable tolling doctrines apply to RICO claims.  Id. at 514.

> *a. Tolling*

Plaintiff asserts multiple injuries caused by alleged RICO violations, all of which occurred quite some time ago; however, the RICO statute of limitations can restart afresh with each "new and independent injury," Grimmett, 75 F.3d at 510.  See Tanaka v. First Hawaiian Bank, 104 F.

2    Supp. 2d 1243, 1246 (D. Haw. 2000) (noting that separate accrual rule applies in multiple-injury

3    cases, and that "'new and independent' acts causing 'separate and independent' injuries accrue

4    anew").  Therefore, the court finds it useful to work backwards from the filing of the complaint to

5    establish the earliest possible accrual—that is, injury discovery—date that would support a timely

6    RICO claim in this case.

7         Plaintiff filed this action in state court on January 29, 2021.  (ECF No. 1.1 at 2.)  Thus,

8    without tolling, her only timely RICO claims are those that accrued on or before January 29, 2017

9    (4 years earlier).  However, the court is persuaded to a certain extent by plaintiff's tolling

10   argument and is willing to assume a slightly earlier accrual cut-off date of August 13, 2016,

11   (4 years before the federal criminal charges were filed against Schoenfeld).

12        Plaintiff argues that the statute of limitations for her RICO claims was tolled during the

13   federal criminal investigation and prosecution of Schoenfeld's conspiracy.[8]  (ECF Nos. 15 at 8,

14   28 at 2-3.)  In support of her theory, plaintiff points to the Clayton Act's tolling provision,

15   15 U.S.C. § 16(i), which "suspends the running of a statute of limitations on a private right of

16   action during the pendency of a criminal proceeding instituted by the United States [in the

17   Clayton Act context, to enforce antitrust laws] and for one year thereafter if the private right of

18   action is based in whole or in part on any matter complained of in the criminal proceeding."  Pres.

19   Petrified Forrest v. Renzi, No. CV-12-08140-PHX-DGC, 2013 WL 530574, at *2 (D. Ariz. Feb.

20   12, 2013).

21        The court is willing to assume, at least for now, that the Clayton Act's tolling provision

22   applies to RICO claims.  Surprisingly few courts have addressed the question of whether the

23   Clayton Act's tolling provision must be applied in RICO cases, which already borrow the Clayton

24   Act's general four-year statute of limitations.  The court is aware of only three cases to decide the

25   issue, with two holding that § 16(i) applies to RICO.  See Pres. Petrified Forrest, 2013 WL

26   530574, at *2-3 (reviewing prior cases and concluding that § 16(i) applies to civil RICO claims);

27   Kerman v. Chenery Assocs., Inc., No. 3:06CV-338-S, 2011 WL 1106736, at *3-4 (W.D. Ky.

---

[8]  Plaintiff neither argues nor pleads any additional basis for tolling.

Mar. 23, 2011) (declining to suspend limitations period on RICO claims under § 16(i) in the absence of any binding authority, and noting that § 16(i) would not apply on the facts of that case anyway); Pension Fund-Mid-Jersey Trucking Indus. v. Omni Funding Grp., 687 F. Supp. 962, 964-65 (D.N.J. 1988) (holding that Clayton Act tolling provisions apply under RICO, based on RICO being patterned after the Clayton Act whose tolling provisions are "inextricably entwined" with its statute of limitations).  The court finds the reasoning of the district courts in Preserve Petrified Forest, which plaintiff quotes at length, and Pension Fund persuasive; and in the absence of any Ninth Circuit precedent on the question, the court is willing to assume that plaintiff's RICO statute of limitations was tolled during the pendency of the parallel criminal proceedings against Schoenfeld.  See Pres. Petrified Forest, 2013 WL 530574, at *2 (noting the court's reasoning in Pension Fund that "the purpose of the tolling provision in the Clayton Act was to allow private plaintiffs to benefit from the Government's prior litigation and that a similar purpose could be served in the RICO civil enforcement context" (citing 687 F. Supp. at 964-65)).

But even with the benefit of § 16(i), plaintiff's statute of limitations would only be tolled as of the filing of the criminal information against Schoenfeld on August 13, 2020 (United States v. Schoenfeld, No. 2:20-cr-0150-KJM (E.D. Cal.), ECF No. 1)—not as of the commencement of the criminal investigation of Schoenfeld sometime in 2014 or 2015.

In Dungan v. Morgan Drive-Away, Inc., the Ninth Circuit declined to use an investigation commencement date to start tolling the Clayton Act claims at issue there.  570 F.2d 867, 871 (9th Cir. 1978) (noting that selecting the "initiation of an investigation" as the tolling start date would "introduce great uncertainty in fixing the time at which the suspension period commences"); see Garrison v. Oracle Corp., 159 F. Supp. 3d 1044, 1068 (N.D. Cal. 2016).  "Instead, courts have used the date on which the government filed a complaint as the date on which statutory tolling began."  Garrison, 159 F. Supp. 3d at 1068 (collecting cases).  These holdings align with the text of § 16(i), itself, which provides for tolling "[w]henever any civil or criminal proceeding is instituted by the United States."  5 U.S.C. § 16(i) (emphases added).  Thus, the earliest point at which the statute of limitations for plaintiff's RICO claims could have started to toll was August 13, 2020, the date the government filed the criminal information against Schoenfeld.  The

12

criminal proceeding against Schoenfeld concluded on February 10, 2021, when judgment was

entered.  (No. 2:20-cr-0150-KJM (E.D. Cal.), ECF No. 38.)  Because the instant civil case is

based at least in part on Schoenfeld's conspiracy conduct charged in the criminal case, her RICO

tolling continued up to (and would have carried beyond) plaintiff's filing of her complaint on

January 29, 2021.  See 5 U.S.C. § 16(i) (providing tolling for any right of action "based in whole

or in part on any matter complained of in [the federal enforcement] proceeding" through the

pendency of the enforcement proceeding and one year thereafter).

The court concludes that plaintiff's RICO limitations period was not suspended from the

commencement of the federal investigation of Schoenfeld.  However, for purposes of this motion,

the court is willing to assume that the limitations period for any then-existing RICO claims was

suspended as of August 13, 2020, applying the tolling provision of § 16(i).  Thus, the only timely

RICO claims plaintiff could assert in this action are those that accrued after August 13, 2016—

that is, within four years of the tolling start date.[9]

*b.  Accrual*

Under Ninth Circuit law, plaintiff's RICO claims accrued when she knew or should have

known of the underlying injury.  Grimmett, 75 F.3d at 510.  As noted, plaintiff asserts multiple

injuries related to the alleged RICO violations, including (1) the failure to hire her for managerial

positions in 2013, and (2) the adverse employment actions she later suffered allegedly as a result

of retaliation for exposing Schoenfeld's conspiracy.  (Complaint ¶¶ 16, 18-19, 31-35, 37, 79, 82;

ECF No. 15 at 8-10.)

Based on the surrounding allegations, plaintiff had at least constructive knowledge of the

failure-to-hire injury well before August 2016.  See Pincay, 238 F.3d at 1110 (plaintiffs are

"deemed to have had constructive knowledge if [they] had enough information to warrant an

investigation which, if reasonably diligent, would have led to discovery of the fraud" (internal

---

[9] Section 16(i)'s tolling provision, of course, does not revive any claims for which the statute of
limitations already expired before tolling commenced.  See Kerman, 2011 WL 1106736, at *4
(concluding that § 16(i) would not apply where 4-year limitations period expired prior to
institution of parallel criminal proceedings); id. ("Once the limitations period expired in 2005, the
later filing of an information against [the criminal defendant] did not revive the claims.").

quotation omitted)).  It was "immediately clear" to plaintiff upon starting her lower-level Analyst position in December 2013 that the person hired for the manager position had none of the requisite experience or knowledge.  (Complaint ¶¶ 1, 22.)  "Within days" of first reviewing the transportation budget in the summer of 2014, plaintiff "had acquired evidence of unethical and irregular procurement" sufficient to report Schoenfeld's conduct to her supervisor and to the internal Ethics and Compliance hotline; and the internal investigation launched immediately thereafter, with her assistance, "resulted in Schoenfeld's termination from PG&E."[10]  (Id. ¶¶ 25, 27.)  Further, plaintiff reported Schoenfeld and Silver's "offenses of federal crimes" to the FBI during an in-person interview and phone conversations in late 2014 or early 2015.  (Id. ¶ 78.)  Shortly after plaintiff "reported the criminal activity in 2014," the alleged retaliation by Dujmovich and Schultz began.  (Id. ¶ 2.)  These allegations demonstrate that plaintiff knew of Schoenfeld's fraud as early as 2014; and, taken together, they indicate that sometime in 2015 plaintiff also had enough information to warrant an investigation into whether she was passed over for the manager positions in order to shield the conspiracy from exposure.  See Pincay, 238 F.3d at 1110.

As to the other adverse employment actions, plaintiff provides no precise dates for any specific acts of retaliation by her supervisors Schultz and Dujmovich.  Their retaliation apparently began shortly after plaintiff reported Schoenfeld's conduct in 2014 and continued until August 7, 2017, when plaintiff transferred out of the department.  (Complaint ¶¶ 2, 4, 35 (citing "continual" and "continuous" retaliation).)  In terms of specific injuries recognized by RICO,[11] plaintiff alleges that she routinely received the lowest acceptable performance evaluations as well as the minimum bonus payouts and cost-of-living raises, and that she was relocated to a less desirable

---

[10]  The complaint does not allege when exactly Schoenfeld was fired.

[11]  "[P]ersonal injuries," such as emotional distress, harassment, or physical injury, "are not compensable under RICO."  Oscar v. Univ. Students Coop. Assn., 965 F.2d 783, 785 (9th Cir. 1992) (en banc), abrogated on other grounds by Diaz v. Gates, 420 F.3d 897 (9th Cir. 2005).  Thus, plaintiff's allegations of off-color comments (Complaint ¶ 31), being "defamed," "ostracized," or otherwise emotionally harmed (Complaint ¶¶ 4, 37(b)-(c)) do not qualify as RICO injuries.

work site where her professional growth opportunities were limited.  (Id. ¶¶ 3, 32, 33, 37(d), 37(e), 37(g).)

Without the benefit of specific dates tied to each of these asserted injuries, the court cannot say at this juncture which could support recovery (by falling within the RICO statute of limitations) and which do not.  Presumably, a large number of these injuries occurred between 2014 and August 2016, in the wake of plaintiff's 2014 reporting and Schoenfeld's firing.  As to any injuries occurring during that span, the court finds that plaintiff had actual knowledge that these injuries were occurring at the time and at least constructive knowledge that they were occurring because of retaliation by individuals she believed to be connected to Schoenfeld's conspiracy.

At plaintiff's meeting with her second-level supervisor, Dujmovich, sometime in the summer of 2014—where she raised her concerns about Schoenfeld's contract procurements—"it was immediately apparent Dujmovich was covering for Schoenfeld," and Dujmovich never reported the issues to PG&E himself.  (Id. ¶ 26.)  Further, plaintiff knew Dujmovich to be "a personal friend and member of the 'Michigan Mafia' with Schoenfeld."  (Id.)  When Dujmovich allegedly assigned her the overly burdensome task of rebuilding the entire transportation sourcing process after the AAL contracts were terminated, plaintiff told Schultz (her third-level supervisor) of "the retaliation against her by Dujmovich."  (Id. ¶¶ 31-32.)  Plaintiff was shocked to receive the bare minimum performance evaluations despite having saved the company millions of dollars by refusing to "look the other way."  (Id. ¶ 37(d).)  The combined effect of these allegations is that plaintiff had enough information, almost certainly at some point August 2016, to warrant an investigation into whether Dujmovich's—and to a lesser extent, Schultz's—pay and performance related actions were taken in retaliation for exposing Schoenfeld's conspiracy.  See Pincay, 238 F.3d at 1110.

Given such constructive knowledge of her injuries, it was incumbent upon plaintiff to swiftly pursue any RICO remedies.  See Rotella, 528 U.S. at 555, 557, 559 (noting that purpose of statutes of limitations is to eliminate stale claims, and that RICO's purpose is not merely to compensate victims but to "reward the swift who undertake litigation in the public good").  In her

15

opposition briefs, plaintiff does not argue that she lacked sufficient awareness of the injuries or their connection to the Schoenfeld conspiracy to bring a RICO cause of action sooner; her only opposition to the RICO statute of limitations defense is the tolling argument addressed above. However, at the August 26, 2021 status conference, in response to the court's questions regarding her delay in filing suit, plaintiff stated that she did not know "for sure" that her injuries were caused by Schoenfeld's conspiracy until the government filed the criminal charges against him in 2020.[12]  As just explained, however, the RICO statute of limitations is not triggered by absolute certainty of one's claim; rather, it begins upon actual <u>or constructive</u> knowledge of the underlying injury.  <u>Pincay</u>, 238 F.3d at 1110.  Nor is there any general procedural requirement that a plaintiff must be entirely certain of the basis of her claims before filing a complaint in federal court.  <u>Cf.</u> Fed. R. Civ. P. 11(b)(3) (requiring only that "factual contentions have evidentiary support <u>or</u> . . . <u>will likely have evidentiary support after a reasonable opportunity for further investigation or discovery</u>" (emphasis added)).

Moreover, in adopting the "injury discovery" rule, the Ninth Circuit flatly rejected as "wrong" the assumption that "a plaintiff's cause of action should not accrue until she has discovered that all elements exist."  <u>Grimmett</u>, 75 F.3d at 512; <u>see</u> <u>Rotella</u>, 528 U.S. at 555 (in rejecting the minority "injury and pattern discovery" rule, noting that "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock").  "That is, even if a plaintiff did not know the injury was caused by a pattern of RICO activity, a claim would still accrue and the statute of limitations would still run."  <u>Tanaka</u>, 104 F. Supp. 2d at 1246.  This strict interpretation of the RICO statute of limitations supports finding all of plaintiff's RICO claims arising from injuries occurring on or before August 13, 2016 time-barred because she had at least constructive knowledge of them and their connection to the alleged RICO violations at the time they occurred.

---

[12]  Plaintiff forfeited this argument by not raising it in her written opposition brief.  However, in the interest of thoroughness, the court briefly explains why plaintiff's argument is not persuasive.  In the future, plaintiff should include all arguments in her opening brief (whether in support of or opposition to a motion) so that defendants have the chance to substantively respond to those arguments.  The same, of course, holds true for defendants.

Nevertheless, the "separate accrual rule"—the second component of the injury discovery rule—somewhat tempers this strict interpretation and could conceivably save a small portion of plaintiff's RICO claims in this case.  There is a short window within four years of the assumed tolling start date when plaintiff was still working under Dujmovich and Schultz in the Supply Chain department and potentially still experiencing retaliation, specifically from August 14, 2016 through August 7th, 2017 (when she transferred out of the department).  As discussed in the next section, certain forms of retaliation constitute predicate acts of racketeering activity, <u>see</u> 18 U.S.C. §§ 1513(e), 1961(1)(B), and thus could trigger application of the separate accrual rule. If plaintiff can identify a sufficiently "new and independent" injury or injuries that she suffered during that year, due to a RICO violation, she could still seek to recover damages for those most recent injuries.[13]

Under the Ninth Circuit's separate accrual rule, the RICO limitations period can be reset by an "overt act" with two characteristics:  (1) it must be "a <u>new and independent act</u> that is not merely a reaffirmation of a previous act," and (2) it must "<u>inflict new and accumulating injury</u> on the plaintiff."  <u>Grimmett</u>, 75 F.3d at 513 (emphasis in original) (quoting <u>Pace Indus., Inc. v. Three Phoenix Co.</u>, 813 F.2d 234, 238 (9th Cir. 1987)).  Even if both criteria are met, that only permits the plaintiff to recover those damages sustained within the newly restarted limitations period.  <u>See Klehr v. A.O. Smith Corp.</u>, 521 U.S. 179, 190 (1997) (discussing separate accrual rule, without specifically adopting it, wherein "the commission of a separable, new predicate act within a 4-year limitations period permits a plaintiff to recover for the <u>additional</u> damages caused by that act" (emphasis added)); <u>Grimmett</u>, 75 F.3d at 512 ("[D]amages may not be recovered for injuries sustained as a result of acts committed outside the limitations period.").

Defendants do not acknowledge the potential application of the separate accrual rule here, and it appears from the court's preliminary review of the case law that plaintiff's chances of succeeding under this theory are slim.  This is partly because the current allegations suggest that

---

[13]  Of course, plaintiff would also have to adequately plead a RICO violation to support such recovery—something the current complaint does not do, as explained in the next section.

plaintiff experienced the same set of allegedly retaliatory pay and performance reviews over and over, across her several years in the Supply Chain department.  Claims of repeated injuries of the same sort that are part of the same scheme are typically rejected as a basis for applying the separate accrual rule.  See, e.g., Grimmett, 75 F.3d at 514 (rejecting acts as not "new and independent" where they were part of the "same . . . scheme" and the claimed injuries were identical to those alleged in the time-barred period); Towne v. Robbins, No. CIV. CV02-1688-MO, 2005 WL 139077, at *3 (D. Or. Jan. 20, 2005).

The other problem for plaintiff, should she attempt to invoke the separate accrual rule in support of any amended RICO claim, is that it appears the RICO enterprise had already ended by 2015, before the only injuries that might support a timely RICO claim occurred.  (See Complaint ¶¶ 1, 13-14 (alleging conspiracy was in effect from 2006 to September 2014); ECF No. 15 at 6 (arguing that "the enterprise terminated in February 2015").)  Thus, it is uncertain at best that any injurious actions by Dujmovich or Schultz after August 13, 2016, could restart the statute of limitations for plaintiff's RICO claims under the separate accrual rule.

### c. Dismissal of RICO Claims against Defendants Schoenfeld and Silver

Having established August 14, 2016, as the earliest possible timely accrual date, any of plaintiff's RICO claims that accrued before that date should be dismissed with prejudice as time-barred.  Although it is unclear in the present complaint exactly when plaintiff's RICO claims against defendants Dujmovich and Schultz accrued, the RICO claims against defendants Schoenfeld and Silver certainly accrued before that date and must be dismissed.

The only injury plaintiff alleges at the hands of defendant Schoenfeld, and arguably defendant Silver, is her failure to be hired as a manager in 2013.  (See Complaint ¶¶ 82, 87 (for both RICO causes of action, alleging plaintiff was "injured in her business and property in that: [she] was not hired for the Manager position by Schoenfeld").)  All of the other injurious employment actions were taken by defendants Dujmovich and Schultz over the following years. As discussed above, plaintiff had at least constructive knowledge of the failure-to-hire injury by 2015 at the latest.  Accordingly, her RICO claims stemming from that injury are barred by the four-year statute of limitations.  The undersigned therefore recommends dismissing with

18

2   prejudice (1) the RICO § 1962(c) claims against Schoenfeld and Silver contained in the Fifth

Cause of Action, and (2) the Sixth Cause of Action in its entirety, that is, both RICO § 1962(d)

3   claims against Schoenfeld and Silver.[14]  Given that these claims are time-barred as a matter of

4   law, amendment would be futile.

5        With the basis for plaintiff's RICO claims narrowed to any "new and independent"

6   injuries discovered after August 13, 2016, the court turns next to the substantive defects in

7   plaintiff's pleading of the remaining RICO claims.

8            2.   Failure to Plead the Elements of a RICO Claim

9        To the extent plaintiff asserts any RICO claims that are not time-barred against the

10  remaining moving defendants, Dujmovich and Schultz, the complaint fails to adequately plead

11  the elements of a RICO claim against them.  The complaint asserts RICO claims only under

12  § 1962(c) against Dujmovich and Schultz.[15]

13       Section 1962(c) makes it unlawful "for any person employed by or associated with any

14  enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct

15  or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

16  racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  Thus, in order to state

17  _____

18  [14]   Although defendant Schoenfeld did not file a motion to dismiss, the court "may properly on
its own motion dismiss an action as to defendants who have not moved to dismiss where such
19  defendants are in a position similar to that of moving defendants or where claims against such
defendants are integrally related."  Silverton v. Dep't of Treasury, 644 F.2d 1341, 1345 (9th Cir.
20  1981); see Kang-Shen Chen v. T.T. Grp., No. SACV 14-0138-DOC (DFMx), 2014 WL
12725598, at *4 (C.D. Cal. June 20, 2014) (sua sponte dismissing as time-barred RICO claim
21  against non-moving and moving defendants alike).  The undersigned finds that with respect to the
RICO statute of limitations, defendant Schoenfeld is identically situated to moving defendant
22  Silver.

23  [15]   Because both of plaintiff's § 1962(d) conspiracy claims should be dismissed as time-barred,
24  the court does not separately analyze the pleading defects with respect to this cause of action.
The court briefly observes, however, that to state a claim under § 1962(d), plaintiff must allege
25  specific facts plausibly suggesting a prohibited agreement.  See Howard v. America Online, Inc.,
208 F.3d 741, 751 (9th Cir. 2000) (violation of § 1962(d) requires "either an agreement that is a
26  substantive violation of RICO or that the defendants agreed to commit, or participated in, a
violation of two predicate offenses").  It is not enough to simply parrot the statutory language by
27  pleading that two people "conspired to conduct and participate in the affairs of the enterprise
through a pattern of racketeering activity."  (See Complaint ¶ 84.)
28

19

a claim under § 1962(c), plaintiff must allege facts showing: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'"  Living Designs, Inc. v. E.I. Dupont de Nemours and Co., 431 F.3d 353, 361 (9th Cir. 2005) (quoting Grimmett, 75 F.3d at 510).

The moving defendants argue that the complaint fails to allege any of the elements of this RICO claim, particularly challenging plaintiff's identification of the "enterprise" and her standing to bring RICO claims based on the arguable attenuation between the injurious adverse employment actions and the enterprise.  (ECF Nos. 7 at 13-20, 19.1 at 16-18.)

As explained below, the court agrees that the current complaint fails to plead how the remaining RICO defendants, Dujmovich and Schultz, were part of a RICO enterprise; however, if plaintiff can cure that defect in her pleadings, standing is not an obstacle to her RICO claims against them.

<em>a.   Conduct of an Enterprise</em>

Defendants Dujmovich and Schultz argue that plaintiff fails to allege sufficient facts to suggest that they conducted or participated in a RICO enterprise.  (ECF No. 19.1 at 16-17.)

A RICO "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4).  "This expansive definition is 'not very demanding.'"  United States v. Christensen, 828 F.3d 763, 780 (9th Cir. 2015) (quoting Odom v. Microsoft Corp., 486 F.3d 541, 548 (9th Cir. 2007) (en banc)).  An associated-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."  United States v. Turkette, 452 U.S. 576, 583 (1981).  To allege an associated-in-fact enterprise, a plaintiff must allege three basic elements: (1) a common purpose; (2) an ongoing organization, whether formal or informal; and (3) that the enterprise functions as a continuing unit.  Christensen, 828 F.3d at 780; Odom, 486 F.3d at 552-53.

Even in an associated-in-fact enterprise, though, a defendant must still have "participate[d], directly or indirectly, in the conduct of such enterprise's affairs" for RICO liability to attach.  18 U.S.C. § 1962(c); see Walter v. Drayson, 538 F.3d 1244, 1249 (9th Cir.

20

2008) ("Section 1962(c)'s 'conduct' requirement applies without regard to the nature of the
enterprise.").  As the Supreme Court explained in <u>Reves</u>, the statutory language requires that a
defendant "have <u>some</u> part in directing the enterprise's affairs."  <u>Reves v. Ernst & Young</u>, 507
U.S. 170, 179 (1993) (emphasis in original); <u>see id.</u> at 185 (holding that "'to conduct or
participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must
participate in the operation or management of the enterprise itself").

Plaintiff's complaint fails to identify an "enterprise" that defendants Schultz and
Dujmovich conducted or participated in.  The only enterprise plaintiff clearly alleges is the
"Criminal Enterprise" conducted by Schoenfeld and Silver.  (Complaint ¶ 76.)  The complaint
refers back to paragraphs 14 and 15 in which plaintiff describes the kickback scheme orchestrated
by Schoenfeld and Silver from 2006 to 2014.  Defendant Dujmovich is mentioned only in
paragraph 15 where plaintiff alleges that both Dujmovich and Schoenfeld were members of the
"Michigan Mafia."  (Complaint ¶ 15.)  Despite using the term "mafia," plaintiff never alleges that
this group had any particular purpose, much less a criminal purpose.  Although Schoenfeld
allegedly met with the group "frequently outside of PG&E facilities, usually weekly," there is no
explanation of why (<u>id.</u>); nor is there any allegation that the "Michigan Mafia" was directing or
otherwise participating in the kickback scheme on any level.[16]  Other than their shared
membership in the "Michigan Mafia," Dujmovich is only alleged to be a "close personal friend"
of Schoenfeld.  (Complaint ¶¶ 2, 26, 79.)

The connection between defendant Schultz and the "Criminal Enterprise" is even more
tenuous.  Schultz is not mentioned at all in paragraphs 14 and 15; nor is he alleged to be a
member of the "Michigan Mafia."  His only connection to Schoenfeld or Silver is that he was a
"mentor" of Silver's.  (Complaint ¶¶ 30, 79.)  Being a friend or mentor to a person conducting a
RICO enterprise does not amount to participating in the conduct of the enterprise.

---

[16]   At best, the complaint describes the "Michigan Mafia" as a tight-knit group of PG&E
employees, including Schoenfeld and Dujmovich, and that Dujmovich refused to report the
budget discrepancies plaintiff discovered and disparaged plaintiff for getting Schoenfeld fired.
(Complaint ¶¶ 26, 28.)

Plaintiff never explains what "common purpose" might have bound Dujmovich and Schultz together with Schoenfeld and Silver in any potential associated-in-fact enterprise.  See Odom, 486 F.3d at 552 (requiring allegations showing that defendants "have associated for 'a common purpose of engaging in a course of conduct'" (quoting Turkette, 452 U.S. at 583)).  To the contrary, it appears that these two sets of defendants were allegedly operating with rather distinct purposes—with Schoenfeld and Silver working to defraud PG&E to their own profit, while the only identified goal of Dujmovich and Schultz's supervisory actions was to punish plaintiff.

The timing of Dujmovich and Schultz's allegedly retaliatory employment actions reinforces their lack of connection to the only "Criminal Enterprise" identified in the complaint. According to the complaint, the "criminal conspiracy had been effective from 2006 to 2014." (Complaint ¶ 1.)  "Shortly after [plaintiff] reported the criminal activity in 2014, she was retaliated against" by Dujmovich and Schultz.  (Complaint ¶ 2.)  Even accepting plaintiff's argument (which does not appear in the complaint itself) that "the enterprise terminated in February 2015," that would rule out much of Dujmovich and Schultz's alleged retaliation as a form of participating in the conduct of the enterprise to defraud PG&E.  See Baumer v. Pachl, 8 F.3d 1341, 1344 (9th Cir. 1993) (dismissing § 1962(c) claim against defendant whose only involvement was toward the end of the fraudulent scheme and was sporadic at best).

Thus, even assuming without deciding that the complaint pleads an enterprise consisting of Schoenfeld and Silver whose purpose was to defraud PG&E, there is no allegation that Schultz or Dujmovich participated in that enterprise.  Even further assuming that Dujmovich and Schultz were members of an associated-in-fact enterprise with Schoenfeld and Silver, there is absolutely no description of how Dujmovich and Schultz had any part in directing the enterprise's affairs. See Reves v. Ernst & Young, 507 U.S. at 179; Walter, 538 F.3d at 1247-48.

To the extent plaintiff intended to identify some other enterprise consisting of Dujmovich and Schultz alone, with some other purpose, the current complaint fails to allege any facts supporting the existence of such secondary enterprise.  The RICO claims against Dujmovich and Schultz should be dismissed with leave to amend to afford plaintiff the opportunity to adequately

22

plead their participation in an enterprise if she can do so in good faith.

2

*b.  Pattern of Racketeering Activities*

3          Only defendant Silver challenges the adequacy of the pleadings with respect to this

4   element.   Having already concluded that the RICO claims against Silver are time-barred, the

5   court need not address this alternative argument, which defendants Dujmovich and Schultz do not

6   separately raise.

7

*c.  Standing / Injury & Causation*

8          Instead, defendants Dujmovich and Schultz jump straight to arguing the absence of the

9   final element of a RICO claim:  lack of statutory standing.  (ECF No. 19.1 at 17-18.)

10         The ability to bring suit under RICO is limited to "[a]ny person injured in [their] business

11  or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  "This injury

12  requirement is described as an issue of standing."  Couch v. Wan, No. CV F 08-1621 LJO DLB,

13  2010 WL 3582519, at *18 (E.D. Cal. Sept. 10, 2010) (citing Sedima, S.P.R.L. v. Imrex Co., 473

14  U.S. 479, 496 (1985)).  "The RICO standing requirement has two components."  Id.  First, a

15  plaintiff must allege an injury to their "business or property."  Diaz v. Gates, 420 F.3d 897 (9th

16  Cir. 2005) (en banc).  Second, a plaintiff must allege that a RICO predicate act was both a but-for

17  cause and a proximate cause of their injury.  Hemi Grp., LLC v. City of New York, 559 U.S. 1, 9

18  (2010).

19         The court assumes for now that plaintiff suffered a cognizable RICO injury or injuries and

20  finds that plaintiff has statutory standing to challenge the injuries caused by defendants

21  Dujmovich and Schultz's alleged predicate acts of informant retaliation.

22

**i.   Injury to Business or Property**

23         To recover under RICO, a plaintiff "must show proof of concrete financial loss."

24  Guerrero v. Gates, 442 F.3d 697, 707 (9th Cir. 2006) (quoting Chaset v. Fleer/Skybox Int'l, LP,

25  300 F.3d 1083, 1087 (9th Cir. 2002)).  "[P]ersonal injuries," such as emotional distress,

26  harassment, or physical injury, "are not compensable under RICO."  Oscar v. Univ. Students

27  Coop. Assn., 965 F.2d 783, 785 (9th Cir. 1992) (en banc), abrogated on other grounds by Diaz v.

28

23

Gates, 420 F.3d 897 (9th Cir. 2005).

Defendants Dujmovich and Schultz do not challenge the sufficiency of plaintiff's asserted injuries, and the court assumes for now that at least some of plaintiff's alleged injuries attributable to these two defendants are injuries to plaintiff's property interests and therefore support a RICO claim.  (See Complaint ¶¶ 3, 32, 33, 37(d), (e), (g) (alleging low annual reviews and transfer to remote work site, impacting wage and bonus levels and opportunity for promotion.)  See Diaz v. Gates, 420 F.3d 897, 900 (9th Cir. 2005) ("intentional interference with contract and interference with prospective business relations," both torts under California law, satisfy harm to specific property interest); Vierria v. Cal. Highway Patrol, 644 F. Supp. 2d 1219, 1237 (E.D. Cal. 2009) (accepting as cognizable injuries alleged damages of "lost past and future income, sick leave, annual leave and personal stress leave benefits, loss of employment and career opportunities"); Couch, 2010 WL 3582519, at *20 (finding that allegations of "lost seniority, lost opportunities for transfer to other positions, promotions, and career advancement" satisfy RICO injury requirement).

### ii.    Causation

Defendants Dujmovich and Schultz exclusively challenge plaintiff's statutory standing based on causation.  (ECF No. 19.1 at 17-18.)

For the causation component of RICO standing, "the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of [their] injury, but was the proximate cause as well.'"  Hemi Grp., 559 U.S. at 9 (quoting Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992); see Rezner v. Bayerische Hypo-Und Vereinsbank AG, 630 F.3d 866, 873 (9th Cir. 2010).  "Proximate cause for RICO purposes . . . requires some direct relation between the injury asserted and the injurious conduct alleged.  A link that is too remote, purely contingent, or indirect is insufficient."  Hemi Grp., 559 U.S. at 9 (cleaned up).

Defendants Dujmovich and Schultz argue that plaintiff lacks statutory standing because, they say, "[a]n employee who is wrongfully discharged, or otherwise suffers adverse employment actions, after reporting alleged racketeering activity lacks standing to sue under Section 1962(c)

and (d)."  (ECF No. 19.1 at 17.)  Defendants rely on <u>Reddy v. Litton Indus., Inc.</u>, in which the

Ninth Circuit indeed held that a former-employee plaintiff "lack[ed] standing to sue under

§ 1962(c) because the injury he suffered was the result of his alleged wrongful termination and

was not caused by predicate RICO acts."  912 F.2d 291, 294 (9th Cir. 1990).  The facts in <u>Reddy</u>

closely resemble the allegations here in certain respects.  In the course of Mr. Reddy's

employment, he discovered a bribery scheme, reported it to his superiors, and thereafter was fired

allegedly for refusing to participate in his company's cover-up of the bribes.  <u>Id.</u> at 292-93.  The

Ninth Circuit reasoned that "that the only compensable injury under the RICO statute is for 'harm

<u>caused by [the] predicate acts</u> . . . ."  <u>Id.</u> at 294 (quoting <u>Sedima</u> 473 U.S. at 497) (emphasis and

alterations in <u>Reddy</u>).  The court held that, because Mr. Reddy was "harmed by his discharge

from employment, and <u>not</u> by the pattern of racketeering activity" (that is, the company's

predicate acts of bribery), he lacked a compensable injury and thus had no RICO standing.  <u>Id.</u>

(emphasis in original).

     <u>Reddy</u> remains controlling precedent in this circuit for the proposition that an employee

who is wrongfully discharged (or subjected to another adverse employment action) for refusing to

participate in an alleged pattern of racketeering activity lacks standing to sue under § 1962(c).

<u>See</u> <u>Khobragade v. Covidien LP</u>, No. 16-CV-068, 2019 WL 652424, at *9 (S.D. Cal. Feb. 15,

2019), <u>aff'd</u>, 821 F. App'x 834 (9th Cir. 2020); <u>Herrick v. S. Bay Lab. Council</u>, No. C-04-02673

RMW, 2004 WL 2645980, at *3 (N.D. Cal. Nov. 19, 2004); <u>Kiefer v. Lithia HPI, Inc.</u>, No. CV

02-3030-TC, 2003 WL 27385963, at *3-6 (D. Or. Jan. 29, 2003).

     The <u>Reddy</u> rule does not eliminate plaintiff's standing in this case, however, because of a

key factual distinction and legislative development post-<u>Reddy</u>.  Twelve years after <u>Reddy</u>, as

part of the Sarbanes-Oxley Act of 2002, Congress amended the criminal informant-retaliation

statute, 18 U.S.C. § 1513, by adding subsection (e), which still currently provides:

> Whoever knowingly, with the intent to retaliate, takes any action
> harmful to any person, including interference with the lawful
> employment or livelihood of any person, for providing to a law
> enforcement officer any truthful information relating to the
> commission or possible commission of any Federal offense, shall be
> fined under this title or imprisoned not more than 10 years, or both.

Pub. L. No. 107–204, 116 Stat. 745 (2002); <u>see</u> <u>DeGuelle v. Camilli</u>, 664 F.3d 192, 195, 200 (7th Cir. 2011) (discussing addition of § 1513(e) and reversing dismissal of RICO claims where employee was terminated after reporting alleged tax fraud scheme to both the company and federal law enforcement).  RICO continues to count violations of Section 1513 as predicate acts.  <u>See</u> 18 U.S.C. § 1961(1)(B) ("racketeering activity" means any act indictable under, among others, "section 1513 (relating to retaliating against a witness, victim, or an informant)"); <u>DeGuelle</u>, 664 F.3d at 200 ("Under RICO, violations of § 1513 are considered 'racketeering activity.'").  Thus, the enactment of Sarbanes-Oxley on July 30, 2002, newly established as a RICO predicate act interference with employment in retaliation for reporting a possible federal offense to law enforcement.  <u>See</u> <u>DeGuelle</u>, 664 F.3d at 200-01 (citing pre-2002 cases denying RICO standing to employees terminated for refusing to cooperate in alleged racketeering schemes).

Unlike in <u>Reddy</u> and post-2002 cases in this circuit applying <u>Reddy</u>'s rule where no underlying offense was reported to federal authorities, plaintiff here alleges that she "reported the offenses of federal crimes of [Schoenfeld] and Silver during an in person interview and phone conversations with the Federal Bureau of Investigations in late 2014 and/or early 2015." (Complaint ¶ 78.)  There is no reason to doubt that the FBI officer(s) she spoke with were "law enforcement officers."  <u>See</u> 18 U.S.C. § 1515(a)(4)(A) (for purposes of §§ 1512 and 1513, defining "law enforcement officer" as, inter alia, an officer or employee of the federal government authorized to "engage in or supervise the prevention, detection, investigation, or prosecution of an offense").  Further, there is no dispute that the conduct plaintiff reported to the FBI was the same conduct that formed the basis of Schoenfeld's guilty plea and conviction for committing a criminal offense under 18 U.S.C. § 371.

The court does not analyze in detail whether the remaining elements of a § 1513(e) violation are sufficiently pled, as defendants do not challenge the pleading on this basis. However, it is clear that plaintiff is claiming defendants Dujmovich and Schultz interfered with her employment—through the previously identified adverse employment actions—and that their interference was "specifically intended to punish [plaintiff] for uncovering the Criminal

26

2   Enterprise of Schoenfeld, who was Dujmovich's personal friend, and Silver, for which [Schultz]

3   was her mentor." (Complaint ¶¶ 79.) The above allegations in combination appear sufficient to

    plead a violation of § 1513(e), which is a RICO predicate act under current law. See Vierria v.

4   California Highway Patrol, 644 F. Supp. 2d 1219, 1236-37 (E.D. Cal. 2009).

5           It is unclear whether or not defendants acknowledge that the type of retaliation plaintiff

6   alleges is now recognized as a predicate act under RICO. (See ECF No. 19.1 at 18 (stating that

7   "the alleged adverse employment actions by Schultz and Dujmovich are predicate acts"

8   immediately after explaining Reddy's holding that the act of terminating plaintiff's employment

9   was not a predicate act).) Regardless, the court holds that on the current allegations, plaintiff does

10  have standing to bring RICO claims against Dujmovich and Schultz because the harm she

11  suffered (lost wages, bonuses, and promotion opportunities) was allegedly caused by these

12  defendants' predicate acts of informant retaliation.[17] With the enactment of § 1513(e), Reddy, 12

13  F.2d 291, does not bar RICO standing for a plaintiff who alleges that they experienced a

14  sufficiently concrete adverse employment action in retaliation for reporting a suspected federal

15  offense to federal law enforcement.

16          Of course, even with standing, in any amended complaint plaintiff would have to cure the

17  above-described defects in pleading Dujmovich and Schultz's participation in the conduct of an

18  enterprise; and she would also have to adequately plead that their repeated retaliatory acts

19  _____

20  [17] Aside from Reddy, defendants Dujmovich and Schultz's only other standing argument is a
    single sentence, lacking citation to authority, arguing that because the alleged retaliation began
21  after Schoenfeld's criminal activities ended in 2014, the retaliation could not have been essential
    to the enterprise. (ECF No. 19.1 at 18.) The court need not substantively address this
22  underdeveloped argument. However, it is worth noting that defendants' argument ignores the
    possibility that plaintiff might identify some alternative enterprise other than Schoenfeld's
23  kickback conspiracy to defraud PG&E. In any event, retaliation occurring after the underlying
    scheme is reported can be, indeed often is, related to the underlying scheme. See DeGuelle, 664
24  F.3d at 201-02 (recognizing that although a predicate act of retaliation will not always be related
    to underlying wrongdoing, "in most cases" they are interrelated).
25

26     Defendants Schultz and Dujmovich also argue for dismissal of the purported § 1962(d) RICO
27  claims against them, but the complaint asserts no § 1962(d) claims against them—only against
    Schoenfeld and Silver. (Complaint at 24-25.)
28

27

constituted a "pattern" of racketeering activity.[18]  Although plaintiff cannot <u>recover</u> for any

injuries (retaliatory or otherwise) that occurred on or before August 13, 2016, due to the statute of

limitations issue explained above, she may nevertheless use any prior injuries as part of the basis

for showing a pattern of racketeering activity that extended beyond the limitations cut-off date.

### 3.   Conclusion

Even under the most generous reading of the law and the complaint, most if not all of

plaintiff's RICO claims are time-barred.  The court recommends dismissing with prejudice both

RICO claims against defendants Schoenfeld and Silver (COA #5 & #6), as there is no possibility

of pleading a timely claim against either of them.

It remains possible, however, that plaintiff could amend the complaint to state a timely

RICO claim against defendants Dujmovich and Schultz.  As to these two defendants, the court

recommends dismissing with prejudice plaintiff's § 1962(c) cause of action (COA #5) insofar as

it is based on acts that occurred before the beginning of the RICO limitations period on

August 14, 2016, but permitting plaintiff to pursue RICO claims for subsequently occurring acts

if those acts are demonstrated to fall within RICO's "separate accrual rule."

### C.  Civil Conspiracy Claim (COA #8)

The complaint also asserts a related cause of action for "Civil Conspiracy" against the

four individual defendants.  Plaintiff alleges that all four "conspired to create AAL" and award it

transportation contracts in furtherance of the "criminal enterprise to defraud PG&E."  (Complaint

¶¶ 93-94.)

As defendants rightly point out, a cause of action for "civil conspiracy" cannot stand on its

own.  "A plaintiff [can] bring suit for civil conspiracy only if [s]he ha[s] been injured by an act

---

[18]   A "pattern" of racketeering activity requires at least two acts of racketeering activity,
occurring within a 10-year period.  18 U.S.C. § 1961(5).  Pleading two predicate acts is necessary
but not sufficient for liability because § 1961(5) also "assumes that there is something to a RICO
pattern <u>beyond</u> simply the number of predicate acts involved."  <u>H.J. Inc. v. Northwestern Bell
Telephone Co.</u>, 492 U.S. 229, 238 (1989).  The Supreme Court requires that there be "continuity
plus relationship" between the predicate acts to form a pattern.  <u>Id.</u> at 239.  That is, "to prove a
pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates
are related, <u>and</u> that they amount to or pose a threat of continued criminal activity."  <u>Id.</u>

that was itself tortious."  Beck v. Prupis, 529 U.S. 494, 501 (2000) (citing numerous state and lower court cases holding that there is no conspiracy liability without proving the elements of an underlying tort).[19]

     Plaintiff fails to plead the elements of a RICO claim against any defendant and asserts no other torts as the basis for this conspiracy cause of action.  Although plaintiff alleges that all four defendants generally deceived PG&E and conspired to promote the kickback scheme (Complaint ¶ 94), she does not plead with particularity how any individual defendant committed fraud, for instance.  Cf. Fed. R. Civ. P. 9(b); Lazar v. Superior Court, 12 Cal.4th 631, 638 (1996) ("The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.").

     Accordingly, the cause of action for civil conspiracy (COA #8) should be dismissed as to all defendants, with leave to amend in case plaintiff is able to adequately plead an underlying violation of RICO or another wrongful act as the basis for such civil conspiracy claim.[20]

**D. Employment Law Claims**

     In addition to the RICO and conspiracy claims, the complaint also brings the following labor and employment law causes of action:

- COA #1 for violation of California Labor Code § 1102.5 against unspecified defendants;
- COA #2 for Adverse Employment Action in Violation of Public Policy ("Tameny Claim") against unspecified defendants;

---

[19]  The court does not opine on the timeliness of this cause of action, as none of the moving defendants substantively argue this point in their opening brief.

[20]  Dismissal without prejudice is appropriate for non-moving defendant Schoenfeld as well, as he his similarly situated to moving defendant Silver for purposes of COA #8.  See Silverton, 644 F.2d at 1345.

Because it is recommended that COA #8 be dismissed with leave to amend, the undersigned does not currently recommend dismissing defendants Schoenfeld and Silver from the action altogether—although (as explained below) it is recommended that all other causes of action against them be dismissed with prejudice.

- COA #3 for Sex Discrimination in Violation of the California Fair Employment and Housing Act ("FEHA") against unspecified defendants;

- COA #4 for Unlawful Retaliation in Violation of FEHA against unspecified defendants; and

- COA #7, which actually contains two parallel causes of action for violation of (A) the California Equal Pay Act, Cal. Lab. Code § 1197.5 and (B) the federal Equal Pay Act, 29 U.S.C. § 206(d), both against defendants Schultz, Dujmovich, and PG&E.

(Complaint at 15-21, 25.)

Almost all of these causes of action are directed generally at "Defendants," without stating which defendants the claims are being asserted against. In her first opposition brief, plaintiff clarifies that she is not bringing any of her state employment law causes of action against defendant Silver (ECF No. 15 at 16-17), who is not alleged to have ever been a PG&E employee. Based on this disclaimer, the court limits its analysis to defendants Dujmovich and Schultz's arguments for dismissal of these claims.[21]

Defendants Dujmovich and Schultz move to dismiss each of the claims on various grounds, including (1) their applicable statutes of limitations and (2) whether the claims can apply to them as individual employee-supervisors, as opposed to plaintiff's "employer." (ECF No. 19.1 at 12-14, 18.)

The court finds the statute-of-limitations argument mostly—but not entirely—dispositive of plaintiff's wage discrimination claims and finds that none of the remaining employment law claims impose individual liability. Accordingly, the court recommends dismissing with prejudice all of the employment law claims (COAs #1-4 & #7) against the four individual defendants, except that a small fraction of the wage discrimination claims should be dismissed without prejudice since they could be timely pled with amendment.

///

---

[21] However, the court notes that all three moving defendants present largely the same arguments.

30

1.   Equal Pay Act ("EPA") Claims (COA #7)

The court begins with the federal and state wage discrimination claims, asserted together as the Seventh Cause of Action, against Dujmovich, Schultz, and PG&E.  (Complaint at 25.) Moving defendants Dujmovich and Schultz only challenge these claims as time-barred by the applicable statutes of limitations.[22]  (ECF No. 19.1 at 18.)  The court finds that the statute of limitations eliminates nearly all of the bases for recovery on these claims, but that a sliver of a window remains available to plaintiff in light of an emergency tolling rule instituted by California courts due to COVID-19.

The California and federal EPAs are "nearly identical" and prohibit sex discrimination in the form of different pay rates for equal work.[23]  Green v. Par Pools, Inc., 111 Cal. App. 4th 620, 623 (Cal. App. Ct. 2003).  Both statutory schemes establish a three-year statute of limitations for "willful" violations, or a two-year statute of limitations for general violations.  See Cal. Lab. Code § 1197.5(i); 29 U.S.C. § 255(a).  Under the EPA, each discriminatory paycheck a plaintiff receives "constitutes a separate violation of the EPA with a cause of action accruing (and the running of the limitations period commencing) upon the receipt of the discriminatory paycheck." O'Donnell v. Vencor Inc., 466 F.3d 1104, 1113 (9th Cir. 2006).  However, a plaintiff may not "recover back pay for discriminatory pay periods outside the applicable statute of limitations period" even when the plaintiff alleges a continuing violation.  Id.  The same "separate violation"

---

[22]  In the opening of their brief, Dujmovich and Schultz also contend that the complaint lacks factual allegations necessary to support a claim under the California and federal EPAs (ECF No. 19.1 at 8), but they never return to substantively argue this point later in the brief. Accordingly, the court only addresses the statute-of-limitations argument.

[23]  The federal EPA provides:

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . .

29 U.S.C. § 206(d)(1).

doctrine also applies to claims under the California EPA.  See Jones v. Tracy Sch. Dist., 27 Cal.

3d 99, 105-07 (1980) (holding that recovery is limited by the applicable statute of limitations);

Carroll v. City & Cty. of San Francisco, 41 Cal. App. 5th 805, 813 n.6, as modified on denial of

reh'g (Cal. App. Ct. Nov. 27, 2019) (noting California Supreme Court's view that § 1197.5

"embodies a theory of continuous accrual under which a claim can be made for the payment and

recovery of unequal wages paid within the Equal Pay Act's limitations period").

Plaintiff here alleges that defendants "intentionally, knowingly, and deliberately" paid her

less than they paid male employees for substantially equal work "from her date of hire to

August 7, 2017," when she transferred to a new department.  (Complaint ¶¶ 89-90.)  As

defendants seem to acknowledge, this is sufficient to allege a willful violation, triggering the

three-year limitations period.  See Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 903 (9th Cir.

2013) (noting that a plaintiff alleging violation of the Fair Labor Standards Act—of which the

EPA is part—"need not allege willfulness with specificity" at the pleading stage (citing Fed. R.

Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged

generally."))).

With the filing of this action on January 29, 2021, defendants argue that any EPA claims

accruing before January 29, 2018 are time-barred, and that this effectively bars all of plaintiff's

claims because the latest possible accrual date was August 7, 2017.  (ECF No. 19.1 at 18.)

Plaintiff counters that the statute of limitations on her state and federal EPA claims was tolled by

the California Judicial Council's Emergency Rule 9, implemented in response to the COVID-19

pandemic.  (ECF No. 28 at 3.)

Emergency Rule 9 tolled civil statutes of limitations that exceed 180 days from April 6,

2020 to October 1, 2020, an extension of 178 days.  See Cal. Rules of Court app. I, Emergency

rule 9(a) (adopted April 6, 2020, amended effective May 29, 2020), available at

https://www.courts.ca.gov/documents/appendix-i.pdf.  Federal courts are applying Emergency

Rule 9 to toll California state law claims.  See, e.g., Palacios v. Interstate Hotels & Resorts Inc.,

No. 21-CV-05799-TSH, 2021 WL 4061730, at *3-4 (N.D. Cal. Sept. 7, 2021); Tapia v. Hyatt

Corp., 2021 WL 3076650, at *5 (C.D. Cal. June 30, 2021) (applying ER 9 to toll claims even

though they technically expired 3 days before start of ER 9 extension period).[24]

Federal and state courts, alike, are treating Emergency Rule 9 as having the practical effect of adding 178 days to unexpired statutes of limitations.  See Palacios, 2021 WL 4061730 at *3 ("the practical effect of Emergency Rule 9 is to extend the time for [plaintiff] to file such claims [by 178 days] from February 1 to July 29"); Tapia, 2021 WL 3076650, at *5 (describing ER 9 as providing "an extension of 178 days"); Tchejeyan v. City Council of City of Thousand Oaks, No. 2D CV B309108, 2021 WL 2819393, at *3 (Cal. Ct. App. July 7, 2021) (adding 8 remaining unexpired days beyond end of the ER 9 tolling period).

Defendants do not respond to plaintiff's tolling argument in their reply.  The undersigned opts to follow the approach taken by previous courts, finding that Emergency Rule 9 tolled the statute of limitations for the California EPA claim,[25] and assuming for now that it could toll the statute of limitations for the federal EPA claim as well.[26]

Given the dearth of dates alleged regarding the adverse employment actions, the court must again work backwards in resolving the statute-of-limitations question.  Applying Emergency Rule 9, the court subtracts 178 days from January 29, 2021 (the filing date) to arrive at August 4, 2020.  To determine the earliest possible accrual date of any claims whose limitations period was not expired before August 4, 2020, the court then further subtracts the three years provided for

---

[24]  With the exception of Tapia, where the limitations period expired just days before the ER 9 tolling start date, federal courts are not permitting ER 9 to revive state law claims that lapsed before April 6, 2020.  See Simon Streets v. Space Systems/Loral, LLC, No. 20-CV-07901-EJD, 2021 WL 4146962, at *5 (N.D. Cal. Sept. 13, 2021) ("California's ER 9 . . . does not revive lapsed claims."); Redick, v. Lowe's Home Centers, LLC, No. 1:21-CV-0979-SAB, 2021 WL 3207250, at *4 n.3 (E.D. Cal. July 29, 2021) (noting that Emergency Rule 9 did not save plaintiff's claims because limitations period had already run as of April 6, 2020).

[25]  State law claims are governed by California's statutes of limitations.  Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp., 878 F. Supp. 2d 1009, 1015 (C.D. Cal. 2011).

[26]  It is not at all clear whether Emergency Rule 9 applies to federal claims.  See Simon Streets, 2021 WL 4146962, at *5 n.4; Harris v. Restivo, No. 1:20-CV-00797-EP-GPC, 2020 WL 3173035, at *1 n.1 (E.D. Cal. June 15, 2020).  However, given the slim chance of Emergency Rule 9 saving any portion of plaintiff's federal EPA claim, and given the present lack of briefing on the issue, the court applies the same tolling analysis to both the state and federal EPA claims.

willful violations of the state and federal EPAs to arrive at August 4, 2017.  Thus, the only EPA

claims that are timely brought in this action (with tolling by Emergency Rule 9) are those that

accrued on or after August 4, 2017—three days before plaintiff transferred to a new department,

where she alleges that the discriminatory treatment ceased.  While this is a tight window, it is not

impossible that plaintiff could in good faith allege in an amended complaint that she received a

discriminatory paycheck (or paychecks) on or after August 4, 2017.  Under binding precedent,

she cannot, however, recover for discriminatory wages received before August 4, 2017 (which the

court recognizes makes up the vast majority of the period at issue in this case).

Accordingly, the court recommends dismissing with prejudice plaintiff's federal and state

EPA causes of action (both contained in COA #7) insofar as they are based on discriminatory

wage payments received before August 4, 2017, the beginning of the tolled limitations period, but

permitting plaintiff to pursue federal and state EPA claims for any subsequently received wage

payments.[27]

2.  Labor Code § 1102.5 Whistleblower Claim (COA #1)

Plaintiff's First Cause of Action asserts a violation of California Labor Code § 1102.5, a

whistleblower protection statute.  (Complaint at 15-17.)  Though not specifically cited in

COA #1, it is clear plaintiff is asserting a violation of Section 1102.5(b), which prohibits

retaliation against an employee for reporting information regarding a suspected violation of state

or federal law.[28]

_____

[27]   The court does not address whether the complaint substantively pleads a cause of action for
violation of either the state or federal EPA, or whether such claims would lie against individual
employee-supervisors like Dujmovich and Schultz, as neither subject was raised in defendants'
motion.

[28]   As relevant to this case, Section 1102.5(b) provides:

An employer, or any person acting on behalf of the employer, shall not retaliate
against an employee for disclosing information . . . to a government or law
enforcement agency, to a person with authority over the employee or another
employee who has the authority to investigate . . . if the employee has reasonable
cause to believe that the information discloses a violation of state or federal
statute . . . .

2
3
4

Defendants Dujmovich and Schultz move to dismiss this cause of action both as time-barred and as improperly asserted against them as individuals.  (ECF No. 19.1 at 12-13.)  Because the court agrees with defendants' liability argument, it does not reach the statute-of-limitations question.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Section 1102.5 "has consistently been construed by district courts in the Ninth Circuit to preclude individual liability by a manager or other non-employer."  Dias v. Burberry Ltd., No. 21-CV-192-MMA (JLB), 2021 WL 2349730, at *5 (S.D. Cal. June 9, 2021) (collecting cases).  Significantly, Section 1102.5(b) expressly prohibits retaliation by "[a]n employer, or any person acting on behalf of the employer," following an amendment in 2014 that added the underlined text.  See Bales v. Cty. of EL Dorado, No. 2:18-CV-01714-JAM-DB, 2018 WL 4558235, at *1 (E.D. Cal. Sept. 20, 2018).  Based on the court's independent research, there still have not been any publicly reported California court cases addressing the issue of whether supervisors—like Dujmovich and Schultz—may be held individually liable under Section 1102.5 since the statute's amendment.  See Rosas v. NFI Indus., No. 2:21-CV-00046-WBS-CKD, 2021 WL 1264921, at *5 (E.D. Cal. Apr. 6, 2021).  However, "federal courts predicting how state courts would decide the issue of individual liability post-amendment have concluded that section 1102.5 does not impose individual liability."  Crone v. Tracy Unified Sch. Dist., No. 2:20-CV-01451-JAM-AC, 2020 WL 7182345, at *2 (E.D. Cal. Dec. 7, 2020) (collecting cases); see Rosas, 2021 WL 1264921, at *5 (noting that numerous federal courts have granted motions to dismiss § 1102.5 claims against individual defendants post-amendment, "largely on the ground that the California Supreme Court has interpreted similar statutory language to preclude individual liability"); see also Tillery v. Lollis, No. 1:14-CV-02025-KJM, 2015 WL 4873111, at *9-10 (E.D. Cal. Aug. 13, 2015) (explaining California Supreme Court interpretations and extensively reviewing legislative history before dismissing § 1102.5 claim against individual supervisors).[29]

25
26
27
28

---

[29]   There is a trend, largely among courts of the Central District of California, to grant motions to remand based on the perceived ambiguity of the amendment's language, but even those cases do not hold that § 1102.5 imposes individual liability.  See Baker v. Sunrise Senior Living, 2020 WL 7640731, at *3-4 (C.D. Cal. Dec. 23, 2020) (discussing post-amendment divisions and recognizing that "the plain language of section 1102.5 seems to stretch itself to individual

The only defendant Section 1102.5 can apply to in this action is PG&E, as that is the only defendant alleged to be plaintiff's "employer."  Dujmovich and Schultz are plaintiff's individual supervisors, not her employers, and as such the Section 1102.5 claim against them should be dismissed with prejudice.  To the extent plaintiff intended to bring this claim against non-moving defendant Schoenfeld as well, the Section 1102.5 claim should also be dismissed with prejudice as against him—since he is also not alleged to have been plaintiff's employer.  See Silverton, 644 F.2d at 1345 (court may sua sponte dismiss claims against non-moving defendants "where such defendants are in a position similar to that of moving defendants or where claims against such defendants are integrally related").

### 3.  *Tameny* Claim (COA #2)

Plaintiff's Second Cause of Action is for "Adverse Employment Action in Violation of Public Policy."  (Complaint at 17-18.)  This is a common law tort-style claim most commonly referred to as "wrongful termination in violation of public policy," as recognized in Tameny v. Atlantic Richfield Co., 27 Cal. 3d 167, 170 (1980).  Despite the traditional title of this cause of action, and contrary to defendants' unfounded opening argument, an adverse employment action taken in violation of public policy is actionable even if it falls short of a full termination.[30]  See Garcia v. Rockwell Internat. Corp., 187 Cal. App. 3d 1556, 1562 (Ct. App. 1986) ("[A]n employee can maintain a tort claim against his or her employer where disciplinary action has been taken against the employee in retaliation for the employee's "whistle-blowing" activities, even though the ultimate sanction of discharge has not been imposed."), abrogated on other grounds by Gantt v. Sentry Ins., 1 Cal. 4th 1083, 1092-93 (1992); Miller v. Danaher Corp., No. H040128, 2015 WL 6869364, at *23 (Cal. Ct. App. Nov. 9, 2015) ([A]n employee can maintain a tort claim

---

liability"); Bales, No. 2:18-CV-01714-JAM-DB, 2018 WL 4558235, at *1 (citing Central District cases but noting they did not involve motion to dismiss standard, nor did they hold that § 1102.5 imposes individual liability).  In the absence of state court guidance, the undersigned agrees with the uniform approach in this district of granting individual supervisors' motions to dismiss § 1102.5 claims against them.

[30]      Plaintiff remained employed by PG&E throughout the period at issue but alleges adverse employment actions such as failure to hire, failure to promote, and constructive demotion.

36

against his or her employer where adverse employment action short of termination has been taken in retaliation for the employee engaging in a protected activity." (citing <u>Garcia</u>)).

However, defendants Dujmovich and Schultz are correct in their alternative argument that they cannot be held liable on this <u>Tameny</u> claim because, as in the Section 1102.5 context, they are not plaintiff's employer.  The California Supreme Court instructs that a <u>Tameny</u> claim "lies only against an employer."  <u>Miklosy v. Regents of Univ. of California</u>, 44 Cal. 4th 876, 900-01 (2008) ("[A] <u>Tameny</u> action for wrongful discharge can only be asserted against <u>an employer</u>. An individual who is not an employer cannot commit the tort of wrongful discharge in violation of public policy; rather, he or she can only be the agent by which <u>an employer</u> commits that tort." (emphasis in original)); <u>see also</u> <u>Reno v. Baird</u>, 18 Cal. 4th 640, 664 (1998).

As with the Section 1102.5 cause of action, the only defendant a <u>Tameny</u> claim can apply to in this action is PG&E, as that is the only defendant alleged to be plaintiff's "employer." Dujmovich and Schultz are plaintiff's individual supervisors, not her employers, and as such the <u>Tameny</u> claim against them should be dismissed with prejudice.  To the extent plaintiff intended to bring this claim against non-moving defendant Schoenfeld as well, the <u>Tameny</u> claim should also be dismissed with prejudice as against him—since he is also not alleged to have been plaintiff's employer.  See <u>Silverton</u>, 644 F.2d at 1345.

### 4.  FEHA Discrimination & Retaliation Claims (COAs #3 & #4)

Plaintiff's final two causes of action are for sex discrimination and unlawful retaliation in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12940(a), (h).  (Complaint at 18-21.)  The court addresses both together because, once again, neither claim can lie against individuals who are not a plaintiff's employer.[31]

California Government Code Section 12940 establishes a litany of unlawful employment practices and prohibits, as relevant here, sex discrimination (subsection (a)), retaliation (subsection (h)), and harassment (subsection (j)).  Based on certain differences in the statutory

---

[31]  Given this conclusion, the court does not address defendants Dujmovich and Schultz's alternative argument that these claims should be dismissed for lack of timely administrative exhaustion.

language used in each of these three provisions, and various policy considerations, the California

Supreme Court holds that only one (§ 12940(j), governing harassment) imposes liability on

individual employees for the conduct underlying an alleged FEHA violation.  See Jones v. Lodge

at Torrey Pines P'ship, 42 Cal. 4th 1158, 1160-69, 1173-74 (2008); Reno v. Baird, 18 Cal. 4th

640, 644-45, 662-63 (1998).

 In Reno, the state supreme court held that "individuals who do not themselves qualify as

employers may not be sued under the FEHA for alleged discriminatory acts."  18 Cal. 4th at

663.[32]  Ten years later in Jones, the court concluded that "the same rule applies to actions for

retaliation that applies to actions for discrimination:  The employer, but not nonemployer

individuals, may be held liable."  42 Cal. 4th at 1160.

 As part of its reasoning, the court in Jones contrasted the FEHA's prohibition of

harassment on the one hand with its prohibitions of retaliation and discrimination on the other.

The court noted the express statement in subsection (j)(3) that "[a]n employee of an entity subject

to this subdivision is personally liable for any harassment prohibited by this section that is

perpetrated by the employee . . . ."  Cal. Gov't Code § 12940(j)(3).  The court concluded that

"[t]his is clear language imposing personal liability on all employees for their own harassing

actions."  Jones, 42 Cal. 4th at 1162.  Because such language did not—and still does not—appear

in subsections (a), governing discrimination, or (h), governing retaliation, the court held that the

FEHA's text did not dictate holding individual employees liable for discriminatory or retaliatory

acts.  Id. at 1162-64.

 Thus, the conclusion on plaintiff's FEHA discrimination and retaliation claims in Causes

of Action Three and Four must be the same as with the preceding two state law claims.  The only

---

[32]  Of particular note for this case where PG&E appears unreachable because of its pre-suit
bankruptcy discharge, the California Supreme Court recognized in Reno that "[t]he only
marginally legitimate purpose for adding individual supervisory employees as defendants is the
possibility that the employer will file for bankruptcy protection and be unable to respond fully in
damages."  18 Cal. 4th at 653.  Even so, the court concluded that the state legislature did not
intend "a legal regime in which individual supervisory employees were personally liable after
bankruptcy of the employer."  Id. at 663 (internal quotation omitted).

2   defendant the FEHA discrimination and retaliation claims can apply to in this action is PG&E, as

3   that is the only defendant alleged to be plaintiff's "employer."  Dujmovich and Schultz are

4   plaintiff's individual supervisors, not her employers, and as such the FEHA discrimination and

5   retaliation claims against them should be dismissed with prejudice.  To the extent plaintiff

6   intended to bring these claims against non-moving defendant Schoenfeld as well, the claims

7   should also be dismissed with prejudice as against him—since he is also not alleged to have been

8   plaintiff's employer.  See Silverton, 644 F.2d at 1345.

*a.   Request to Amend to Add FEHA Harassment Claim*

9         In apparent recognition of the limitations of her FEHA discrimination and retaliation

10  claims against the individual defendants, plaintiff includes in her second opposition brief a

11  request for leave to amend the complaint to bring a FEHA harassment claim against Schultz and

12  Dujmovich for their alleged hostility toward her after exposing the conspiracy.  (ECF No. 28 at

13  4-5.)  As discussed at the status conference, this is not the proper way to request leave to amend.

14  Instead, at this point in the litigation, plaintiff would have to file a motion to amend the complaint

15  under Federal Rule of Civil Procedure 15(a)(2) in order to add a brand new cause of action.

16  Although the undersigned presently recommends granting plaintiff leave to amend the complaint

17  in response to the pending motions to dismiss, that leave extends only to those causes of action

18  included in the original complaint and not dismissed with prejudice; the court does not herein

19  grant plaintiff leave to add new causes of action or new defendants.  As outlined below, if

20  plaintiff wishes to add new causes of action or defendants to this suit, she must separately move

21  to so amend the complaint within 14 days of filing a First Amended Complaint as permitted on

22  the below identified causes of action.  Accordingly, defendants' time to respond to the First

23  Amended Complaint is extended to 30 days.  See Fed. R. Civ. P. 15(a)(3) (normally, time to

24  respond to amended pleading is 14 days at most, "[u]nless the court orders otherwise").

25         Should plaintiff choose to seek leave to file a Second Amended complaint adding new

26  claims or defendants to this action, plaintiff is informed that the court will consider several factors

27  in deciding whether to grant leave to amend, including:  undue delay, bad faith or dilatory motive,

28

2   undue prejudice to the opposing parties, and futility of amendment.[33]  <u>Eminence Capital, LLC v.</u>
<u>Aspeon, Inc.</u>, 316 F.3d 1048, 1052 (9th Cir. 2003).

3      **E.  Leave to Amend as to Existing Claims and Defendants**

4          When a court finds that a complaint or claim should be dismissed for failure to state a

5   claim, the court has discretion to dismiss with or without leave to amend.  Leave to amend should

6   be granted if it appears possible that the defects in the complaint could be corrected, especially if

7   a plaintiff is self-represented.  <u>Lopez v. Smith</u>, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (en banc);

8   <u>Cato v. United States</u>, 70 F.3d 1103, 1106 (9th Cir. 1995) ("A pro se litigant must be given leave

9   to amend his or her complaint, and some notice of its deficiencies, unless it is absolutely clear that

10  the deficiencies of the complaint could not be cured by amendment." (citing <u>Noll v. Carlson</u>, 809

11  F.2d 1446, 1448 (9th Cir. 1987))).  However, if, after careful consideration, it is clear that a claim

12  cannot be cured by amendment, the court may dismiss without leave to amend.  <u>Cato</u>, 70 F.3d

13  at 1105-06.  As discussed above and detailed in the below order, the court recommends

14  dismissing some claims with leave to amend and dismissing others without leave.

15          To reiterate, any First Amended Complaint plaintiff might choose to file shall be limited

16  to the defendants named and causes of action asserted in the original complaint.  Further, plaintiff

17

18  _____

    [33]  "Futility alone can justify the denial of a motion to amend."  <u>Johnson v. Buckley</u>, 356
19  F.3d 1067, 1077 (9th Cir. 2004).  As to the potential addition of a claim of harassment in
    violation of the FEHA, the court notes that in moving to amend plaintiff would need to be
20  prepared to overcome—among other possible challenges—a likely futility challenge that such a
    harassment claim was not timely and properly administratively exhausted (as to each defendant
21  against whom it is asserted) before the Department of Fair Employment and Housing.  Although
    the court does not definitively decide the issue here, it appears from their reply brief (ECF No. 29
22  at 4-5) that defendants have a strong argument that, at the time of the alleged harassment, plaintiff
    was required to file her administrative charge with the DFEH within one year of the harassment's
23  occurrence.  (<u>See</u> Complaint ¶¶ 4, 38 (alleging end of adverse employment actions on August 7,
    2017 but receiving DFEH notice of right to sue on January 23, 2021).)  <u>See</u> Cal. Gov't Code
24  § 12960(d) (eff. Jan. 1, 2003 to Dec. 31, 2005) (DFEH charge must be filed within 1 year from
    date unlawful practice occurred, except in select circumstances); <u>id.</u> (eff. Jan. 1, 2006 to Dec. 31,
25  2017) (same); <u>see also</u> Cal. Gov't Code § 12965(b) (DFEH must issue notice of right to sue
    within 1 year of charge being filed).  <u>But see</u> <u>Rodriguez v. Airborne Express</u>, 265 F.3d 890, 900
26  (9th Cir. 2001) ("The administrative time limits prescribed by FEHA are treated as equivalent to
27  statutes of limitations and are subject to equitable doctrines such as waiver, estoppel, and
    tolling.").
28

is cautioned that renewed claims that are identical or substantially similar to those dismissed on the original complaint will likely be subject to dismissal without leave to amend.  If plaintiff finds that she cannot sufficiently plead a certain claim against certain defendants, she is instructed to follow Federal Rule of Civil Procedure 41 concerning voluntary dismissals of actions without prejudice.

Plaintiff is additionally cautioned that the court cannot refer to a prior complaint or other filing in order to make an amended complaint complete.  Local Rule 220 requires that an amended complaint be complete in itself without reference to any prior pleading.  As a general rule, an amended complaint supersedes the original complaint, and once an amended complaint is filed, the prior complaint no longer serves any function in the case.

**IV.    CONCLUSION**

As explained above, it is HEREBY ORDERED that:

1.  **Within thirty (30) days** of the date of the District Judge's forthcoming order regarding the enclosed findings and recommendations plaintiff shall file an amended complaint, which shall be captioned "First Amended Complaint," or shall notify the court that she is voluntarily dismissing this action;

2.  If plaintiff wishes to add new causes of action or defendants to this suit, she must separately move for leave to file a Second Amended Complaint within 14 days of filing the First Amended Complaint.

    a.  Regardless whether plaintiff seeks leave to file a Second Amended Complaint, defendants shall have 30 days to respond to any First Amended Complaint.

Further, for the above reasons, it is HEREBY RECOMMENDED that:

1.       Defendant Silver's motion to dismiss (ECF No. 6) be GRANTED;

2.       Defendants Dujmovich and Schultz's motion to dismiss (ECF No. 19) be GRANTED IN PART;

///

///

41

3.     The First Cause of Action for violation of California Labor Code § 1102.5 be dismissed with prejudice as to defendants Dujmovich, Schultz, Schoenfeld, and Silver;

4.     The Second Cause of Action for adverse employment action in violation of public policy be dismissed with prejudice as to defendants Dujmovich, Schultz, Schoenfeld, and Silver;

5.     The Third Cause of Action for sex discrimination in violation of the FEHA be dismissed with prejudice as to defendants Dujmovich, Schultz, Schoenfeld, and Silver;

6.     The Fourth Cause of Action for unlawful retaliation in violation of the FEHA be dismissed with prejudice as to defendants Dujmovich, Schultz, Schoenfeld, and Silver;

7.     The Fifth Cause of Action for violation of RICO, 18 U.S.C. § 1962(c), be

     a.  dismissed with prejudice as against defendants Schoenfeld and Silver, and

     b.  dismissed with leave to amend to assert any RICO claims based on acts occurring after August 13, 2016, that fall within RICO's "separate accrual rule" as against defendants Dujmovich and Schultz;

8.     The Sixth Cause of Action for violation of RICO, 18 U.S.C. § 1962(d), be dismissed with prejudice in its entirety;

9.     The Seventh Cause of Action for violation of the California Equal Pay Act and the federal Equal Pay Act be dismissed as against all defendants

     a.  with prejudice as to claims based on wages received before August 4, 2017, and

     b.  with leave to amend as to claims based on subsequent wage payments; and

10.    The Eighth Cause of Action for civil conspiracy be dismissed in its entirety with leave to amend.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned

///

42

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served on all parties and filed with the court within fourteen (14) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

Dated:  October 6, 2021

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

gian.0477

43