1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SHEILA GIANELLI,                        No.  2:21-cv-0477-KJM-KJN (PS)

12                    Plaintiff,

13          v.                               FINDINGS AND RECOMMENDATIONS

14   RONALD STEVEN SCHOENFELD, et
     al.,
15
                     Defendants.
16

17

18          Before the court are two motions to dismiss the First Amended Complaint brought by

19   three of the five defendants named in this action:  one by defendant Debra Lee Silver, and one by

20   defendants Lance Schultz and Nick Dujmovich.[1]  (ECF Nos. 46, 48.)  Both motions were taken

21   under submission without oral argument, pursuant to Local Rule 230(g).  (ECF No. 49.)  Plaintiff

22   filed a combined opposition to both motions, to which the moving defendants replied.  (ECF

23   Nos. 52, 54, 55.)  For the following reasons, the undersigned recommends (1) granting both

24   motions in full, (2) dismissing all claims against the moving defendants—in addition to all claims

25   against similarly situated non-moving defendant Ronald Schoenfeld, (3) dismissing all purported

26   ─────────────────
     [1]    Because plaintiff is self-represented, the case is referred to the undersigned for all pretrial
27   proceedings pursuant to 28 U.S.C § 636 and Local Rule 302(c)(21).  On July 27, 2022, this case
     was reassigned to Chief District Judge Kimberly J. Mueller.  (ECF No. 56.)  As reflected above,
28   the new case number is 2:21-cv-00477-KJM-KJN (PS).

                                                   1

claims against non-moving defendant Pacific Gas and Electric Company ("PG&E") for lack of jurisdiction, and (4) dismissing the case.

**BACKGROUND**

In November 2021, the court granted the same moving defendants' motions to dismiss plaintiff's original complaint, with leave to amend certain claims.  (ECF Nos. 38 (F&Rs), 40 (Order adopting).)  On December 8, 2021, plaintiff filed a First Amended Complaint ("FAC") which largely replicates the original complaint—although it properly omits the claims dismissed with prejudice.  (ECF No. 41 ("FAC").)

**The First Amended Complaint**

Plaintiff brings this action for alleged employment-related discrimination, RICO violations, and civil conspiracy arising from her work in the "Supply Chain/Materials" department of PG&E.  (FAC at 3-4, 6-13.)  In 2013, plaintiff was hired as an Analyst in PG&E's Supply Chain department.  (Id. at 3, 7.)  It was later revealed through a federal investigation—in which plaintiff assisted—that from approximately 2006 until 2015, another PG&E employee, non-moving defendant Ronald Schoenfeld, was conspiring to fraudulently funnel PG&E's annual trucking contracts to a company owned by his cousin, in return for over $1.4 million in kickback payments.  (Id. at 3, 5-6.)  Schoenfeld violated PG&E bidding policies by helping his alleged co-conspirator and cousin, Debra Silver—one of the moving defendants—to obtain contracts at inflated pay rates for her LLC, All American Logistics ("AAL").  (Id. at 3, 5.)  In exchange, Schoenfeld received 2.5% of the value of the contracts procured for AAL.  (Id. at 5.)  The FAC designates this conspiracy as the "Criminal Enterprise."  (Id. ¶ 12.)

In August 2020, as a result of the federal investigation, Schoenfeld was charged with and pled guilty to one count of conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 371.[2]  (Id. at 3; see United States v. Schoenfeld, No. 2:20-cr-0150-KJM (E.D. Cal.),

---

[2]   "Honest services fraud entails a scheme or artifice to 'deprive another,' by mail or wire, 'of the intangible right of honest services.'"  United States v. Christensen, 828 F.3d 763, 784 (9th Cir. 2015) (quoting 18 U.S.C. § 1346 and citing mail and wire fraud statutes 18 U.S.C. §§ 1341, 1343); see also Skilling v. United States, 561 U.S. 358, 400-09, 412 (2010) (discussing historical recognition of private-sector honest services fraud and holding that § 1346 criminalizes only fraud that includes acceptance of bribes or kickbacks).

ECF Nos. 1 at 2, 12 at 1-2.)[3]  In January 2021, shortly before plaintiff filed this action, Schoenfeld was sentenced to 22 months in prison and ordered to pay PG&E some $1.4 million in restitution.[4]  (FAC at 3; No. 2:20-cr-0150-KJM, ECF Nos. 37, 38.)

Plaintiff discovered and reported the Criminal Enterprise in August 2014 shortly after joining PG&E.  (FAC at 3-4.)  Plaintiff asserts overall that she was hired into an entry-level role in 2013 due to efforts to conceal the Criminal Enterprise; and that in retaliation for exposing the Criminal Enterprise, she was denied pay increases, given onerous assignments, and relocated to a less desirable work site until she was able to secure a transfer to a different department in August 2017.  (Id. at 4, 9-14.)  She also alleges that general sex discrimination within the Supply Chain department contributed to these adverse employment actions.  (Id. at 6-7, 17-20.)

In addition to defendants Schoenfeld and Silver, plaintiff also brings this action against her employer PG&E,[5] and two of her former upper-level managers in the Supply Chain department:  (1) her third-level supervisor and the department's director, Lance Schultz; and (2) her second-level supervisor, Nick Dujmovich.  (Id. at 7-8.)  Plaintiff—who holds a B.S. in Industrial Engineering and an M.B.A., and who has decades of experience in supply chain management—alleges that in 2013 she interviewed for two management-level positions in PG&E's Supply Chain department but was passed over in favor of less-qualified male applicants. (Id. at 6-7.)  Defendants Schoenfeld and Dujmovich conducted her interview for the second managerial position, which they ultimately gave to a man; and Dujmovich ended up instead

---

[3]    The undersigned takes judicial notice of the docket and filings in Schoenfeld's criminal case before this court.  See United States v. Howard, 381 F.3d 873, 876 n.1 (9th Cir. 2004) (courts may take judicial notice of public records, including court records from another case).

[4]    Plaintiff assisted PG&E with preparing its restitution request and also appeared at Schoenfeld's sentencing on her own behalf to request personal restitution.  (No. 2:20-cr-0150-KJM (E.D. Cal.), ECF Nos. 30.1 (restitution request), 48 at 3-5 (sentencing transcript).)  The court took plaintiff's personal restitution request under submission and on September 8, 2021 denied the request.  (Id., ECF No. 50.)

[5]    PG&E does not join in the motions to dismiss, nor has it entered an appearance in this case. As explained below, the undersigned nevertheless recommends dismissing the present claims against PG&E as barred by the bankruptcy discharge injunction that went into effect before the commencement of this action.

offering plaintiff a job as an Analyst, which she accepted in December 2013.  (Id. at 7.)  Plaintiff alleges that she was not hired for the managerial roles because of defendants' participation in the then-ongoing Criminal Enterprise.  (Id. ¶ 35(a).)  At various points in the complaint, plaintiff alleges that Dujmovich and Schoenfeld were part of a group of PG&E employees known as the "Michigan Mafia," some of whom had previously worked together at another company in Michigan before joining PG&E's Supply Chain department.  (Id. at 6, 9, 11.)  Like the original complaint, the FAC contains few specifics about the nature of this group or how it might be connected to Schoenfeld's kickback scheme—other than his "membership" in the group.

From the start of plaintiff's employment, Dujmovich—a "close personal friend" of Schoenfeld—told plaintiff not to look at anything associated with "Transportation and Schoenfeld."  (Id. at 3, 7.)  In the summer of 2014, however, defendant Schultz directed plaintiff to examine the department's transportation budget which was causing concern because it was on pace to exceed projections by $2 million.  (Id. at 8.)  Within days, plaintiff found "evidence of unethical and irregular procurement."  (Id.)  When she and another coworker approached Schoenfeld about it, he "admitted to authorizing the irregularities" and then asked plaintiff several times during the encounter whether "he and [she] were ok?," which plaintiff interpreted as a request that she "look the other way."  (Id. at 8-9.)  Plaintiff and her immediate supervisor then brought her concerns to defendant Dujmovich, who was "covering for Schoenfeld" and never reported the issue higher up the chain of command.  (Id. at 9.)

Accordingly, plaintiff took it upon herself to report Schoenfeld's activity to the PG&E Ethics and Compliance hotline.  (Id.)  The company launched an investigation with plaintiff's assistance, which resulted in Schoenfeld's termination from PG&E.  (Id.)  In late 2014 or early 2015, plaintiff also cooperated with the FBI's investigation into the conspiracy.  (Id. at 3, 22.)  Plaintiff alleges that, despite Schoenfeld's ouster, the criminal conspiracy had "infiltrated the entire Supply Chain organization," causing her to be treated as a "pariah" for having exposed it.  (Id. at 9-10.)  Dujmovich allegedly retaliated against her by directing her to "rebuild the entire transportation sourcing process"—a task not appropriate for her current role—telling her that "she had 'made the mess, so she had to clean it up.'"  (Id. at 10.)  When plaintiff reported this

perceived retaliation to Schultz (the department director), he refused to help her and thereafter approved Dujmovich giving her "the lowest performance reviews, bonus payouts, and performance raises possible"—despite her having saved the company millions of dollars.  (Id. at 10.)  Schultz later reassigned plaintiff to a "warehouse position" far from the main offices, which was "a demotion in visibility to other company leadership and opportunity for professional growth."  (Id. at 11; see id. ¶ 35(g).)

With a great deal of effort, plaintiff transferred to a new role at PG&E outside of Schultz's control on August 7, 2017; and since leaving the Supply Chain department, her "career with PG&E has flourished."  (Id. at 11, 13-14.)  Plaintiff newly alleges in the FAC that, nevertheless, the "tortious retaliation continues by express agreement between [the four individual defendants] to the present."  (Id. at 22.)  As an example, plaintiff alleges that in February 2021, she was not selected for a promotion after interviewing with a panel that included a subordinate of Schultz's who voted against promoting her.  (Id. at 22-23.)

The FAC contains seven causes of action, asserting:  (1) violation of California Labor Code § 1102.5 against PG&E only; (2) violation of public policy ("Tameny Claim") against PG&E only; (3) sex discrimination in violation of the California Fair Employment and Housing Act ("FEHA") against PG&E only; (4) unlawful retaliation in violation of the FEHA against PG&E only; (5) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against defendants Schultz and Dujmovich; (6) violation of the California Equal Pay Act and the Federal Equal Pay Act against PG&E only; and (7) civil conspiracy against all four individual defendants.  (FAC at 14-27.)

**Procedural History**

A few days after Schoenfeld was sentenced in the criminal proceedings in this court, on January 29, 2021, plaintiff (representing herself) filed this civil case in San Joaquin County Superior Court.  Gianelli v. Schoenfeld, et al., Cal. Sup. Ct., San Joaquin Cty., No. STK-CV-UMR-2021-0000849.  After some initial proceedings in state court, defendants removed the action to this court.  (ECF Nos. 1 (Notice of Removal), 32 (Amended Notice of Removal).)  Defendants Dujmovich, Schultz and Silver moved to dismiss the complaint, and plaintiff

1   responded by moving to remand the case back to state court.  (ECF Nos. 6, 17, 19.)

2          In June 2021, the previously assigned district judge adopted the undersigned's

3   recommendation to deny remand (ECF Nos. 27, 30) and in November 2021 adopted the

4   undersigned's recommendation to grant the original motions to dismiss (ECF Nos. 38, 40).  In

5   ruling on the motions to dismiss, the court:  (A) dismissed with prejudice all but a portion of the

6   employment-related discrimination claims against the individual defendants; (B) dismissed with

7   prejudice all RICO claims against defendants Schoenfeld and Silver, as barred by the statute of

8   limitations; (C) dismissed the RICO § 1962(c) claims against defendants Dujmovich and Schultz

9   with leave to amend only to assert any claims arising after August 13, 2016, under RICO's

10  "separate accrual rule"; and (D) dismissed the civil conspiracy claim with leave to amend.  (ECF

11  No. 40 at 3; see ECF No. 38 at 10-18, 28, discussing tolling and separate accrual rule.)

12         On December 8, 2021, plaintiff filed the currently operative FAC.[6]  (ECF No. 41.)

13  Defendants Dujmovich, Schultz, and Silver now move to dismiss all claims against them under

14  Rule 12(b)(6).[7]  (ECF Nos. 46, 48.)  The motions were fully briefed and taken under submission.

15
16  [6]   The same day, plaintiff also filed a notice of appeal of the court's November 2021 dismissal
    order.  (ECF No. 42.)  On January 20, 2022, the Ninth Circuit dismissed the appeal of this non-
17  final order for lack of jurisdiction.  (ECF Nos. 50, 53.)

18  [7]   In their joint motion, defendants Dujmovich and Schultz also move to dismiss the FAC under
    Rule 41(b) for violating a prior court order on two grounds.  (ECF No. 48.1 at 6.)  As to the first,
19  although plaintiff indeed filed the FAC two days after the deadline (see ECF No. 38 at 41; ECF
    No. 40), the undersigned does not view this as a serious enough violation to warrant a dismissal
20  sanction.
       As to the second, defendants are incorrect that the FAC's causes of action against PG&E
21  constitute new claims added without leave of court.  (See ECF No. 48.1 at 2 n.1, 6 & n.3; see also
    ECF No. 38 at 41, requiring separate motion to amend to add new causes of action or defendants
22  beyond those named in original complaint.)  PG&E has been a named party to this action from
    the outset, and the original complaint is best construed as asserting all five employment-related
23  discrimination claims against PG&E, as well as some or all of the individual defendants—
    although the target defendants were only expressly named in the Seventh Cause of Action (under
24  the Equal Pay Act).  In dismissing the employment-related discrimination claims against the
    individual defendants, the court did not dismiss them against PG&E.  Indeed, the court repeatedly
25  noted that PG&E was the only proper defendant for such claims, as it alone is plaintiff's
    "employer."  (ECF No. 38 at 36, 37, 39.)
26     Moreover, the court expressly noted (in denying remand) that its ruling that service of
27  process on PG&E was a nullity "for purposes of removal procedure" did not constitute a ruling on
    "PG&E's status as a defendant in this case."  (ECF No. 27 at 14 n.15.)  Thus, the FAC simply
28

1    (ECF Nos. 47, 48.1, 49, 52, 54, 55.)

2    **LEGAL STANDARD**

3        A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the

4    sufficiency of the pleadings set forth in the complaint.  Vega v. JPMorgan Chase Bank, N.A., 654

5    F. Supp. 2d 1104, 1109 (E.D. Cal. 2009).  "To survive a motion to dismiss, a complaint must

6    contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

7    face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

8    U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content

9    that allows the court to draw the reasonable inference that the defendant is liable for the

10   misconduct alleged."  Id.  "Threadbare recitals of the elements of a cause of action, supported by

11   mere conclusory statements do not suffice."  Id.

12       In considering a motion to dismiss for failure to state a claim, the court accepts all of the

13   facts alleged in the complaint as true and construes them in the light most favorable to the

14   plaintiff.  Corrie v. Caterpillar, Inc., 503 F.3d 974, 977 (9th Cir. 2007).  However, the court need

15   not "assume the truth of legal conclusions merely because they are cast in the form of factual

16   allegations."  Paulsen v. CNF Inc., 559 F.3d 1061, 1071 (9th Cir. 2009).

17       The court must construe a pro se pleading liberally to determine if it states a claim and,

18   prior to dismissal, tell a plaintiff of deficiencies in her complaint and give plaintiff an opportunity

19   to cure them if it appears at all possible that the plaintiff can correct the defect.  See Lopez v.

20   Smith, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (en banc); see also Hebbe v. Pliler, 627 F.3d 338,

21   342 n.7 (9th Cir. 2010) (stating that courts continue to construe pro se filings liberally even when

22   evaluating them under the standard announced in Iqbal).

23       In ruling on a Rule 12(b)(6) motion to dismiss, the court "may generally consider only

24   allegations contained in the pleadings, exhibits attached to the complaint, and matters properly

25   subject to judicial notice."  Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899

26   _____

27   maintains the non-dismissed original claims against PG&E, an originally named defendant in the
     action.  As discussed below, the undersigned now concludes that all claims against PG&E should
     be dismissed for lack of jurisdiction based on its pre-complaint bankruptcy discharge; however,

28   the contents of the FAC did not violate any then-existing court order when it was filed.

(9th Cir. 2007) (citation and quotation marks omitted).  Although the court may not consider a

memorandum in opposition to a defendant's motion to dismiss to determine the propriety of a

Rule 12(b)(6) motion, see Schneider v. Cal. Dep't of Corrections, 151 F.3d 1194, 1197 n.1 (9th

Cir. 1998), it may consider allegations raised in opposition papers in deciding whether to grant

leave to amend, see, e.g., Broam v. Bogan, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003).

If the expiration of the applicable statute of limitations is apparent from the face of the

complaint, the defendant may raise a statute of limitations defense in a Rule 12(b)(6) motion to

dismiss.  Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980).  This is true even

though expiration of the limitations period is an affirmative defense, because Federal Rule of

Civil Procedure 9(f) "makes averments of time and place material for the purposes of testing the

sufficiency of a complaint."  Suckow Borax Mines Consol. v. Borax Consol., 185 F.2d 196, 204

(9th Cir. 1950).  When a motion to dismiss is based on the running of the statute of limitations, "it

can be granted only if the assertions of the complaint, read with the required liberality, would not

permit the plaintiff to prove that the statute was tolled."  Jablon, 614 F.2d at 682.  In contrast,

where the statute of limitations question turns on factual issues that may be disputed, the question

is more appropriately addressed at a later stage of the proceeding.  Id.

**DISCUSSION**

The court begins by addressing the sufficiency of the two causes of action challenged in

the present motions to dismiss:  the RICO claim and the civil conspiracy claim.  Finding that the

FAC fails to sufficiently state either claim and that all four individual defendants should therefore

be dismissed from the action, the undersigned then further recommends sua sponte dismissing all

claims against PG&E based on lack of jurisdiction.

**A.  RICO Claim (COA #5)**

Plaintiff's RICO claim, carried over from the original complaint, stems from her

allegations that as a result of Schoenfeld and Silver's kickback scheme, she was not hired at the

managerial level in 2013 and later was unlawfully retaliated against by her supervisors

Dujmovich and Schultz for exposing the scheme.  (FAC at 21-23.)

In granting the prior motions to dismiss the original complaint, the court found that most

8

of plaintiff's RICO claims were barred by the four-year statute of limitations, <u>Agency Holding Corp. v. Malley-Duff & Assoc., Inc.</u>, 483 U.S. 143, 156 (1987), even assuming the limitations period was tolled during the federal prosecution of Schoenfeld's criminal conduct.  (ECF No. 38 at 9-19.)  The court determined that tolling began, at the earliest, on August 13, 2020, the date the government filed the criminal information against Schoenfeld—not in 2014 or 2015 when the FBI began its criminal investigation—and continued through plaintiff's filing of her civil complaint on January 29, 2021.  (<u>Id.</u> at 12-13, assuming Clayton Act tolling provision, 5 U.S.C. § 16(i), applies to RICO claims.)  Therefore, counting four years backward, the court determined that the only timely RICO claims plaintiff could assert in this action are those that accrued after August 13, 2016 (i.e., within four years of the tolling start date).  (<u>Id.</u>)

Under Ninth Circuit law, plaintiff's RICO claims accrued when she knew or should have known of the underlying injury.  <u>Grimmett v. Brown</u>, 75 F.3d 506, 510 (9th Cir. 1996) ("[T]he civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies [the] cause of action."); <u>Pincay v. Andrews</u>, 238 F.3d 1106, 1109 (9th Cir. 2001) (noting that either "actual or constructive notice" begins statute of limitations).  Because the only injury plaintiff alleged at the hands of Schoenfeld (and arguably Silver) was her failure to be hired into a managerial role in 2013, and plaintiff had at least constructive knowledge of that injury by 2015, the court dismissed with prejudice all RICO claims against Schoenfeld and Silver, as time-barred.  (ECF No. 38 at 13-14, 18-19.)  As to the various injurious employment actions ascribed to supervisory defendants Dujmovich and Schultz in the wake of plaintiff's 2014 whistleblowing (plaintiff's low performance evaluations, minimal bonuses and raises, and relocation to an undesirable job site), the court could not determine when exactly the RICO claims for those injuries accrued because the complaint contained no precise dates for any of the alleged retaliation.  (<u>Id.</u> at 14-15.)  However, the complaint's allegations made clear that any and all RICO claims arising <u>purely</u> from injuries occurring on or before August 13, 2016, were time-barred because plaintiff had at least constructive knowledge of them and their connection to the alleged RICO violations at the time they occurred.  (<u>Id.</u> at 16.)  Nevertheless, the court acknowledged that the "separate accrual rule"—the second component of the injury discovery

rule—could conceivably save a small portion of plaintiff's RICO claims against Dujmovich and Schultz.  (Id. at 17.)

The Ninth Circuit's separate accrual rule allows the RICO limitations period to be reset by an "overt act" that is (1) "a new and independent act that is not merely a reaffirmation of a previous act," and (2) "inflict[s] new and accumulating injury on the plaintiff."  Grimmett, 75 F.3d at 513 (emphasis omitted) (quoting Pace Indus., Inc. v. Three Phoenix Co., 813 F.2d 234, 238 (9th Cir. 1987)).  Therefore, the court granted leave for plaintiff to amend the complaint only to pursue RICO claims against defendants Dujmovich and Schultz based on acts occurring on or after August 14, 2016 that met the criteria for RICO's separate accrual rule.  (ECF No. 38 at 17-18, 28.)

Because not all claims were time-barred, the court went on to address the substantive pleading deficiencies of the RICO § 1962(c) claims against Dujmovich and Schultz in the original complaint.  (Id. at 19-28.)  See 18 U.S.C. § 1962(c) (making it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt").  The court primarily explained how the complaint failed to allege that Dujmovich and Schultz conducted or participated in a RICO "enterprise."  (ECF No. 38 at 20-22.)  See 18 U.S.C. § 1961(4) (defining RICO enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").  As Dujmovich and Schultz were not alleged to be part of any "legal entity," the court discussed the requirements for pleading an associated-in-fact enterprise.

As explained, though the test is "not very demanding," to establish an associated-in-fact enterprise the plaintiff must allege three basic elements:  (1) a common purpose; (2) an ongoing organization, whether formal or informal; and (3) that the enterprise functions as a continuing unit.  United States v. Christensen, 828 F.3d 763, 780 (9th Cir. 2015); Odom v. Microsoft Corp., 486 F.3d 541, 552-53 (9th Cir. 2007) (en banc).  Even in an associated-in-fact enterprise, a defendant must still have "participate[d], directly or indirectly, in the conduct of such enterprise's

10

affairs" for RICO liability to attach.  18 U.S.C. § 1962(c); see Walter v. Drayson, 538 F.3d 1244, 1249 (9th Cir. 2008) ("Section 1962(c)'s 'conduct' requirement applies without regard to the nature of the enterprise.").  The statutory language requires that a defendant "have some part in directing the enterprise's affairs."  Reves v. Ernst & Young, 507 U.S. 170, 179 (1993) (emphasis in original); see id. at 185 (holding that "'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself").

The court concluded that the only enterprise clearly alleged in the complaint was the "Criminal Enterprise" conducted by Schoenfeld and Silver from 2006 to 2014.  (ECF No. 38 at 21.)  However, the complaint did not allege how defendants Dujmovich and Schultz were connected to that Criminal Enterprise; it merely alleged that Dujmovich was a "close personal friend" of Schoenfeld's and that Schultz was a "mentor" of Silver's.  (Id. at 21-22.)  The court remained open to the possibility that plaintiff might be able to identify some other "secondary enterprise" between Dujmovich and Schultz (perhaps with a purpose to harm plaintiff, as opposed to a purpose to defraud PG&E) and therefore granted leave to amend the § 1962(c) claim against these two defendants.  (Id. at 22-23.)

The FAC contains virtually identical allegations to the complaint with respect to identifying a RICO enterprise.  Again, it explains in detail the "Criminal Enterprise" run by Schoenfeld and Silver (FAC ¶ 12), but it still connects Dujmovich and Schultz to that enterprise only by way of general association (as friend and mentor, respectively) (id. ¶¶ 24, 28).  Plaintiff adds some more details about the Michigan Mafia—such as the group's origin and membership— but again fails to allege that the group had any involvement in the Criminal Enterprise.[8]  As to the alleged retaliation plaintiff suffered after reporting the Criminal Enterprise, plaintiff makes no effort to describe any "secondary enterprise" in which her supervisors were participating.  While the FAC alleges various instances of retaliation by Dujmovich and Schultz, there is no allegation of a coordinated effort between them so as to demonstrate an "ongoing organization" functioning

---

[8]  As in the original complaint, the FAC does not allege that defendant Schultz was even a part of the Michigan Mafia.

as a "continuing unit." <u>See</u> <u>Odom</u>, 486 F.3d at 552-53.  The FAC contains only the conclusory allegation that the "retaliation continues by express agreement between [all four individual defendants] to the present" and that the "conspiracy of these four defendants to suppress the discovery of the full scope [of the] criminal enterprise, and jointly, to restrict Plaintiff's career with PG&E continues."  (FAC ¶ 78.)  The FAC offers no factual allegations to support the existence of an express agreement between the defendants to hamper plaintiff's career.  Plaintiff's opposition to the motions to dismiss fails to address the missing "enterprise" element at all. Accordingly, the undersigned finds that the FAC again fails to plead defendant Dujmovich's or Schultz's participation in a RICO enterprise of any sort.

Even assuming the FAC satisfies the enterprise element, it also still does not plead an injury within the RICO limitations period sufficient to make this action timely under the separate accrual rule.  Plaintiff makes a mild attempt to show a timely injury by newly alleging in the FAC that defendants' retaliation against her continues to the present.  (FAC ¶ 78.)  As in the original complaint, the FAC maintains that plaintiff's career at PG&E "has flourished" since August 2017 when she left the Supply Chain department where Dujmovich and Schultz held sway.  (<u>Id.</u> ¶ 33.) Nevertheless, plaintiff now alleges within her RICO claim that their retaliation continues.  (<u>Id.</u> ¶ 78.)  The sole example alleged is that in February 2021 plaintiff was not selected for a promotion (outside of the Supply Chain department) after interviewing with a panel of interviewers, one of whom was a subordinate of Schultz's and cast a deciding vote against her. (<u>Id.</u>)  This lone example from three-to-four years later does not permit a plausible inference of continuous retaliation since leaving the Supply Chain department in August 2017.  Moreover, alleging that the person who voted against plaintiff's promotion was a subordinate of Schultz's is not enough to infer that Schultz influenced that person's negative vote; and the FAC makes no allegation as to how Dujmovich was implicated in that vote.[9]  Therefore, the February 2021

---

[9]   All agree that by February 2021, defendant Dujmovich no longer worked for PG&E or resided in California where plaintiff and Schultz were stationed.  (<u>See</u> ECF No. 38 at 8.)  Plaintiff attempts to demonstrate Dujmovich's connection to the negative vote by attaching to her opposing declaration an undated screenshot of a social media post which she describes as Dujmovich expressing gratefulness to be working as a vendor with the person who voted against plaintiff's promotion.  (ECF No. 52 at 7, 13.)  Even assuming the court could take judicial notice

failure-to-promote incident does not constitute a new and independent injury inflicted by

Dujmovich or Schultz so as to reset the RICO limitations period.  See Grimmett, 75 F.3d at 513.

Plaintiff also fails to add any detail to the FAC regarding the timing of the other adverse

employment actions allegedly suffered before her transfer out of the Supply Chain Department,

despite the court's invitation to present these as potential new injuries covered by the separate

accrual rule.  Thus, it does not appear that plaintiff can allege in good faith any injury suffered

after August 13, 2016, that would allow the separate accrual rule to make her RICO claims

timely.  Accordingly, the undersigned also finds that plaintiff's RICO claims against Dujmovich

and Schultz, like the original claims against Schoenfeld and Silver, are barred by the statute of

limitations.[10]

Because, after two attempts, plaintiff has proven unable to plead the elements of a

§ 1962(c) claim against defendants Dujmovich and Schultz (the last remaining RICO defendants),

or to demonstrate that she has a timely claim, the undersigned recommends dismissing the RICO

claim with prejudice.

**Civil Conspiracy Claim (COA #7)**

Defendants Dujmovich, Schultz, and Silver also move to dismiss the FAC's other cause of

action against them:  the renewed civil conspiracy claim asserted against all four individual

defendants.

To state a claim for civil conspiracy, a plaintiff must plead "(1) the formation of a group

of two or more persons who agreed to a common plan or design to commit a tortious act; (2) a

wrongful act committed pursuant to the agreement; and (3) resulting damages."  City of Indus. v.

City of Fillmore, 198 Cal. App. 4th 191, 212 (2d Dist. 2011), as modified (Aug. 24, 2011).  "Civil

conspiracy is not an independent tort."  Id.  "A plaintiff [can] bring suit for civil conspiracy only

---

of this post, its content fails to suggest that Dujmovich influenced the negative vote any more
than Schultz did.

[10]    Plaintiff also states her desire to ask the Ninth Circuit to revisit the "tolling issue" which led
this court to rule (on the previous motions to dismiss) that the RICO limitations period is tolled—
if at all—only during the pendency of the prosecution of related crimes, not their investigation.
(See ECF No. 52 at 2.)  Plaintiff is, of course, welcome to raise that issue on appeal.

1    if [s]he ha[s] been injured by an act that was itself tortious."  Beck v. Prupis, 529 U.S. 494, 501

2    (2000) (citing numerous state and lower court cases holding that there is no conspiracy liability

3    without proving the elements of an underlying tort).

4        On the prior motions to dismiss, the court dismissed the civil conspiracy claim against all

5    defendants for failure to plead the elements of a RICO claim or any other underlying tort against

6    any defendant.  (ECF No. 38 at 29.)  However, the court granted leave to amend in case plaintiff

7    could plead an underlying violation of RICO or another wrongful act.  (Id.)

8        Plaintiff's conspiracy cause of action suggests two separate conspiracies:  one to defraud

9    PG&E through the kickbacks scheme under the Criminal Enterprise, and a subsequent one to

10   restrict her career in retaliation for exposing the kickbacks scheme.  (FAC at 24-27.)  Plaintiff

11   now alleges that all four individual defendants were, or are, involved in both conspiracies.

12       As to the Criminal Enterprise conspiracy, the FAC maintains the original complaint's

13   allegation that all four "conspired to create AAL" (defendant Silver's LLC) and award it

14   transportation contracts in furtherance of the "criminal enterprise to defraud PG&E."  (FAC

15   ¶¶ 88-89.)  The FAC generally describes an agreement between Schoenfeld and Silver to defraud

16   PG&E, stating that specific details are admitted in Schoenfeld's criminal plea agreement—which

17   plaintiff attached to the original complaint, but does not attach to the FAC.  (Id. ¶¶ 90-91.)

18   However, again, the only allegation plaintiff can muster to connect Dujmovich and Schultz to that

19   conspiracy is that each was a friend and mentor to Schoenfeld and Silver, respectively.  (Id. ¶ 90.)

20   Here, too, this allegation is insufficient to implicate defendants Dujmovich and Schultz in the

21   Criminal Enterprise conspiracy.  There simply are no factual allegations to support plaintiff's

22   conclusion that Dujmovich and Schultz "conspired to create AAL" or otherwise conspired to

23   defraud PG&E alongside Silver and Schoenfeld.  See Daniels v. Select Portfolio Servicing, Inc.,

24   246 Cal. App. 4th 1150, 1172 (6th Dist. 2016) (rejecting as "too conclusory" conspiracy

25   allegations that defendants "agree[d] . . . to deceive [appellants] into participating in the loan

26   modification processes," with no accompanying factual allegations about the nature of that

27   agreement), disapproved of on other grounds by Sheen v. Wells Fargo Bank, N.A., 12 Cal. 5th

28   905 (2022).

1      As to defendants Schoenfeld and Silver, the court is willing to assume for purposes of the

2  present motions that their agreement to conduct the Criminal Enterprise is established by virtue of

3  the plea agreement Schoenfeld entered on the charge of conspiracy to commit honest services

4  wire fraud, in violation of 18 U.S.C. § 371.  See United States v. Schoenfeld, No. 2:20-cr-0150-

5  KJM (E.D. Cal.), ECF Nos. 1 at 2, 12 at 1-2.)  Plaintiff frames their agreement(s) in terms of

6  RICO violations ("a pattern of racketeering activity") and common law fraud.  (FAC ¶ 90,

7  lines 12 & 22.)

8      The problem with the Criminal Enterprise civil conspiracy claims against Schoenfeld and

9  Silver is that there is no allegation of how these torts or wrongful acts (the alleged RICO

10  violations and fraud) were committed against plaintiff—as opposed to PG&E, the entity being

11  defrauded out of millions of dollars.  Tort liability for conspiracy does not derive from the

12  commission of just any tort.  Rather, it "presupposes . . . that [the coconspirator] owes a duty to

13  plaintiff recognized by law and is potentially subject to liability for breach of that duty."  Applied

14  Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 511 (1994) (emphasis added).  The FAC

15  again fails to identify a cognizable underlying tort for which defendants Schoenfeld or Silver

16  could be liable to plaintiff—so as to subject the other to liability on a conspiracy theory.[11]  See id.

17  at 512 ("A cause of action for civil conspiracy may not arise, however, if the alleged conspirator,

18  though a participant in the agreement underlying the injury, was not personally bound by the duty

19  violated by the wrongdoing." (cleaned up)).

20      The court turns next to the alleged post-Criminal Enterprise conspiracy to restrict

21  plaintiff's career at PG&E in retaliation for exposing the kickbacks scheme.  (FAC ¶¶ 92-95.)

22  Similar to the defects in pleading an "enterprise" with respect to retaliation for RICO, plaintiff

23  fails to plead any facts to support the existence of an "express agreement" (or any agreement)

24  between any of the four defendants to try to thwart her career.  Plaintiff therefore fails to plead the

25  threshold element for a conspiracy claim:  "the formation of a group of two or more persons who

26

27  [11]    The same reasoning also applies to defendants Dujmovich and Schultz, in addition to the
       previously discussed absence of any agreement allegations.

28

1  agreed to a common plan or design to commit a tortious act."  City of Indus., 198 Cal. App. 4th at

2  212; see Daniels, 246 Cal. App. 4th at 1172.

3      Accordingly, the FAC again fails to plead the elements of a civil conspiracy cause of

4  action against any defendant.  Therefore, the civil conspiracy claim (COA #7) should be

5  dismissed with prejudice as to all defendants.[12]

6      **Employment-Related Discrimination Claims against PG&E (COAs #1-4, 6)**

7      Finally, the court turns to the claims asserted exclusively against PG&E, which has neither

8  moved to dismiss nor entered an appearance in this action.  The FAC renews the same

9  employment-related discrimination causes of action from the original complaint—this time

10  asserting them solely against PG&E, as plaintiff's employer.  (FAC at 14-20, 23-24.)  PG&E's

11  only activity in this case to date was a limited appearance in state court pre-removal by its

12  counsel—Mr. Bren Thomas, who also represents defendants Schultz and Dujmovich—filing a

13  Notification of Effective Date of Chapter 11 Plan and Imposition of Plan Injunction

14  ("Notification of Plan Effective Date"), advising the state court that a bankruptcy discharge

15  injunction enjoined plaintiff's prosecution of her present claims against PG&E.  (ECF No. 23.2;

16  see ECF No. 23.1 (Thomas Decl.) ¶ 3.)  In denying remand, this court found that PG&E's non-

17  participation in the removal process was not fatal because plaintiff's service of process on PG&E

18  was a legal nullity given that her claims were barred by the bankruptcy discharge injunction.  For

19  similar reasons, the undersigned now recommends sua sponte dismissal of all claims against

20  PG&E for lack of jurisdiction.

21      As found in the May 2021 findings and recommendations on the motion to remand (ECF

22  No. 27 at 7), PG&E filed a voluntary petition for Chapter 11 bankruptcy in January 2019.  (In re:

23

24  [12]   Although defendant Schoenfeld did not file a motion to dismiss, the court "may properly on
its own motion dismiss an action as to defendants who have not moved to dismiss where such

25  defendants are in a position similar to that of moving defendants or where claims against such
defendants are integrally related."  Silverton v. Dep't of Treasury, 644 F.2d 1341, 1345 (9th Cir.

26  1981); see Kang-Shen Chen v. T.T. Grp., 2014 WL 12725598, at *4 (C.D. Cal. June 20, 2014)
(sua sponte dismissing as time-barred RICO claim against non-moving and moving defendants

27  alike). The undersigned finds that with respect to the civil conspiracy claim, defendant
Schoenfeld is identically situated to moving defendant Silver.

28

1   PG&E Corp. and Pacific Gas and Electric Co., No. 19-30088 (Bankr. N.D. Cal., filed Jan. 29,

2   2019), hereafter "Bankruptcy Case," ECF No. 1.)[13]  On June 19, 2020, the Bankruptcy Court

3   issued an Order Confirming Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of

4   Reorganization Dated June 19, 2020 ("Confirmation Order")—and its attached Plan of

5   Reorganization ("Chapter 11 Plan").  (Bankruptcy Case, ECF No. 8053.)  (See ECF No. 27 at 7.)

6   According to both the Confirmation Order and the identically worded provision of the Chapter 11

7   Plan, subject to certain inapplicable exceptions, "[u]pon the Effective Date and in consideration

8   of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan

9   or in this Confirmation Order, the Debtors shall be discharged to the fullest extent permitted by

10  section 1141 of the Bankruptcy Code . . . ."  (Bankruptcy Case, ECF No. 8053 at 47, ¶ 49, entitled

11  "Discharge of the Debtors"; Bankruptcy Case, ECF No. 8053.1 at 81, § 10.3.)

12       Section 1141 of the Bankruptcy Code governs the effect of an order of confirmation of a

13  plan of reorganization under Chapter 11.  Unless otherwise provided in a confirmation order or in

14  a reorganization plan, "the confirmation of a plan . . . discharges the debtor from any debt that

15  arose before the date of such confirmation."  11 U.S.C. § 1141(d)(1).  The Confirmation Order in

16  this case specified that discharge would take effect upon the Effective Date, which ultimately

17  occurred on July 1, 2020.  (See Bankruptcy Case, ECF No. 8252, Notice Regarding Entry of

18  Confirmation Order and Occurrence of Effective Date, at 2, ¶ 2.)

19       Section 524 of the Bankruptcy Code provides in relevant part that a "discharge"

20           (1) voids any judgment at any time obtained, to the extent that such
21           judgment is a determination of the personal liability of the debtor
             with respect to any debt discharged under section . . . 1141 . . . of
22           this title, whether or not discharge of such debt is waived; [and]

23           (2) operates as an injunction against the commencement or
24           continuation of an action, the employment of process, or an act, to
             collect, recover or offset any such debt as a personal liability of the
25           debtor, whether or not discharge of such debt is waived . . . .

---

26  [13]    The jointly administered bankruptcy cases were filed out of concerns over the utility
    companies' potential liability for causing wildfires that ravaged California in 2017 and 2018.
27  Under the terms of the since-confirmed Chapter 11 Plan of Reorganization, PG&E and PG&E
    Corporation agreed, among other things, to contribute billions of dollars to certain newly
28  established fire trusts and funds.

1    11 U.S.C. § 524(a).  "Once a discharge is entered, the permanent injunction of § 524 replaces the

2    automatic stay of [11 U.S.C.] § 362 and prevents creditors from ever collecting a discharged

3    debt." In re Howes, 246 B.R. 280, 290 (Bankr. W.D. Ky. 2000) (emphasis and internal quotation

4    marks omitted).

5        "In this context, a debt is defined as liability on a claim," In re Jackson, 2017 WL

6    2371111, at *4 (Bankr. D. Conn. May 30, 2017), and the term "claim" means "right to payment,

7    whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent,

8    matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," 11 U.S.C.

9    § 101(5)(A).  "For purposes of the discharge in bankruptcy, a claim arises at the time of the

10   events giving rise to the claim, not at the time plaintiff is first able to file suit on the claim." In re

11   Lombard Flats, LLC, 2014 WL 3963009, at *7 (N.D. Cal. Aug. 13, 2014) (citing In re Heilman,

12   430 B.R. 213, 219-20 (9th Cir. B.A.P. 2010)).

13       Here, plaintiff filed this action against PG&E (and the other defendants) in January 2021,

14   some six months after the bankruptcy discharge became effective on July 1, 2020.  However, all

15   of the claims this action asserts against PG&E assert a legal right to payment based on events that

16   concluded, at the latest, in August 2017—before the bankruptcy petition.  Although precise dates

17   are not given for the adverse employment actions underlying each of the employment-related

18   causes of action against PG&E, all are alleged to have occurred before plaintiff transferred out of

19   the Supply Chain department on August 7, 2017.  (FAC ¶ 35(a)-(h) ("Adverse Employment

20   Actions"); ¶ 38, incorporating Adverse Employment Actions into COA #1; ¶ 47, same for

21   COA #2; ¶¶ 56-60, alleging gender discrimination during 2013 hiring process and while working

22   for Schultz for COA #3; ¶¶ 68-70, alleging retaliation for opposing above discrimination for

23   COA #4; ¶¶ 84-85, alleging unequal pay until Aug. 7, 2017, for COA #6.)  Thus, any claim

24   plaintiff held against PG&E for these causes of action arose well before PG&E filed its

25   Chapter 11 bankruptcy petition in January 2019; and PG&E's liability on those claims—i.e., its

26   "debt" to plaintiff—was discharged on the Chapter 11 Plan effective date of July 1, 2020.

27       By statute, this discharge automatically enjoined "the commencement or continuation of

28   an action, the employment of process, or an act, to collect, recover or offset" that pre-petition

1    debt. 11 U.S.C. § 524(a)(2).  In addition, the Bankruptcy Court issued its own discharge

2    injunction, as permitted by 11 U.S.C. § 524(g)(1)(A) ("After notice and hearing, a court that

3    enters an order confirming a plan of reorganization under chapter 11 may issue, in connection

4    with such order, an injunction in accordance with this subsection to supplement the injunctive

5    effect of a discharge under this section.").  As stated in the Confirmation Order and the identically

6    worded provision of the Chapter 11 Plan, "[u]pon the Effective Date, all holders of Claims

7    against or Interests in the Debtors shall be forever precluded and enjoined, pursuant to

8    section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim

9    against or Interest in the Debtors."  (Bankruptcy Case, ECF No. 8053 at 47, ¶ 49; Bankruptcy

10   Case, ECF No. 8053.1 at 81, § 10.3.)  The Confirmation Order and the Chapter 11 Plan further

11   specify that (again subject to inapplicable exceptions) as of the entry of the Confirmation Order

12   and "subject to the occurrence of the Effective Date":

13            [A]ll Entities who have held, hold, or may hold Claims[14] or
14            Interests are, with respect to any such Claim or Interest,
              **permanently enjoined** after the entry of the Confirmation Order
15            from: **(i)** commencing, conducting, or continuing in any manner,
              directly or indirectly, any suit, action, or other proceeding of any
16            kind (including, any proceeding in a judicial, arbitral,
              administrative, or other forum) against or affecting, directly or
17            indirectly, a Debtor, . . . ; and **(v)** commencing or continuing, in any
              manner or in any place, any action that does not comply with or is
18            inconsistent with the provisions of the Plan . . . .

19

20   (Bankruptcy Case, ECF No. 8053 at 48-49, ¶ 52(a) (emphasis added); Bankruptcy Case, ECF

21   No. 8053.1 at 82, § 10.6(a).)

22            These provisions of the Chapter 11 Plan and Confirmation Order were highlighted in

23   PG&E's March 2021 Notification of Plan Effective Date, filed in the state court in this action.

24   (ECF No. 23.2 at 3.)  The Notification of Plan Effective Date stated that none of the specific

25   limited exceptions in the Plan "apply to the claim or claims asserted against PG&E in this action,"

26   _____

27   14    The Chapter 11 Plan defines "Entities" and "Claims" the same way the Bankruptcy Code
     does.  (Bankruptcy Case, ECF No. 8053.1 at 12, ¶ 1.25 and 15, ¶ 1.61.)  See 11 U.S.C. §§ 101(5)
28   (definition quoted above), 101(15) ("The term 'entity' includes person, estate, trust, governmental
     unit, and United States trustee.").

1    and accordingly "the Plan injunction applies to and enjoins the continued prosecution of this

2    action except pursuant to the plan and the Chapter 11 claims reconciliation process." (Id. at 4

3    (emphasis omitted).)  Therefore, both the statutory and case-specific discharge injunctions block

4    plaintiff from prosecuting her current claims against PG&E.  (See Bankruptcy Case, ECF

5    No. 8053 at 48-49, ¶ 52(a) (permanently enjoining the "commencing, conducting, or continuing

6    in any manner . . . any suit . . . against . . . a Debtor").)  See 11 U.S.C. § 524(a)(2) (discharge

7    "operates as an injunction against the ***commencement or continuation of an action***, the

8    employment of process, or an act, to collect, recover or offset" a discharged debt (emphasis

9    added)).

10          Although no Ninth Circuit decision addresses whether a district court has jurisdiction over

11   claims that were discharged in bankruptcy before being filed in district court, its precedent

12   strongly suggests that jurisdiction is absent.  Cases addressing the self-executing automatic stay

13   imposed by 11 U.S.C. § 362(a) upon the filing of a bankruptcy petition make clear that "actions

14   taken in violation of the automatic stay are void."  In re Gruntz, 202 F.3d 1074, 1082 (9th Cir.

15   2000) (en banc) (citing Schwartz v. United States (In re Schwartz), 954 F.2d 569, 571 (9th Cir.

16   1992)).  More particularly, "***[j]udicial proceedings*** in violation of th[e] automatic stay are void."

17   Id. (quoting Phoenix Bond & Indemnity Co. v. Shamblin (In re Shamblin), 890 F.2d 123, 125

18   (9th Cir. 1989) (emphasis and alterations in Schwartz)).  In In re Schwartz, the Ninth Circuit

19   clarified that "violations of the automatic stay are void, not voidable," 954 F.2d at 571, meaning

20   that such violations need not be affirmatively challenged by the debtor—but are simply void from

21   the start.

22          As later noted by the Ninth Circuit's Bankruptcy Appellate Panel ("BAP"), "[t]he term

23   'void' is [] a term of art with a long history in the law of judgments that equates with the concept

24   of a nullity associated with lack of jurisdiction . . . ."  In re Gurrola, 328 B.R. 158, 164 (9th Cir.

25   B.A.P. 2005).[15]  Drawing on the above precedent regarding the automatic stay, and after

26   ───────────────

27   [15]    Although decisions by the BAP are not binding on district courts or the court of appeals,
     "BAP opinions may be 'persuasive and aid [courts in their] reading of the Bankruptcy Code."
28   Shapiro v. Henson, 739 F.3d 1198, 1201 n.3 (9th Cir. 2014) (quoting In re Healthcentral.com, 504
     F.3d 775, 784 n.3 (9th Cir. 2007)).

1    extensively detailing the legislative history of § 524(a)'s discharge injunction provision, the BAP

2    concluded in In re Gurrola that judgments entered in violation of a discharge injunction were also

3    void from the start, just like judgments entered in violation of an automatic stay.  328 B.R. at 171.

4    Crucially for present purposes, the BAP held that both "judgments *and acts* in violation of the

5    [§ 524] injunction are automatically *void ab initio*, hence self-executing, for the same reasons as

6    the [§ 362] automatic stay."  Id. at 175 (emphases added) (citations omitted).

7         Because plaintiff's present claims against PG&E arose pre-petition, they were discharged

8    as of July 1, 2020 and are subject to the § 524 discharge injunction prohibiting the

9    "commencement or continuation of an action, the employment of process, or an act, to collect,

10   recover or offset" a discharged debt.  11 U.S.C. § 524(a)(2).  As previously found in denying

11   remand, plaintiff's service of process on PG&E therefore violated the discharge injunction.  (ECF

12   No. 27 at 13-14.)  Continuing "judicial proceedings" on the claims against PG&E would likewise

13   violate the discharge injunction and be considered void.  See In re Schwartz, 954 F.2d at 571

14   (alteration omitted).

15        Accordingly, at least one sister district court has concluded that a "bankruptcy discharge

16   acts as a jurisdictional bar to suit."  Stewart v. Stoller, 2014 WL 585442, at *3 (D. Utah Feb. 14,

17   2014) (adopting recommendation to dismiss debtor as defendant for lack of jurisdiction, based on

18   information in case status report about prior Chapter 7 discharge).  This conclusion is supported

19   by the Ninth Circuit's statement, albeit in dicta, that a discharge judgment could have res judicata

20   effect, "if the creditor were to try to enforce the debt by bringing a post-discharge lawsuit, *but the*

21   *discharge injunction prevents him from even commencing the second suit* where the res

22   judicata issue could be litigated."  Espinosa v. United Student Aid Funds, Inc., 553 F.3d 1193,

23   1200 (9th Cir. 2008) (emphasis added), aff'd, 559 U.S. 260 (2010).

24        Taken all together, the above precedent demonstrates that the court lacks jurisdiction to

25   adjudicate the FAC's claims against PG&E, all of which arose before its bankruptcy petition and

26   were discharged before plaintiff brought suit, in violation of the ensuing discharge injunction.

27   The undersigned concludes, like the court in Stewart, that PG&E's Chapter 11 discharge

28   "effectively acts as a jurisdictional bar to the continuation of [plaintiff]'s claims against [it]," and

therefore recommends that PG&E be dismissed from the case.[16]  See 2014 WL 585442, at *3.

Because further amendment cannot cure this jurisdictional defect, the dismissal should be without

leave to amend.

**CONCLUSION**

As explained above, none of the claims in the FAC are suitable to proceed past the

pleadings stage.  Accordingly, the undersigned recommends dismissing the action in its entirety

and closing the case.

Therefore, it is HEREBY RECOMMENDED that:

1.      Defendant Silver's motion to dismiss (ECF No. 46) be GRANTED;

2.      Defendants Dujmovich and Schultz's motion to dismiss (ECF No. 48) be GRANTED;

3.      All claims against defendants Dujmovich, Schoenfeld, Schultz, and Silver be

        dismissed with prejudice for failure to state a claim;

4.      All claims against defendant PG&E be dismissed for lack of subject matter

        jurisdiction; and

5.      The Clerk of the Court be directed to CLOSE this case.

These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14)

days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served on all parties and filed with the court within fourteen (14) days after service of the

objections.  The parties are advised that failure to file objections within the specified time may

////

////

////

////

---

[16]      The court invites plaintiff to show cause, in any objections to these findings and
recommendations, why the court does have jurisdiction to hear her claims against PG&E.

waive the right to appeal the District Court's order.  <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

Dated:  August 9, 2022

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/gian.0477

23